**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BANK MIDWEST, a division of NBH Bank,<br><br>Plaintiff,<br><br>v.<br><br>TIG QUESO LLC, QUESO TIME DE 1 LLC, QUESO TIME DE 2 LLC, QUESO TIME DE 3 LLC, QUESO TIME DE 4 LLC, QUESO TIME DE 5 LLC, QUESO TIME TPA1 LLC, QUESO TIME TPA2 LLC, QUESO TIME TPA3 LLC, QUESO TIME NJ 1 LLC, QUESO TIME NJ 10 LLC, QUESO TIME NJ 11 LLC, QUESO TIME NJ 12 LLC, QUESO TIME NJ 17 LLC, QUESO TIME NJ 2 LLC, QUESO TIME NJ 20 LLC, QUESO TIME NJ 3 LLC, QUESO TIME NJ 4 LLC, QUESO TIME NJ 5 LLC, QUESO TIME NJ 6 LLC, QUESO TIME NJ 9 LLC, QUESO TIME NJ 15 LLC, QUESO TIME NJ 18 LLC, QUESO TIME NJ 19 LLC, QUESO TIME NJ 21 LLC, QUESO TIME NJ 22 LLC, QUESO TIME NY 1 LLC, QUESO TIME NY 2 LLC, QUESO TIME NY 3 LLC, QUESO TIME NY 4 LLC, QUESO TIME PA 1 LLC, QUESO TIME PA 10 LLC, QUESO TIME PA 11 LLC, QUESO TIME PA 2 LLC, QUESO TIME PA 3 LLC, QUESO TIME PA 6 LLC, QUESO TIME PA 7 LLC, QUESO TIME PA 8 LLC, QUESO TIME PA 9 LLC, QUESO TIME PA 12 LLC, TIG QUESO NY LLC, TIG QUESO DE LLC, TIG QUESO NJ LLC, TIG QUESO PA LLC, and TIG QUESO FL LLC,<br><br>Defendants. | Case No. 2:26-cv-5612 |

**VERIFIED COMPLAINT**

Bank Midwest, a division of NBH Bank ("Plaintiff" or "Lender"), files this Complaint against TIG QUESO LLC, QUESO TIME DE 1 LLC, QUESO TIME DE 2 LLC, QUESO TIME

DE 3 LLC, QUESO TIME DE 4 LLC, QUESO TIME DE 5 LLC, QUESO TIME TPA1 LLC, QUESO TIME TPA2 LLC, QUESO TIME TPA3 LLC, QUESO TIME NJ 1 LLC, QUESO TIME NJ 10 LLC, QUESO TIME NJ 11 LLC, QUESO TIME NJ 12 LLC, QUESO TIME NJ 17 LLC, QUESO TIME NJ 2 LLC, QUESO TIME NJ 20 LLC, QUESO TIME NJ 3 LLC, QUESO TIME NJ 4 LLC, QUESO TIME NJ 5 LLC, QUESO TIME NJ 6 LLC, QUESO TIME NJ 9 LLC, QUESO TIME NJ 15 LLC, QUESO TIME NJ 18 LLC, QUESO TIME NJ 19 LLC, QUESO TIME NJ 21 LLC, QUESO TIME NJ 22 LLC, QUESO TIME NY 1 LLC, QUESO TIME NY 2 LLC, QUESO TIME NY 3 LLC, QUESO TIME NY 4 LLC, QUESO TIME PA 1 LLC, QUESO TIME PA 10 LLC, QUESO TIME PA 11 LLC, QUESO TIME PA 2 LLC, QUESO TIME PA 3 LLC, QUESO TIME PA 6 LLC, QUESO TIME PA 7 LLC, QUESO TIME PA 8 LLC, QUESO TIME PA 9 LLC, QUESO TIME PA 12 LLC, TIG QUESO NY LLC, TIG QUESO DE LLC, TIG QUESO NJ LLC, TIG QUESO PA LLC, TIG QUESO FL LLC (collectively, "Queso Borrower" or "Defendants"), showing the Court as follows:

## INTRODUCTION

Queso Borrower is the owner and operator of 41 Qdoba locations in Pennsylvania, New Jersey, New York, Delaware and Florida. In April 2025, Queso Borrower obtained $20 million in loans from Plaintiff, secured by all of Queso Borrower's assets, including their Qdoba locations, and guaranteed by Manisha Patel.

Unbeknownst to Plaintiff, just three (3) months following the loans to Queso Borrower, Queso Borrower ran into trouble with the franchisor, Qdoba Franchisor LLC ("Qdoba Franchisor"). Also unbeknownst to Plaintiff, Queso Borrower failed to pay $1,053,885.50 in royalty fees, National Marketing Fund fees and rent to Qdoba Franchisor. Thereafter, again without informing Plaintiff, Queso Borrower entered into a workout agreement with Qdoba

Franchisor agreeing to the termination of the franchise agreements between Qdoba Franchisor and Queso Borrower, thereby agreeing to effectively destroy all value of Plaintiff's collateral. During this same period, Queso Borrower failed to pay sales taxes, with over $1 million in past due sales taxes now owed. All the while, Queso Borrower has failed to provide financial statements and other information to Plaintiff as and when due under the loan documents, further disguising Queso Borrower's liquidity problems from Plaintiff.

Further, on August 4, 2026, Lender learned that approximately $300,000 was diverted from Queso Borrower's bank account(s) to unknown transferees for unknown purposes. At the same time, notwithstanding a lack of sufficient funds in its bank account, Queso Borrower is writing payroll checks on August 3 and 4, 2026, and hoping that sufficient funds are received from receivables before employees attempt to cash the checks. Further, Queso Borrower is not paying rent as and when due, is not paying debt service, is not paying royalty and marketing fees, and accounts payables continues to accrue.

Queso Borrower is in default under its loan documents. Queso Borrower agreed that, in the event of a default, Plaintiff is entitled to the appointment of a receiver. Accordingly, and as set forth in more detail below, Plaintiff seeks repayment of the amounts owed by Defendants under the respective loan documents and the appointment of a receiver over Queso Borrower and all of its businesses and assets wherever located. Absent the immediate appointment of a receiver with the power to manage and operate Queso Borrower's assets and business and to sell its assets, Plaintiff's collateral is at immediate risk and will likely continue to deteriorate. A receiver is necessary to ensure that revenues of Plaintiff's collateral are being properly used to operate, preserve and protect Plaintiff's collateral and to sell Plaintiff's collateral. A receiver is further warranted and necessary to oversee Queso Borrower's operations and ensure that continuity of

Queso Borrower's operations through the completion of a sale of Queso Borrower's assets, which sale is currently contemplated and under negotiation by Queso Borrower. Absent immediate appointment of a receiver, the restaurants may close, franchisor(s) may terminate franchise agreements and all of Lender's collateral value will dissipate. Queso Borrower agreed that under these precise circumstances Plaintiff is entitled to a receiver. For the reasons set forth below, Plaintiff requests that the Court immediately appoint a receiver and enter judgment in favor of Plaintiff against Defendants in the amounts owed under the loan documents.

**Parties, Jurisdiction and Venue**

1. Plaintiff is a division of NBH Bank, a Colorado corporation with its principal place of business at 7800 E Orchard Road, Suite 300, Greenwood Village, Colorado.

2. TIG QUESO LLC is a Delaware limited liability company. TIG QUESO LLC may be served with process by serving its registered agent, Manisha Patel, at 416 S Ridge Ave, Middletown Delaware.

3. QUESO TIME DE 1 LLC is a Delaware limited liability company. QUESO TIME DE 1 LLC may be served with process by serving its registered agent, Raj Maha Devia, at 416 S Ridge Ave, Middletown, Delaware 19709.

4. QUESO TIME DE 2 LLC is a Delaware limited liability company. QUESO TIME DE 2 LLC may be served with process by serving its registered agent, Raj Maha Devia, at 416 S Ridge Ave, Middletown, Delaware 19709.

5. QUESO TIME DE 3 LLC is a Delaware limited liability company. QUESO TIME DE 3 LLC may be served with process by serving its registered agent, Raj Maha Devia, at 416 S Ridge Ave, Middletown, Delaware 19709.

6. QUESO TIME DE 4 LLC is a Delaware limited liability company. QUESO TIME DE 4 LLC may be served with process by serving its registered agent, Raj Maha Devia, at 416 S Ridge Ave, Middletown, Delaware 19709.

7. QUESO TIME DE 5 LCC is a Delaware limited liability company. QUESO TIME DE 5 LCC may be served with process by serving its registered agent, Raj Maha Devia, at 416 S Ridge Ave, Middletown, Delaware 19709.

8. QUESO TIME TPA1 LLC is a Florida limited liability company. QUESO TIME TPA1 LLC may be served with process by serving its registered agent, Manisha Patel, at 2550 S Falkenburg Road, Tampa, Florida 33619.

9. QUESO TIME TPA2 LLC is a Florida limited liability company. QUESO TIME TPA2 LLC may be served with process by serving its registered agent, Manisha Patel, at 11335 Canopy Loop, Fort Myers, Florida 33913.

10. QUESO TIME TPA3 LLC is a Florida limited liability company. QUESO TIME TPA3 LLC may be served with process by serving its registered agent, Manisha Patel, at 11335 Canopy Loop, Fort Myers, Florida 33913.

11. QUESO TIME NJ 1 LLC is a New Jersey limited liability company. QUESO TIME NJ 1 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

12. QUESO TIME NJ 10 LLC is a New Jersey limited liability company. QUESO TIME NJ 10 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

13. QUESO TIME NJ 11 LLC is a New Jersey limited liability company. QUESO TIME NJ 11 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

14. QUESO TIME NJ 12 LLC is a New Jersey limited liability company. QUESO TIME NJ 12 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

15. QUESO TIME NJ 17 LLC is a New Jersey limited liability company. QUESO TIME NJ 17 LLC may be served with process by serving its registered agent, Manisha Patel, at 393 N State Rt 17, Paramus, New Jersey 07652.

16. QUESO TIME NJ 2 LLC is a New Jersey limited liability company. QUESO TIME NJ 2 LLC may be served with process by serving its registered agent, Manisha Patel, at 55 Rockafeller Rd Ste 10, Piscataway, New Jersey 08854.

17. QUESO TIME NJ 20 LLC is a New Jersey limited liability company. QUESO TIME NJ 20 LLC may be served with process by serving its registered agent, Manisha Patel, at 604 Bartholomew Road, Piscataway, New Jersey 08854.

18. QUESO TIME NJ 3 LLC is a New Jersey limited liability company. QUESO TIME NJ 3 LLC may be served with process by serving its registered agent, Manisha Patel, at 2924 770 US Route 1 N, Iselin, New Jersey 08830.

19. QUESO TIME NJ 4 LLC is a New Jersey limited liability company. QUESO TIME NJ 4 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

20. QUESO TIME NJ 5 LLC is a New Jersey limited liability company. QUESO TIME NJ 5 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

21. QUESO TIME NJ 6 LLC is a New Jersey limited liability company. QUESO TIME NJ 6 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

22. QUESO TIME NJ 9 LLC is a New Jersey limited liability company. QUESO TIME NJ 9 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

23. QUESO TIME NJ 15 LLC is a New Jersey limited liability company. QUESO TIME NJ 15 LLC may be served with process by serving its registered agent, Manisha Patel, at 1951 E Edgar Rd, Linden, New Jersey 07036.

24. QUESO TIME NJ 18 LLC is a New Jersey limited liability company. QUESO TIME NJ 18 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

25. QUESO TIME NJ 19 LLC is a New Jersey limited liability company. QUESO TIME NJ 19 LLC may be served with process by serving its registered agent, Manisha Patel, at 561 US Highway 1 Ste E7, Edison, New Jersey 08817.

26. QUESO TIME NJ 21 LLC is a New Jersey limited liability company. QUESO TIME NJ 21 LLC may be served with process by serving its registered agent, Manisha Patel, at 1070 White Horse Ave, Trenton, New Jersey 08610.

27. QUESO TIME NJ 22 LLC is a New Jersey limited liability company. QUESO TIME NJ 22 LLC may be served with process by serving its registered agent, Manisha Patel, at 3542 Broidy Road, McGuire AFB, New Jersey 08641.

28. QUESO TIME NY 1 LLC is a New York limited liability company. QUESO TIME NY 1 LLC may be served with process by serving its registered agent, Manisha Patel, at 2335 Richmond Avenue, Staten Island, New York 10314.

29. QUESO TIME NY 2 LLC is a New York limited liability company. QUESO TIME NY 2 LLC may be served with process by serving its registered agent, Manisha Patel, at 7001 Amboy Road, Unit 106, Staten Island, New York 10307.

30. QUESO TIME NY 3 LLC is a New York limited liability company. QUESO TIME NY 3 LLC may be served with process by serving its registered agent, Manisha Patel, at 1275 Woodrow Road, Staten Island, New York 10309.

31. QUESO TIME NY 4 LLC is a New York limited liability company. QUESO TIME NY 4 LLC may be served with process by serving its registered agent, Manisha Patel, at 2750-A Hylan Blvd, Staten Island, New York 10306.

32. QUESO TIME PA 1 LLC is a Pennsylvania limited liability company. QUESO TIME PA 1 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

33. QUESO TIME PA 10 LLC is a Pennsylvania limited liability company. QUESO TIME PA 10 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

34. QUESO TIME PA 11 LLC is a Pennsylvania limited liability company. QUESO TIME PA 10 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

35. QUESO TIME PA 2 LLC is a Pennsylvania limited liability company. QUESO TIME PA 2 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

36. QUESO TIME PA 3 LLC is a Pennsylvania limited liability company. QUESO TIME PA 3 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

37. QUESO TIME PA 6 LLC is a Pennsylvania limited liability company. QUESO TIME PA 6 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

38. QUESO TIME PA 7 LLC is a Pennsylvania limited liability company. QUESO TIME PA 7 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

39. QUESO TIME PA 8 LLC is a Pennsylvania limited liability company. QUESO TIME PA 8 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

40. QUESO TIME PA 9 LLC is a Pennsylvania limited liability company. QUESO TIME PA 9 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

41. QUESO TIME PA 12 LLC is a Pennsylvania limited liability company QUESO TIME PA 12 LLC may be served with process by serving its registered agent, Manisha Patel, at 406 Executive Dr, Langhorne, Pennsylvania 19047.

42. TIG QUESO NY LLC is a Delaware limited liability company. TIG QUESO LLC may be served with process by serving its registered agent, Manisha Patel

43. TIG QUESO DE LLC is a Delaware limited liability company. TIG QUESO DE LLC may be served with process by serving its registered agent, Manisha Patel, at 211 S Main Street, Suite 101, Newark, Delaware 19711.

44. TIG QUESO NJ LLC is a Delaware limited liability company. TIG QUESO NJ LLC may be served with process by serving its registered agent, Manisha Patel, at 416 S Ridge Ave., Middletown, Delaware 19709.

45. TIG QUESO PA LLC is a Delaware limited liability company. TIG QUESO PA LLC may be served with process by serving its registered agent, Manisha Patel, at 416 S Ridge Ave., Middletown, Delaware 19709.

46. TIG QUESO FL LLC is a Delaware limited liability company. TIG QUESO FL LLC may be served with process by serving its registered agent, Manisha Patel, at

47. In the Queso Loan Agreement (defined below), Queso Borrower agreed to accept service by mail to Manisha Patel, at 416 S Ridge Ave, Middletown, Delaware 19709 with a copy to Albert M. Belmont, III, Bochetto & Lentz, P.C., 1524 Locust Street, Philadelphia, Pennsylvania 19102. (Queso Loan Agreement, § 8.12.)

48. In the Queso Loan Agreement, Queso Borrower agreed to the jurisdiction and venue of this Court. Specifically, Queso Borrower agreed that "nothing in this Agreement shall limit or restrict Lender's right to commence any proceeding in the federal or state courts located

in the state in which a particular Site is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under any Loan Document." (Queso Loan Agreement, § 8.12.)

49. Queso Borrower further "irrevocably waive[d] any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions." (Queso Loan Agreement, § 8.12.)

50. A Queso Borrower site is located at 2669 Macarthur Road, Whitehall, Pennsylvania.

51. Accordingly, Defendants agreed to jurisdiction and venue in this Court.

52. Additionally, pursuant to 28 U.S.C. § 1332, Defendants are subject to the jurisdiction and venue of this Court because Defendants are not citizens of any State of which Plaintiff is a citizen such that there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Each entity comprising Queso Borrower are owned by Manisha Patel and Jiger Patel, both of whom are domiciled in Pennsylvania. Plaintiff is domiciled in Colorado.

53. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this Court.

## STATEMENT OF RELEVANT FACTS

### The Queso Loan Documents

54. In April 2025, Plaintiff made a loan to Queso Borrower in the original principal amount of $10,000,000.00 (the "Queso Term Loan") evidenced by that certain Term Loan A Note dated April 14, 2025 (as amended and/or modified, the "Queso Term Note") executed by Queso

Borrower in favor of Plaintiff. A true and correct copy of the Queso Term Note is attached hereto as **Exhibit A**.

55. Also in April 2025, Plaintiff made a loan to Queso Borrower in the original principal amount of $10,000,000.00 (the "Queso DLOC Loan") evidenced by that certain DLOC A Note dated April 14, 2025 (as amended and/or modified, the "Queso DLOC Note", together with the Queso Term Note, the "Queso Notes") executed by Queso Borrower in favor of Plaintiff. A true and correct copy of the Queso DLOC Note is attached hereto as **Exhibit B**.

56. On or about April 14, 2025, Queso Borrower and Plaintiff executed that certain Loan Agreement (the "Queso Loan Agreement"). A true and correct copy of the Queso Loan Agreement is attached hereto as **Exhibit C**.

57. On or about April 14, 2025, Queso Borrower executed that certain Security Agreement (the "Queso Security Agreement") in favor Plaintiff and granted Plaintiff a first-priority security interest in all of Queso Borrower's assets. A true and correct copy of the Queso Security Agreement is attached hereto as **Exhibit D**.

58. On or about April 14, 2025, Manisha Patel ("Guarantor") executed that certain Guaranty in favor of Plaintiff (the "Queso Guaranty"), guarantying all amounts owed by Queso Borrower to Lender. A true and correct copy of the Queso Guaranty is attached hereto as **Exhibit E**.

59. On or about November 13, 2025, Queso Borrower, Guarantor and Lender executed that certain Loan Assumption and First Modification Agreement (the "Queso Modification Agreement", together with the Queso Term Note, Queso DLOC Note, Queso Loan Agreement, Queso Security Agreement and Queso Guaranty, together with all documents executed in

connection therewith and/or related thereto are collectively, the "Queso Loan Documents"). A true and correct copy of the Queso Modification Agreement is attached hereto as **Exhibit F**.

**The Defaults Under the Queso Loan Documents**

60. Pursuant to Section 5.6 of the Queso Loan Agreement, Queso Borrower agreed that no Credit Party (as defined in the Queso Loan Agreement) shall agree to any amendment of the Franchise Agreement (as defined in the Queso Loan Agreement) that could reasonably be expected to adversely affect the rights, privileges and remedies of Lender and agreed to provide Lender a copy of any amendments to the Franchise Agreement promptly following execution. (Queso Loan Agreement, § 5.6.)

61. Pursuant to Section 6.1(c) of the Queso Loan Agreement, a violation of any provision of Article 5 of the Loan Agreement is an Event of Default.

62. Pursuant to the Queso Loan Agreement, Queso Borrower is required to do the following:

a. comply with and perform all of its obligations under each Franchise Agreement, and give Lender prompt written notice of the occurrence of any default by any Credit Party under such Franchise Agreement and of any notice of default given to any Credit Party by Franchisor (Queso Loan Agreement, § 4.7);

b. keep each Franchise Agreement in full force and effect such that each Franchise Agreement will not expire prior to the Credit Facilities Maturity Date (Queso Loan Agreement, § 4.7);

c. for each Leased Site, Borrower will timely comply with and perform all of lessee's obligations under each Lease, and will give Lender prompt written notice of the

occurrence of any default by Borrower and of any notice of default given to any Credit Party by Lessor (Queso Loan Agreement, § 4.8);

d. Borrower shall at all times occupy each Site and diligently operate its business at each Site as the Permitted Concept (Queso Loan Agreement, § 4.9);

e. within 45 days after the end of each Fiscal Quarter of Borrower, Borrower shall deliver to Lender complete Financial Statements for the Fiscal Quarter then ended (Queso Loan Agreement, § 4.15(a)(i));

f. within 45 days after the end of each Fiscal Quarter of Borrower, Borrower shall deliver to Lender bank and brokerage statements evidencing liquidity of Guarantor for the Fiscal Quarter then ended (Queso Loan Agreement, § 4.15(a)(ii));

g. within 120 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Borrower for the Fiscal Year then ended (Queso Loan Agreement, § 4.15(b)(i));

h. within 45 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Guarantor for the Fiscal Year then ended (Queso Loan Agreement, § 4.15(b)(ii));

i. within 15 days following Lender's written request, Borrower shall deliver to Lender such additional Financial Statements and information (financial or otherwise) as Lender may reasonably request (Queso Loan Agreement, § 4.15(e));

j. give prompt written notice to Lender of any action, event or condition of any nature that could reasonably be expected to have a Material Adverse Effect, or which, with notice or lapse of time or both, would constitute an event of default or default under

Case 8:26-cv-02460 Document 1 Filed 08/24/26 Page 15 of 26

any other instrument or agreement to which Borrower is a party (Queso Loan Agreement, § 4.17); and

k. no Credit Party shall, without the prior written consent of Lender, enter into any agreement to sell, assignment transfer or otherwise encumber or dispose of the Collateral to any Person (Queso Loan Agreement, § 5.8).

63. Under the Queso Loan Agreement, an Event of Default occurs when, among other things, any Credit Party fails to observe any of the covenants or obligations of the Queso Loan Agreement or any of the other Queso Loan Documents. (Queso Loan Agreement, § 6.1(c).)

64. On or about February 20, 2026, Qdoba Franchisor issued a notice of default and termination to Queso Borrower. Queso Borrower failed to timely cure their defaults (to the extent they were entitled to cure).

65. On or about March 12, 2026, Queso Borrower and Qdoba Franchisor executed that certain Workout Letter (the "Qdoba Workout Letter") wherein Queso Borrower acknowledged and agreed that Queso Borrower owed Qdoba Franchisor $1,053,885.50 in past due royalty fees (covering the period beginning with at least October 2025), past due National Marketing Fund fees, and past due rent. Queso Borrower also agreed to sell its interests in the Qdoba restaurants operated by Queso Borrower and acknowledged that Qdoba Franchisor is entitled to terminate the Franchise Agreements as a result of Queso Borrower's defaults.

66. Events of Default occurred under the Loan Agreement because, among other things (collectively, the "Queso Covenant Defaults"):

a. Borrower failed to timely comply with and perform all of its obligations under each Franchise Agreement, as evidenced by the Qdoba Workout Letter, and because

Borrower failed to make payments as and when due to Franchisor, including royalty, marketing, technology and rent payments due to Franchisor;

b. Borrower failed to keep each Franchise Agreement in full force and effect;

c. Borrower failed to timely comply with and perform all obligations under each Lease, and failed to provide Lender with prompt written notice of the occurrence of defaults under Leases;

d. Borrower failed to occupy each Site and diligently operate its business at each Site as a Permitted Concept, as Borrower closed Store 2693 in Collegeville, Pennsylvania without Lender's prior written consent;

e. Borrower failed to provide to Lender copies of Borrower's Financial Statements for Fiscal Year 2025, which are to be audited;

f. Borrower failed to provide to Lender complete bank and brokerage statements evidencing Guarantor's liquidity; and

g. Borrower entered into one or more agreements to sell or otherwise dispose of the Collateral without Lender's prior written consent.

67. Under the Queso Notes, Queso Borrower is obligated to make monthly interest payments on or before the first day of each month. (Queso Term Note, § 2(a); Queso DLOC Note, § 5(b).)

68. The Queso Loan Agreement further provides that an Event of Default occurs if "any Obligation for the payment of money is not paid (i) in the case of any scheduled monthly payments due under the Notes or any other regularly scheduled payments under the Loan Documents, within 10 days of the due date therefore (the 'Outside Payment Date')[.]" (Queso Loan Agreement, § 6.1(a).)

69. An Event of Default occurred under the Queso Loan Documents because Queso Borrower failed to pay the interest payment due July 1, 2026 (the "Queso Payment Default", together with the Queso Franchise Default and Queso Covenant Defaults, the "Queso Defaults").

70. On July 2, 2026, Lender notified Queso Borrower and Guarantor of the Queso Franchise Default and provided Queso Borrower and Guarantor an opportunity to cure the Queso Covenant Defaults. A true and correct copy of the July 2, 2026 letter is attached hereto as **Exhibit G**.

71. On July 10, 2026, Lender notified Queso Borrower and Guarantor of the Queso Defaults and demanded payment of all amounts that were due on July 1, 2026. A true and correct copy of the July 10, 2026 letter is attached hereto as **Exhibit H**.

72. On July 22, 2026, Lender again notified Queso Borrower and Guarantor of the Queso Defaults and that the indebtedness owed under the Queso Notes and Queso Loan Documents was accelerated. (The July 2, 2026, July 10, 2026 and July 22, 2026 letters from Lender the Queso Borrower and Guarantor are referred to collectively as the "Queso Letters.") A true and correct copy of the July 22, 2026 letter is attached hereto as **Exhibit I**.

73. Notwithstanding receipt of the Queso Letters, Queso Borrower and Guarantor failed to pay the amounts owed under the Queso Loan Documents or otherwise cure the Queso Defaults.

74. As of July 22, 2026, an amount not less than $18,318,768.44, consisting of principal in the amount of $18,073,388.09, unpaid accrued (non-default) interest in the amount of $170,145.80, unused line fee of $100.45, and late fees of $75,134.10, is owed under the Queso Loan Documents. Interest and attorneys' fees and expenses continue to accrue.

Case 8:26-cv-05612 Document 1 Filed 08/26/26 Page 18 of 26

**Basis to Appoint a Receiver Over Queso Borrower**

75. Compelling grounds exist for the immediate appointment of a receiver over Queso Borrower.

76. The Queso Events of Default are ongoing and have not been cured.

77. In the Queso Security Agreement, Queso Borrower agreed to the appointment of a receiver in precisely this scenario. Specifically, Queso Borrower agreed as follows:

> If an Event of Default shall have occurred and be continuing and in additional to any other rights and remedies, as matter of right and without notice to Debtor or anyone claiming under Debtor, and without regard to the then value of the UCC Collateral or the interest of Debtor therein, or the solvency of Debtor or the occurrence of any Event of Default described in Section 6.1(f) of the [Queso] Loan Agreement, lender may seek the appointment of a receiver for Debtor and/or any of the other Credit Parties and/or the UCC Collateral and, to the maximum extent permitted by law, for all other assets of Debtor and such other Credit Parties. Debtor and each other Credit Party waives any right to a hearing or notice of hearing prior to the appointment of a receiver and irrevocably consents to such appointment. Such receiver shall have all of the usual powers and duties of receivers in like or similar cases and all of the powers and duties of Lender in case of entry as provided above and shall continue as such and exercise all such powers until the later of the date of confirmation of sale of the UCC Collateral or the date of expiration of any redemption period, unless such receivership is sooner terminated. All expenses incurred by the receiver or its agents, including obligations to repay funds borrowed by the receiver, shall constitute a part of the Obligations. Any revenues collected by the receiver shall be applied first to the expenses of the receivership, including reasonable attorneys' fees incurred by the receiver and Lender, together with interest thereon at the Default Rate from the date incurred until paid, and the balance shall be applied toward the Obligations or in such other manner as the court may direct.

(Queso Security Agreement, § 8.)

78. The Queso Defaults are ongoing.

79. Queso Borrower's principal, Jiger Patel, is responsible for ensuring Queso Borrower complies with its obligations under the Queso Loan Documents and communicating with Lender.

80. Under Mr. Patel's leadership, Lender has not received adequate or timely reporting, resulting in a complete lack of transparency as to the status of its collateral.

81. Lender made the Queso Term Loan and Queso DLOC Loan in April of 2025, and unbeknownst to Lender, by as early as July of 2025, Queso Borrower was no longer in good standing with Qdoba Franchisor.

82. Queso Borrower did not inform Lender until July 2026, a year later, that it was not in good standing with Qdoba Franchisor.

83. On or about February 20, 2026, Qdoba Franchisor issued a notice of default and termination to Queso Borrower. Queso Borrower failed to timely cure their defaults (to the extent they were entitled to cure). Queso Borrower also failed to inform Lender of Queso Borrower's receipt of the default and termination letter from Qdoba Franchisor.

84. On or about March 12, 2026, Queso Borrower and Qdoba Franchisor executed that certain Workout Letter (the "Qdoba Workout Letter") wherein Queso Borrower acknowledged and agreed that Queso Borrower owed Qdoba Franchisor $1,053,885.50 in past due royalty fees (covering the period beginning with at least October 2025), past due National Marketing Fund fees, and past due rent. Queso Borrower also agreed to sell its interests in the Qdoba restaurants operated by Queso Borrower and acknowledged that Qdoba Franchisor is entitled to terminate the Franchise Agreements as a result of Queso Borrower's defaults.

85. In the Workout Letter, Queso Borrower acknowledged that it owed over $1 million in past due royalties, marketing fees and rent to Qdoba Franchisor and agreed to pay that amount

in three installment payments between March 20, 2026 and April 22, 2026. Queso Borrower also agreed to an April 22, 2026 termination date of the franchise agreements under which Lender's collateral was operating and to sell all of Queso Borrower's Qdoba restaurants.

86. Queso Borrower did not inform Lender of the Workout Letter or the consequences thereof or provide Lender with a copy of the Workout Letter until July 2026 and after Lender's written demand.

87. Around the same time that Queso Borrower failed to pay amounts owed to Qdoba Franchisor and entered into the Workout Letter, Queso Borrower stopped and/or failed to pay sales taxes. Currently, Queso Borrower owes over $1 million in unpaid sales taxes.

88. Only when Lender became generally aware of an amendment to the franchise agreements between Queso Borrower and Qdoba Franchisor and made repeated requests to Queso Borrower and Mr. Patel for more information did Queso Borrower provide a copy of the Workout Letter to Plaintiff.

89. Even more troubling, the financial information that was provided to Lender did not indicate that Queso Borrower's business operations were distressed or that Queso Borrower had a serious liquidity problem.

90. Though the Queso Loan Agreement required Queso Borrower to provide regular reporting and to respond to reasonable requests from Lender within fifteen (15) days, Mr. Patel did not maintain Queso Borrower's books and records in such a manner that accurate information could timely be provided to Lender.

91. Mr. Patel also negotiated two letters of intent with the same purchaser, one for the sale of eighteen (18) stores securing the indebtedness owed to Lender, and the other for sale of one (1) store securing indebtedness owed to another lender. Confoundingly, the purchase price for the

single store is five times greater than the purchase price for the 18 stores, leaving a significant deficiency owed to Lender and showing clear favoritism by Mr. Patel of the other lender.

92. Queso Borrower is pursuing a sale of its assets, but it is unclear what diligence has been provided to the purchasers. If purchasers do not timely receive due diligence information, the sale of Lender's collateral will be put in serious jeopardy.

93. In addition to its failure to comply with its obligations to Lender, Queso Borrower is not paying other obligations as and when due, including over $1,000,000 in unpaid sales taxes, over $1,000,000 (and climbing each week) in royalty, advertising, rent and other fees owed to Qdoba franchisor, rent to third-party landlords, over $300,000 owed to Door Dash, with over $3.6 million in accounts payable owed.

94. Further, notwithstanding Queso Borrower's recent engagement of a chief restructuring officer (the "CRO"), the CRO does not have treasury management control, does not have full visibility into or control over Queso Borrower's operations and remains reliant on Queso Borrower's existing management, including Mr. Patel, for information and documents such that Lender continues to not receive timely information. For example, Lender does not receive updated cash flow statements or budget-to-actual reporting. Mr. Patel continues to control all aspects of Queso Borrower, including finances and negotiations with potential buyers.

95. Even with the CRO in place, Lender still lacks any real visibility into Queso Borrower's financial position.

96. Further, Queso Borrower recently moved to paying payroll via check versus payment by direct deposit, presumably to add more of a buffer to collect sufficient revenues to pay the amounts owed before the checks are cashed, thereby jeopardizing Queso Borrower's continued employment of managers and other staff at the restaurant.

97. Even more concerning, Queso Borrower, apparently consultation with the CRO, is now issuing payroll checks without sufficient funds in its bank accounts to cover those checks. It is unclear how, given Queso Borrower's liquidity position, it is covering payroll obligations, rent, food and other critical operating expenses. Queso Borrower is apparently writing checks for the payroll obligations, and hoping that sufficient deposits are received before the checks clear. Failure to make payroll will put Queso Borrower's operations (and Lender's collateral) at severe risk of imminent harm, as employees are not likely to return to work if they do not timely receive the amounts owed to them. Similarly, failure to pay food vendors puts Lender's collateral at risk.

98. Lender also recently became aware that, over the last several weeks, while Queso Borrower's business has been in a state of distress, Queso Borrower, diverted approximately $300,000 from its bank account(s), which funds were transferred to unknown transferees for unknown purposes. This money could have been used to fund payroll or other operating expenses. Lender requested that Mr. Patel and the CRO provide an explanation of the missing funds, but has yet to receive a response.

99. In addition to payroll obligations, Queso Borrower is not complying with its obligations to Qdoba Franchisor and owes approximately $432,000 for August rent, including rent owed to Qdoba Franchisor, and, upon information and belief, does not have sufficient funds to pay rent and certain stores have reduced their hours.

100. Notwithstanding the foregoing, on July 31, 2026, Lender offered to provide $850,000 of emergency funding to ensure that payroll, rent and other operating expenses were timely paid. But Queso Borrower has been slow to respond to information requests from Lender in connection with the financing and has not signed the documents necessary to enable the funding. Lender is no longer willing to advance funds to Queso Borrower without the oversight of a receiver

to ensure that the funds are appropriately used to maintain Queso Borrower as a going concern until its assets can be sold.

101. Lender continues to make requests to Queso Borrower for information regarding Queso Borrower's operations, liquidity and financial status, which information should be readily available. Many of these requests go unanswered or Queso Borrower provides only partial responses.

102. Given the foregoing, the appointment of a receiver over Queso Borrower, its businesses and all of its assets, wherever located, is necessary to preserve and protect the collateral and to sell the collateral in an orderly and professional manner that maximizes the value of the collateral. It is Lender's understanding that Qdoba Franchisor is supportive of the appointment of a receiver.

**COUNT I**
**SUIT ON NOTE – QUESO NOTES**
**(Against Queso Borrower)**

103. The allegations contained in paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

104. Queso Borrower is in default under the Queso Notes and Queso Loan Documents.

105. Despite proper demand being made on Queso Borrower for payments of the amounts owed under the Queso Notes and Queso Loan Documents, Queso Borrower has failed and/or refused to make the payments required thereunder or otherwise cure the Queso Defaults.

106. As July 22, 2026, an amount not less than $18,318,768.44, consisting of principal in the amount of $18,073,388.09, unpaid accrued (non-default) interest in the amount of $170,145.80, unused line fee of $100.45, and late fees of $75,134.10, is owed under the Queso Loan Documents. Interest and attorneys' fees and expenses continue to accrue.

107. Plaintiff is also entitled to recover attorneys' fees and expenses incurred in connection with collection of the amounts owed under the Queso Loan Documents.

**COUNT II**
**APPOINTMENT OF RECEIVER – QUESO BORROWER**
**(Against Queso Borrower)**

108. The allegations contained in paragraphs 1 through 102 are incorporated by reference as if fully set forth herein.

109. This Court has the legal and equitable power to appoint a receiver.

110. Pursuant to Federal Rule of Civil Procedure 66, this Court is authorized to appoint a receiver over Queso Borrower and its businesses and assets.

111. The appointment of a receiver to take control of, manage and operate Queso Borrower and sell its assets is proper under the circumstances.

112. As a result of Queso Borrower's defaults under the Queso Loan Documents, Lender is entitled to the appointment of a receiver both under the express terms of the Queso Loan Documents and because equitable considerations weigh heavily in favor of such an appointment.

113. The Queso Defaults are ongoing and have not been cured.

114. Pursuant to Section 8 of the Queso Security Agreement, Queso Borrower agreed to and recognized Lender's right to the appointment of a receiver upon the occurrence of an Event of Default, with or without notice to Queso Borrower.

115. Because Queso Borrower consented to the appointment of a receiver following an Event of Default and because the Queso Defaults occurred and remain ongoing, Lender respectfully requests that the Court appoint a receiver over Queso Borrower.

116. In addition to Lender's contractual right to the appointment of a receiver, the appointment of a receiver is appropriate under the Court's equitable powers given Queso

Borrower's failure to cure the Queso Defaults, failure to pay obligations as and when due, including but not limited to sales taxes and franchise fees, and complete lack of transparency regarding Queso Borrower's financial condition.

117. Additionally, Queso Borrower entered into the Workout Agreement requiring it to pay Qdoba Franchisor over $1 million of past due fees and sell all of its restaurants and did not notify Lender of the Workout Agreement or provide a copy until months later.

118. Queso Borrower does not maintain its books and records in a sufficient form to be able to provide Lender with an accurate depictions of its financial status.

119. Furthermore, Queso Borrower is putting the going concern value of the operations, and Lender's collateral, at risk by writing checks for payroll notwithstanding a lack of sufficient funds in Queso Borrower(s) bank accounts, and hoping that sufficient deposits are received before employees try to cash the checks.

120. Even more, notwithstanding the appointment of a CRO, there are approximately $300,000 of unexplained transfers out of Queso Borrower(s) bank account.

121. As described in Lender's accompanying motion, a receivership is necessary and desirable to preserve, manage and operate Queso Borrower's assets, protect against loss and to conduct an orderly sale of Queso Borrower's assets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a) Against Queso Borrower, jointly and severally, for all amounts owed under the Queso Loan Documents, together with all interest accruing thereon through the date and entry of judgement;

Case 8:26-cv-05612 Document 1 Filed 08/06/26 Page 26 of 26

(b) For entry of an order appointing a receiver to take possession and control of Queso Borrower and its businesses and assets and to manage, operate and sell the assets, pending the completion of this case or further order of this Court;

(c) For Plaintiff's attorneys' fees and expenses of litigation;

(d) For post-judgment interest as provided by law;

(e) For all costs of court; and

(f) For such other and further relief as this Court deems just and proper.

Dated: August 6, 2026

Respectfully submitted,

/s/ *James E. Van Horn*______
James E. Van Horn
Pennsylvania Bar No. 88715
**Barnes & Thornburg LLP**
555 12th St NW, Suite 1200
Washington, DC 20004
Telephone: (202) 371-6531
JVanHorn@btlaw.com

Lisa Wolgast (pro hac forthcoming)
**Barnes & Thornburg LLP**
3340 Peachtree Road, N.E., Suite 2900
Atlanta, Georgia 30326-1092
Telephone: (470) 832-7535
Lisa.Wolgast@btlaw.com

*Attorneys for Bank Midwest, a division of NBH Bank*

**UNITED STATES DISTRICT COURT**
**EATERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA DIVISION**

BANK MIDWEST, a division of NBH Bank,

Plaintiff,

v.

TIG QUESO LLC, QUESO TIME DE 1 LLC, QUESO TIME DE 2 LLC, QUESO TIME DE 3 LLC, QUESO TIME DE 4 LLC, QUESO TIME DE 5 LLC, QUESO TIME TPA1 LLC, QUESO TIME TPA2 LLC, QUESO TIME TPA3 LLC, QUESO TIME NJ 1 LLC, QUESO TIME NJ 10 LLC, QUESO TIME NJ 11 LLC, QUESO TIME NJ 12 LLC, QUESO TIME NJ 17 LLC, QUESO TIME NJ 2 LLC, QUESO TIME NJ 20 LLC, QUESO TIME NJ 3 LLC, QUESO TIME NJ 4 LLC, QUESO TIME NJ 5 LLC, QUESO TIME NJ 6 LLC, QUESO TIME NJ 9 LLC, QUESO TIME NJ 15 LLC, QUESO TIME NJ 18 LLC, QUESO TIME NJ 19 LLC, QUESO TIME NJ 21 LLC, QUESO TIME NJ 22 LLC, QUESO TIME NY 1 LLC, QUESO TIME NY 2 LLC, QUESO TIME NY 3 LLC, QUESO TIME NY 4 LLC, QUESO TIME PA 1 LLC, QUESO TIME PA 10 LLC, QUESO TIME PA 11 LLC, QUESO TIME PA 2 LLC, QUESO TIME PA 3 LLC, QUESO TIME PA 6 LLC, QUESO TIME PA 7 LLC, QUESO TIME PA 8 LLC, QUESO TIME PA 9 LLC, QUESO TIME PA 12 LLC, TIG QUESO NY LLC, TIG QUESO DE LLC, TIG QUESO NJ LLC, TIG QUESO PA LLC, and TIG QUESO FL LLC,

Defendants.

Case No. 2:26-cv-5612

**VERIFICATION**

Under penalty of perjury and pursuant to 28 U.S.C. § 1746, I, Bobby R. Oliver, Jr., state and affirm that I am a Senior Managing Director of NBH Bank. Plaintiff Bank Midwest is a

division of NBH Bank. I have read the foregoing Verified Complaint and that the facts contained therein are true and correct to the best of my knowledge, information and belief based on my personal knowledge and/or the business records of Bank Midwest.

Dated: This ____ day of August, 2026.

______________________________
**BOBBY R. OLIVER, JR.**

vision of NBH Bank. I have read the foregoing Verified Complaint and that the facts contained erein are true and correct to the best of my knowledge, information and belief based on my rsonal knowledge and/or the business records of Bank Midwest.

Dated: This 6tth day of August, 2026.

**BOBBY R. OLIVER, JR.**

# TERM LOAN A NOTE

Dated as of April 14, 2025 (the "***Note Date***")

***Note Amount***: $10,000,000.00

**FOR VALUE RECEIVED**, **TIG QUESO, LLC**, a Delaware limited liability company, **TIG QUESO LLC**, a Delaware limited liability company, **QUESO TIME DE 1 LLC**, a Delaware limited liability company, **QUESO TIME DE 2 LLC**, a Delaware limited liability company, **QUESO TIME DE 3 LLC**, a Delaware limited liability company, **QUESO TIME DE 4 LLC**, a Delaware limited liability company, **QUESO TIME DE 5 LLC**, a Delaware limited liability company, **QUESO TIME TPA1 LLC**, a Florida limited liability company, **QUESO TIME TPA2 LLC**, a Florida limited liability company, **QUESO TIME TPA3 LLC**, a Florida limited liability company, **QUESO TIME NJ 1 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 10 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 11 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 12 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 17 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 2 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 20 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 3 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 4 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 5 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 6 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 9 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 15 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 18 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 19 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 21 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company, **QUESO TIME NY 1 LLC**, a New York limited liability company, **QUESO TIME NY 2 LLC**, a New York limited liability company, **QUESO TIME NY 3 LLC**, a New York limited liability company, **QUESO TIME NY 4 LLC**, a New York limited liability company, **QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company, **TIG QUESO NY LLC**, a Delaware limited liability company, **TIG QUESO DE LLC**, a Delaware limited liability company, **TIG QUESO NJ LLC**, a Delaware limited liability company, **TIG QUESO PA LLC**, a Delaware limited liability company, and **TIG QUESO FL LLC**, a Delaware limited liability company (collectively, "***Borrower***"), jointly and severally, promises to pay to the order of **BANK MIDWEST**, a division of NBH Bank, and its successors and assigns ("***Lender***"), the principal sum stated above as the Note Amount, or so much thereof as may have been advanced by Lender, with interest thereon, on the dates and at the rates and upon the terms and conditions specified below. This Term Loan A Note (this "***Note***") is the Term Loan A Note referred to in the Loan Agreement, dated the same date as this Note, between Borrower and Lender (as it may be amended, restated, supplemented, extended or renewed from time to time, the "***Loan Agreement***") and is being executed and delivered pursuant thereto (the loan made pursuant to this Note and the Loan Agreement being referred to in this Note as the "***Loan***"). Capitalized terms used in this Note and not defined in this Note have the meanings given to such terms in the Loan Agreement.

1. <u>Interest Rate</u>.

(a) Interest shall accrue on the unpaid principal balance of the Loan from the Note Date at the Interest Rate.

(b) All interest hereunder shall be computed on the basis of a 360-day year and the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder shall be computed on a daily basis based upon the outstanding principal amount of the Loan as of the applicable date of determination. Term SOFR and the Base Rate (and components thereof), as applicable shall be determined by Lender and such determination shall be conclusive absent manifest error.

(c) Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, (i) the administration, submission or any other matter related to the Base Rate, the Term SOFR Reference Rate, or Term SOFR or with respect to any rate that is an alternative or replacement for or successor to any such rate (including any Benchmark Replacement); (ii) any Benchmark Replacement Conforming Changes; or (iii) the effect of any of the foregoing (including whether any such alternative, replacement or successor rate will be similar to, or produce the same value or economic equivalence of, any of the foregoing rates or have the same volume or liquidity as did any such rate prior to its discontinuance or unavailability).

(d) Notwithstanding anything to the contrary set forth in this Note or any of the other Loan Documents, Term SOFR and Benchmark Replacement shall be subject to replacement in accordance with the terms and conditions of ***Exhibit A (Benchmark Replacement Setting)***.

(e) The following defined terms shall have the following meanings hereunder:

"***Base Rate***" means, for any day, a fluctuating rate per annum in effect for such day equal to the sum of the Spread plus the highest of (a) the "prime rate" as publicly announced for such day by JPMorgan Chase Bank, N.A. (or a successor source reasonably selected by Lender), and (b) the Federal Funds Rate plus one-half of one percent (0.5%). Any change in the Base Rate shall take effect without notice to Borrower from the effective date thereof.

"***Base Rate Period***" means, subject to ***Section 1(d)*** **(*Benchmark Replacement Setting*)** hereof, any period in which (a) SOFR, the Term SOFR Reference Rate, or Term SOFR is unavailable or cannot be determined in accordance with the definition thereof, or (b) any Applicable Law has made it unlawful, or any Governmental Authority has asserted that it is unlawful, for Lender or its applicable lending office to make or maintain the Loan whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, or Term SOFR, or to determine or charge rates based thereon. A Base Rate Period will be deemed to have occurred and continue to exist for any Interest Period in which any of the foregoing circumstances exist as of the related Periodic Term SOFR Determination Day (unless any Applicable Law requires that such Base Rate Period be deemed to have occurred immediately upon the occurrence of any of the foregoing events, in which case, it shall so be deemed to have occurred).

"***Benchmark Replacement***" is defined in ***Exhibit A***.

"***Benchmark Replacement Conforming Changes***" is defined in ***Exhibit A***.

"***Benchmark Replacement Date***" is defined in ***Exhibit A***.

"***Business Day***" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by Applicable Law to close.

"***Federal Funds Rate***" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"***Interest Period***" means each period from a Payment Date (or, in the case of the first Payment Date, from the Note Date) to the successive Payment Date; provided, however, any Interest Period which would otherwise extend beyond the Maturity Date shall end on the Maturity Date so long as all of the Obligations have been repaid by the Maturity Date.

"***Interest Rate***" means, subject to ***Section 1(d)*** and ***Section 7***, the rate per annum (expressed as a percentage) equal to Term SOFR for the Interest Period therefor plus the Spread; provided, that, during any Base Rate Period, "Interest Rate" shall mean the Base Rate.

"***Payment Date***" means the first day of each calendar month.

"***Periodic Term SOFR Determination Day***" has the meaning specified in the definition of "Term SOFR".

"***SOFR***" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"***SOFR Administrator***" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"***Spread***" means a rate of interest equal to three percent (3.00%).

"***Term SOFR***" means the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the first day of such Interest Period, provided however, if such day is not a U.S. Government Securities Business Day, the first U.S. Government Securities Business Day preceding such day (such day, the "***Periodic Term SOFR Determination Day***"), as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"***Term SOFR Administrator***" means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

"***Term SOFR Reference Rate***" means the rate per annum determined by Lender as the forward-looking term rate based on SOFR.

"***U.S. Government Securities Business Day***" means any day except for (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

2. Payments.

(a) Principal and Interest Payments. Interest on the Loan shall be paid in arrears. If the Note Date is not also a Payment Date, interest accrued on the Loan from the Note Date to the first Payment Date to occur after the Note Date is due and payable on such first Payment Date. Regular monthly payments of principal and interest (each, a "***Monthly Payment***") will commence and be due and payable on the second Payment Date to occur after the Note Date (unless the Note Date is also a Payment Date in which case Monthly Payments will commence on the first Payment Date to occur after the Note Date) and will continue on each Payment Date thereafter through the Payment Date occurring on May 1, 2030 (the "***Maturity Date***"). On the Maturity Date, in addition to the required Monthly Payment, Borrower shall also pay the entire remaining unpaid balance of the Loan, all accrued and unpaid interest to the Maturity Date, and any other amounts payable under this Note and the other Loan Documents. **BORROWER SPECIFICALLY**

**ACKNOWLEDGES AND AGREES THAT A SUBSTANTIAL PAYMENT WILL BE DUE ON THE MATURITY DATE.**

(b) Monthly Payment Amounts. Each Monthly Payment will equal (i) all accrued and unpaid interest, plus (ii) principal in an amount equal to the Monthly Principal Payment. "***Monthly Principal Payment***" means an amount determined by dividing the original principal amount of the Loan by the Amortization Period. "***Amortization Period***" means a period of 120 months that commences on the first Payment Date after the Note Date.

3. Prepayments.

(a) Generally. Except as may otherwise be expressly provided in this Note and the other Loan Documents, Borrower may not make any prepayment of the Loan except as follows: (i) prepayments must be made on a Payment Date (a "***Permitted Prepayment Date***"); (ii) Borrower must give Lender at least 30 days' prior written notice of the proposed prepayment; (iii) the prepayment must be for the full outstanding principal balance of this Note (except that partial prepayments are permitted in the case of (A) payments of Insurance Proceeds that are applied to principal on the Loan; and (B) other mandatory prepayments, if any, required pursuant to any of the Loan Documents and that are applied to principal on the Loan); and (iv) the prepayment must be accompanied by payment to Lender of the following: (A) interest on the prepaid principal through the Permitted Prepayment Date; (B) any and all costs, fees, and other expenses, including late fees, due and payable with respect to the Obligations. **PREPAYMENTS ARE ONLY ALLOWED ON PERMITTED PREPAYMENT DATES AND INTEREST ON THE PREPAYMENT AMOUNT MUST BE PAID THROUGH THE PERMITTED PREPAYMENT DATE. IF LENDER AGREES TO ACCEPT A PREPAYMENT ON A DATE OTHER THAN A PERMITTED PREPAYMENT DATE, THERE WILL BE NO REDUCTION IN THE AMOUNT OF INTEREST REQUIRED TO BE PAID AS PROVIDED ABOVE. ACCORDINGLY, AS A FURTHER CONDITION TO THE PREPAYMENT AND IN ADDITION TO ALL OTHER AMOUNTS PAYABLE IN RESPECT OF SUCH PREPAYMENT, BORROWER WILL PAY TO LENDER THE AMOUNT OF INTEREST THAT WOULD HAVE ACCRUED ON THIS NOTE, BUT FOR THE PREPAYMENT, FROM THE DATE OF PREPAYMENT TO THE NEXT PERMITTED PREPAYMENT DATE.**

(b) Intentionally Omitted.

(c) Application of Prepayment Amounts. Subject to the provisions of ***Section 1.6(c)*** of the Loan Agreement: (i) amounts paid pursuant to ***Section 3(a)(iv)*** shall be applied in payment of the amounts specified therein; (ii) all prepaid principal shall be applied to the unpaid principal balance of this Note; ***provided, however***, that any permitted partial prepayment of principal shall be applied to principal in the inverse order of maturity, such that the scheduled Monthly Payment amounts for the Loan otherwise calculated do not change; and (iii) all other payments pursuant to this Note shall be applied first to accrued and unpaid interest on this Note and the balance to reduction of principal on this Note, in the inverse order of maturity.

4. General Payment Provisions. All payments due pursuant to this Note shall be payable at the place and in the manner provided in ***Section 1.6*** of the Loan Agreement and otherwise in accordance with the provisions of that Section, which Section is incorporated herein by this reference.

5. Non-Conforming Payments. Credit to Borrower's account may be delayed if the payment is not made as provided above or if not accompanied by the correct invoice number. Lender may, at its sole option, refuse any amount tendered by Borrower that is not in the required form or in the exact amount of the required payment. Delayed credit may cause Borrower to incur a late payment fee. Credit for payments is subject to final payment by the institution on which the item of payment was drawn. **UNAUTHORIZED FORMS OF PAYMENT, SUCH AS CASH, CASHIER'S CHECKS, OFFICIAL BANK CHECKS, TELLER'S CHECKS, CERTIFIED CHECKS, TRAVELERS' CHECKS, AND MONEY ORDERS, ARE NOT ACCEPTABLE FORMS OF PAYMENT AND MAY BE RETURNED TO BORROWER AT BORROWER'S RISK OF LOSS**.

6. Disputed Payments. All written communication concerning disputed amounts, including any check or other payment instrument that (a) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (b) is tendered with other conditions or limitations must be mailed or delivered to Lender at the following address and not to the address shown on the invoice as the address for remitting payments, unless Lender otherwise directs: Bank Midwest, a division of NBH Bank, c/o NBH Bank, P.O. Box 26528, Kansas City, MO 64196-6528.

7. Default Interest. Effective immediately upon (a) the occurrence of any Event of Default under ***Section 6.1(f)*** of the Loan Agreement; or (b) the delivery of a notice by Lender to Borrower during the continuance of any other Event of Default and, in each case, for as long as such Event of Default shall be continuing, the outstanding principal balance of this Note shall bear interest at a rate equal to **2%** ***added to*** the interest rate that is otherwise applicable to the Loan from time to time, payable on demand or, in the absence of demand, on the date(s) otherwise applicable.

8. Late Fees. If Borrower fails to make any payment pursuant to this Note or any other Loan Document on or before the 5th day after the due date for such payment, then Borrower shall pay Lender a late fee equal to **5%** of such past-due payment. Such late fee will be immediately due and payable and is in addition to any other charges, costs, fees, and expenses that Borrower may owe as a result of the late payment, including the imposition of a default rate of interest pursuant to this Note or any other Loan Document.

9. Waivers. Borrower and all endorsers, guarantors, and sureties of this Note waive presentment, demand for payment, notice of dishonor, notice of protest, and protest, notice of intent to accelerate, notice of acceleration and all other notices or demands in connection with delivery, acceptance, performance, default or endorsement of this Note.

10. Lender Computations Final. Lender's computations, in accordance with the terms of this Note and the Loan Agreement, of interest rates, Monthly Payment amounts, and final payment amounts, prepayment fees, and other amounts due and owing from Borrower to Lender shall be final and conclusive, absent manifest error.

11. Maximum Rate of Interest. Anything herein to the contrary notwithstanding, the obligations of Borrower hereunder or pursuant to any other Loan Document shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment would be contrary to the provisions of any Applicable Law limiting the highest rate of interest which may be lawfully contracted for, charged or received by Lender, and in such event Borrower shall pay Lender interest at the highest rate permitted by Applicable Law.

12. Inconsistencies. If there are any inconsistencies between the terms of this Note and the other Loan Documents, the provisions of this Note shall control.

13. Funding Losses. Borrower agrees to reimburse Lender and to hold Lender harmless from any reasonable and customary loss or expense which Lender may sustain or incur as a consequence of (a) the failure of Borrower to borrow a Loan after Borrower has given a notice to borrow; (b) the failure of Borrower to make any prepayment after Borrower has given a notice of prepayment; (c) the failure of Borrower to make any payment or mandatory prepayment of principal of any Loan (including payments made after any acceleration thereof); or (d) the prepayment of a Loan on a day which is not a Payment Date, as applicable. If a Rate Contract has been entered into in connection with this Note, any full or partial prepayments of principal amounts due under this Note may require termination or adjustment of the Swap Obligations under such Rate Contract and may result in a payment due from Borrower per the terms and conditions of such Rate Contract.

14. Increased Costs. If on or after the date hereof the adoption of any Applicable Law, or any change therein, or any change in the interpretation or administration thereof by any Government Authority, including the central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive of any such authority (a) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System of the United States) against assets of, deposits with or for the account of, or credit extended by, Lender; or (b) shall impose on Lender any other condition affecting the applicable Interest Rate

Case 8:26-mc-00024-MSS-SPF Document 1-2 Filed 08/24/26 Page 36 of 163

or its obligation to make the Loan; and the result of any of the foregoing is to increase the cost to Lender of making or maintaining the Loan at the Interest Rate, or to reduce the amount of any sum received or receivable by Lender under this Note with respect thereto, by an amount deemed by Lender to be material, then, within 15 days after delivery of written evidence of such increase or reduction and demand by Lender, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such increased cost or reduction.

15. Capital Adequacy. If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in of, any Applicable Law of any court, central bank, regulator or other Government Authority affects or would affect the amount of capital required or expected to be maintained by Lender, or person controlling Lender, and Lender determines (in its sole discretion) that the rate of return on its or such controlling person's capital as a consequence of its commitments or the Loan made by Lender is reduced to a level below that which Lender or such controlling person could have achieved but for the occurrence of any such circumstance, then, in any such case upon notice from time to time by Lender to Borrower, Borrower shall within 15 days after delivery of written evidence by Lender in reasonable detail of such circumstance pay directly to Lender additional amounts sufficient to compensate Lender or such controlling person for such reduction in rate of return. A statement of Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on Borrower. In determining such amount, Lender may use any method of averaging and attribution that it (in its sole discretion) shall deem applicable.

16. Applicability of General Provisions. All provisions of the Article in the Loan Agreement titled "***General Provisions***", as well as the defined terms in the Loan Agreement, including in the Schedule of Defined Terms attached thereto, apply to this Note, the same as if such provisions were set forth in full in this Note.

[SIGNATURE PAGE(S) FOLLOW]

**IN WITNESS WHEREOF**, Borrower has executed this Note as of the date stated above.

**BORROWER:**

**TIG QUESO LLC**, a Delaware limited liability company

By: *Manisha Patel*
Manisha Patel, Authorized Member

**QUESO TIME DE 1 LLC**, a Delaware limited liability company,
**QUESO TIME DE 2 LLC**, a Delaware limited liability company,
**QUESO TIME DE 3 LLC**, a Delaware limited liability company,
**QUESO TIME DE 4 LLC**, a Delaware limited liability company, and
**QUESO TIME DE 5 LLC**, a Delaware limited liability company

By: TIG Queso DE LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: *Manisha Patel*
Manisha Patel, Authorized Member

**QUESO TIME TPA1 LLC**, a Florida limited liability company,
**QUESO TIME TPA2 LLC**, a Florida limited liability company, and
**QUESO TIME TPA3 LLC**, a Florida limited liability company

By: TIG Queso FL LLC, a Delaware limited liability company, Authorized Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: *Manisha Patel*
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME NJ 1 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 10 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 11 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 12 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 17 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 2 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 20 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 3 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 4 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 5 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 6 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 9 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 15 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 18 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 19 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 21 LLC**, a New Jersey limited liability company,
and **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company

By: TIG Queso NJ LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME NY 1 LLC**, a New York limited liability company,
**QUESO TIME NY 2 LLC**, a New York limited liability company,
**QUESO TIME NY 3 LLC**, a New York limited liability company,
and **QUESO TIME NY 4 LLC**, a New York limited liability company

By: TIG Queso NY LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company,
and **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company

By: TIG Queso PA LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**TIG QUESO NY LLC**, a Delaware limited liability company,
**TIG QUESO DE LLC**, a Delaware limited liability company,
**TIG QUESO NJ LLC**, a Delaware limited liability company,
**TIG QUESO PA LLC**, a Delaware limited liability company, and
**TIG QUESO FL LLC**, a Delaware limited liability company

By: TIG Queso LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: Manisha Patel
Manisha Patel, Authorized Member

# EXHIBIT A

## BENCHMARK REPLACEMENT SETTING

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document.

(b) Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Note or any other Loan Document.

(c) Notices; Standards for Decisions and Determinations. Lender will promptly notify Borrower of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Lender will promptly notify Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to subsection (d) below. Any determination, decision or election that may be made by Lender pursuant to this ***Exhibit A***, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this Note or any other Loan Document, except, in each case, as expressly required pursuant to this ***Exhibit A***.

(d) Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e) Benchmark Unavailability Period. During a Benchmark Unavailability Period, interest on the Loan shall accrue at the Base Rate.

(f) Certain Defined Terms. As used in this Note, each of the following capitalized terms has the meaning given to such term below:

"***Available Tenor***" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Note or

(y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to subsection (d) above.

"***Benchmark***" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (a) of this ***Exhibit A***.

"***Benchmark Replacement***" means with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by Lender for the applicable Benchmark Replacement Date:

(a) Daily Simple SOFR; or

(b) the sum of: (i) the alternate benchmark rate that has been selected by Lender and Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated or bi-lateral credit facilities and (ii) the related Benchmark Replacement Adjustment.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by Lender and Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated or bi-lateral credit facilities.

"***Benchmark Replacement Conforming Changes***" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of ***Section 13*** of this Note and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Note and the other Loan Documents).

"***Benchmark Replacement Date***" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative or not to comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided, that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c) even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Event***" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative or do not, or as a specified future date will not, comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Unavailability Period***" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this ***Exhibit A*** and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this ***Exhibit A***.

"***Daily Simple SOFR***" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by Lender in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans;

provided, that if Lender decides that any such convention is not administratively feasible for Lender, then Lender may establish another convention in its reasonable discretion.

"***Relevant Governmental Body***" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"***Unadjusted Benchmark Replacement***" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

**DLOC A NOTE**

Dated as of April 14, 2025 (the "***Note Date***")

***Note Amount***: $10,000,000.00

**FOR VALUE RECEIVED**, **TIG QUESO, LLC**, a Delaware limited liability company, **TIG QUESO LLC**, a Delaware limited liability company, **QUESO TIME DE 1 LLC**, a Delaware limited liability company, **QUESO TIME DE 2 LLC**, a Delaware limited liability company, **QUESO TIME DE 3 LLC**, a Delaware limited liability company, **QUESO TIME DE 4 LLC**, a Delaware limited liability company, **QUESO TIME DE 5 LLC**, a Delaware limited liability company, **QUESO TIME TPA1 LLC**, a Florida limited liability company, **QUESO TIME TPA2 LLC**, a Florida limited liability company, **QUESO TIME TPA3 LLC**, a Florida limited liability company, **QUESO TIME NJ 1 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 10 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 11 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 12 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 17 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 2 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 20 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 3 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 4 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 5 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 6 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 9 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 15 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 18 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 19 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 21 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company, **QUESO TIME NY 1 LLC**, a New York limited liability company, **QUESO TIME NY 2 LLC**, a New York limited liability company, **QUESO TIME NY 3 LLC**, a New York limited liability company, **QUESO TIME NY 4 LLC**, a New York limited liability company, **QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company, **TIG QUESO NY LLC**, a Delaware limited liability company, **TIG QUESO DE LLC**, a Delaware limited liability company, **TIG QUESO NJ LLC**, a Delaware limited liability company, **TIG QUESO PA LLC**, a Delaware limited liability company, and **TIG QUESO FL LLC**, a Delaware limited liability company (collectively, "***Borrower***"), jointly and severally, promises to pay to the order of **BANK MIDWEST**, a division of NBH Bank, and its successors and assigns ("***Lender***"), the principal sum stated above as the Note Amount, or so much thereof as may have been advanced by Lender, with interest thereon, on the dates and at the rates and upon the terms and conditions specified below. This DLOC A Note (this "***Note***") is the DLOC A Note referred to in the Loan Agreement, dated the same date as this Note, between Borrower and Lender (as it may be amended, restated, supplemented, extended or renewed from time to time, the "***Loan Agreement***") and is being executed and delivered pursuant thereto (the loan made pursuant to this Note and the Loan Agreement being referred to in this Note as the "***DLOC A***"). Capitalized terms used in this Note and not defined in this Note have the meanings given to such terms in the Loan Agreement.

1. <u>Interest Rate</u>.

(a) Interest shall accrue on outstanding Draws under the DLOC A (each, a "***DLOC A Draw***"), from the date of each DLOC A Draw, at the Interest Rate.

(b) All interest hereunder shall be computed on the basis of a 360-day year and the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder shall be computed on a daily basis based upon the outstanding principal amount of the DLOC A as of the applicable date of determination. Term SOFR and the Base Rate (and components thereof), as applicable shall be determined by Lender and such determination shall be conclusive absent manifest error.

(c) Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, (i) the administration, submission or any other matter related to the Base Rate, the Term SOFR Reference Rate, or Term SOFR or with respect to any rate that is an alternative or replacement for or successor to any such rate (including any Benchmark Replacement); (ii) any Benchmark Replacement Conforming Changes; or (iii) the effect of any of the foregoing (including whether any such alternative, replacement or successor rate will be similar to, or produce the same value or economic equivalence of, any of the foregoing rates or have the same volume or liquidity as did any such rate prior to its discontinuance or unavailability).

(d) Notwithstanding anything to the contrary set forth in this Note or any of the other Loan Documents, Term SOFR and Benchmark Replacement shall be subject to replacement in accordance with the terms and conditions of ***Exhibit A (Benchmark Replacement Setting)***.

(e) The following defined terms shall have the following meanings hereunder:

"***Base Rate***" means, for any day, a fluctuating rate per annum in effect for such day equal to the sum of the Spread plus the highest of (a) the "prime rate" as publicly announced for such day by JPMorgan Chase Bank, N.A. (or a successor source reasonably selected by Lender), and (b) the Federal Funds Rate plus one-half of one percent (0.5%). Any change in the Base Rate shall take effect without notice to Borrower from the effective date thereof.

"***Base Rate Period***" means, subject to ***Section 1(d)*** (***Benchmark Replacement Setting***) hereof, any period in which (a) SOFR, the Term SOFR Reference Rate, or Term SOFR is unavailable or cannot be determined in accordance with the definition thereof, or (b) any Applicable Law has made it unlawful, or any Governmental Authority has asserted that it is unlawful, for Lender or its applicable lending office to make DLOC A Draws or maintain the DLOC A whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, or Term SOFR, or to determine or charge rates based thereon. A Base Rate Period will be deemed to have occurred and continue to exist for any Interest Period in which any of the foregoing circumstances exist as of the related Periodic Term SOFR Determination Day (unless any Applicable Law requires that such Base Rate Period be deemed to have occurred immediately upon the occurrence of any of the foregoing events, in which case, it shall so be deemed to have occurred).

"***Benchmark Replacement***" is defined in ***Exhibit A***.

"***Benchmark Replacement Conforming Changes***" is defined in ***Exhibit A***.

"***Benchmark Replacement Date***" is defined in ***Exhibit A***.

"***Business Day***" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by Applicable Law to close.

"***Federal Funds Rate***" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"***Interest Period***" means each period from a Payment Date (or, in the case of the first Payment Date, from the Note Date) to the successive Payment Date; <u>provided</u>, <u>however</u>, any Interest Period which would otherwise extend beyond the Maturity Date shall end on the Maturity Date so long as all of the Obligations have been repaid by the Maturity Date.

"***Interest Rate***" means, subject to ***Section 1(d)*** and ***Section 10***, the rate per annum (expressed as a percentage) equal to Term SOFR for the Interest Period therefor plus the Spread; provided, that, during any Base Rate Period, "Interest Rate" shall mean the Base Rate.

"***Payment Date***" means the first day of each calendar month.

"***Periodic Term SOFR Determination Day***" has the meaning specified in the definition of "Term SOFR".

"***SOFR***" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"***SOFR Administrator***" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"***Spread***" means a rate of interest equal to three percent (3.00%).

"***Term SOFR***" means the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the first day of such Interest Period, provided however, if such day is not a U.S. Government Securities Business Day, the first U.S. Government Securities Business Day preceding such day (such day, the "***Periodic Term SOFR Determination Day***"), as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"***Term SOFR Administrator***" means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

"***Term SOFR Reference Rate***" means the rate per annum determined by Lender as the forward-looking term rate based on SOFR.

"***U.S. Government Securities Business Day***" means any day except for (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

2. DLOC A Draw Period Interest-Only Payments. During the DLOC A Draw Period, interest on outstanding DLOC A Draws is payable in arrears on each Payment Date, commencing on the first Payment Date to occur after the Note Date and continuing on each subsequent Payment Date occurring prior to the last day of the DLOC A Draw Period.

3. Conversion of DLOC A Draws to DLOC A Term Loans. All DLOC A Draws outstanding on a particular Conversion Date shall be converted to a single "***DLOC A Term Loan***" at that time, on the terms and conditions specified herein, with the date of such conversion being referred to as the "***DLOC A Term Loan Effective Date***" for the DLOC A Term Loan resulting from such conversion. "***Conversion Date***" means each of (i) the one (1) year anniversary of the Note Date, and (ii) the day (the "***Final Conversion Date***") that is the last day of the DLOC A Draw Period.

4. No Separate DLOC A Term Loan Notes. Each DLOC A Term Loan will be represented by this Note, on the terms and conditions specified for such DLOC A Term Loan herein and in the Loan Agreement, and there will not be separate promissory notes for DLOC A Term Loans.

5. DLOC A Term Loan Interest Rates; Payments. Each DLOC A Term Loan will bear interest and be payable as follows:

(a) Applicable Interest Rate. Interest shall accrue on a particular DLOC A Term Loan at the Interest Rate.

(b) DLOC A Term Loan Payments; Maturity Date. If any applicable DLOC A Term Loan Effective Date is not also a Payment Date, interest on the unpaid principal balance of a particular DLOC A Term Loan, for the period from the DLOC A Term Loan Effective Date for such DLOC A Term Loan to the first Payment Date to occur following such DLOC A Term Loan Effective Date, together with interest accrued on the corresponding DLOC A Draws for the period from the immediately preceding Payment Date to the DLOC A Term Loan Effective Date for such DLOC A Term Loan, shall be due and payable on such first Payment Date. Regular monthly payments (each, a "***Monthly Payment***") for a particular DLOC A Term Loan will commence on the second Payment Date to occur after the DLOC A Term Loan Effective Date for such DLOC A Term Loan (unless the DLOC A Term Loan Effective Date for such DLOC A Term Loan is also a Payment Date in which case Monthly Payments will commence on the first Payment Date to occur after the DLOC A Term Loan Effective Date for such DLOC A Term Loan) and will continue on each Payment Date thereafter through the Payment Date occurring on May 1, 2030 (the "***Maturity Date***"). On the Maturity Date, in addition to the required Monthly Payment, Borrower shall also pay the entire remaining unpaid balance of each DLOC A Term Loan; all accrued and unpaid interest to the Maturity Date for each DLOC A Term Loan; any other amounts payable with respect to each DLOC A Term Loan; and any other amounts then due and payable with respect to the DLOC A Term Loans. **BORROWER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT A SUBSTANTIAL PAYMENT WILL BE DUE ON THE MATURITY DATE.**

(c) Monthly Payment Amounts. Each Monthly Payment will equal (i) all accrued and unpaid interest, plus (ii) principal in an amount equal to the Monthly Principal Payment. "***Monthly Principal Payment***" means, with respect to each DLOC A Term Loan, an amount determined by dividing the original principal amount of such DLOC A Term Loan on the corresponding DLOC A Term Loan Effective Date by the Amortization Period "***Amortization Period***" means a period of 120 months that commences on the first Payment Date after the DLOC A Term Loan Effective Date for a particular DLOC A Term Loan.

6. Prepayments.

(a) Draws. Voluntary repayments of outstanding DLOC A Draws are not permitted during the DLOC A Draw Period.

(b) DLOC A Term Loans. Except as may otherwise be expressly provided in this Note and the other Loan Documents, Borrower may not make any prepayment of any DLOC A Term Loan except as follows: (i) prepayments must be made on a Payment Date (a "***Permitted Prepayment Date***"); (ii) Borrower must give Lender at least 30 days' prior written notice of the proposed prepayment; (iii) the prepayment must be for the full outstanding principal balance of such DLOC A Term Loan (except that partial prepayments are permitted in the case of (A) payments of Insurance Proceeds that are applied to principal on such DLOC A Term Loan; and (B) other mandatory prepayments, if any, required pursuant to any of the Loan Documents and that are applied to principal on such DLOC A Term Loan); and (iv) the prepayment must be accompanied by payment to Lender of the following: (A) interest on the prepaid principal of such DLOC A Term Loan through the Permitted Prepayment Date; and(B) any and all costs, fees, and other expenses, including late fees, due and payable with respect to the DLOC A Term Loan. **PREPAYMENTS ARE ONLY ALLOWED ON PERMITTED PREPAYMENT DATES AND INTEREST ON THE PREPAYMENT AMOUNT MUST BE PAID THROUGH THE PERMITTED PREPAYMENT DATE. IF LENDER AGREES TO ACCEPT A PREPAYMENT ON A DATE OTHER THAN A PERMITTED PREPAYMENT DATE THERE WILL BE NO REDUCTION IN THE AMOUNT OF INTEREST REQUIRED TO BE PAID AS PROVIDED ABOVE. ACCORDINGLY, AS A FURTHER CONDITION TO THE PREPAYMENT AND IN ADDITION TO ALL OTHER AMOUNTS PAYABLE IN RESPECT OF SUCH PREPAYMENT, BORROWER WILL PAY TO LENDER THE AMOUNT OF INTEREST THAT WOULD HAVE ACCRUED ON THE DLOC A TERM LOAN**

**BEING PREPAID, BUT FOR THE PREPAYMENT, FROM THE DATE OF PREPAYMENT TO THE NEXT PERMITTED PREPAYMENT DATE.**

(c) Intentionally Omitted.

(d) Application of Prepayment Amounts. Subject to the provisions of ***Section 1.6(c)*** of the Loan Agreement: (i) amounts paid pursuant to ***Section 6(b)(iv)*** shall be applied in payment of the amounts specified therein; (ii) all prepaid principal with respect to such DLOC A Term Loan shall be applied to the unpaid principal balance of such DLOC A Term Loan; ***provided, however***, that any permitted partial prepayment of principal shall be applied to principal in the inverse order of maturity, such that the scheduled Monthly Payment amounts for such DLOC A Term Loan otherwise calculated do not change; and (iii) all other payments pursuant to this Note with respect to such DLOC A Term Loan shall be applied first to accrued and unpaid interest on such DLOC A Term Loan and the balance to reduction of principal on such DLOC A Term Loan, in the inverse order of maturity.

7. General Payment Provisions. All payments due pursuant to this Note shall be payable at the place and in the manner provided in ***Section 1.6*** of the Loan Agreement and otherwise in accordance with the provisions of that Section, which Section is incorporated herein by this reference.

8. Non-Conforming Payments. Credit to Borrower's account may be delayed if the payment is not made as provided above or if not accompanied by the correct invoice number. Lender may, at its sole option, refuse any amount tendered by Borrower that is not in the required form or in the exact amount of the required payment. Delayed credit may cause Borrower to incur a late payment fee. Credit for payments is subject to final payment by the institution on which the item of payment was drawn. **UNAUTHORIZED FORMS OF PAYMENT, SUCH AS CASH, CASHIER'S CHECKS, OFFICIAL BANK CHECKS, TELLER'S CHECKS, CERTIFIED CHECKS, TRAVELERS' CHECKS, AND MONEY ORDERS, ARE NOT ACCEPTABLE FORMS OF PAYMENT AND MAY BE RETURNED TO BORROWER AT BORROWER'S RISK OF LOSS**.

9. Disputed Payments. All written communication concerning disputed amounts, including any check or other payment instrument that (a) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (b) is tendered with other conditions or limitations must be mailed or delivered to Lender at the following address and not to the address shown on the invoice as the address for remitting payments, unless Lender otherwise directs: Bank Midwest, a division of NBH Bank, c/o NBH Bank, P.O. Box 26528, Kansas City, MO 64196-6528.

10. Default Interest. Effective immediately upon (a) the occurrence of any Event of Default under ***Section 6.1(f)*** of the Loan Agreement; or (b) the delivery of a notice by Lender to Borrower during the continuance of any other Event of Default and, in each case, for as long as such Event of Default shall be continuing, the outstanding principal balance of this Note, including all outstanding DLOC A Draws and DLOC A Term Loans shall bear interest at a rate equal to **2% *added to*** the interest rate that is otherwise applicable to outstanding DLOC A Draws and DLOC A Term Loans, as applicable, from time to time, payable on demand or, in the absence of demand, on the date(s) that would otherwise be applicable to outstanding DLOC A Draws and DLOC A Term Loans, as the case may be.

11. Late Fees. If Borrower fails to make any payment pursuant to this Note or any other Loan Document on or before the 5th day after the due date for such payment, then Borrower shall pay Lender a late fee equal to **5%** of such past-due payment. Such late fee will be immediately due and payable and is in addition to any other charges, costs, fees, and expenses that Borrower may owe as a result of the late payment, including the imposition of a default rate of interest pursuant to this Note or any other Loan Document.

12. Waivers. Borrower and all endorsers, guarantors, and sureties of this Note waive presentment, demand for payment, notice of dishonor, notice of protest, and protest, notice of intent to accelerate, notice of acceleration and all other notices or demands in connection with delivery, acceptance, performance, default or endorsement of this Note.

13. Lender Computations Final. Lender's computations, in accordance with the terms of this Note and the Loan Agreement, of interest rates, Monthly Payment amounts, and final payment amounts, prepayment fees, and other amounts due and owing from Borrower to Lender shall be final and conclusive, absent manifest error.

14. Maximum Rate of Interest. Anything herein to the contrary notwithstanding, the obligations of Borrower hereunder or pursuant to any other Loan Document shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment would be contrary to the provisions of any Applicable Law limiting the highest rate of interest which may be lawfully contracted for, charged or received by Lender, and in such event Borrower shall pay Lender interest at the highest rate permitted by Applicable Law.

15. Inconsistencies. If there are any inconsistencies between the terms of this Note and the other Loan Documents, the provisions of this Note shall control.

16. Funding Losses. Borrower agrees to reimburse Lender and to hold Lender harmless from any reasonable and customary loss or expense which Lender may sustain or incur as a consequence of (a) the failure of Borrower to borrow on the DLOC A after Borrower has given a notice to borrow; (b) the failure of Borrower to make any prepayment after Borrower has given a notice of prepayment; (c) the failure of Borrower to make any payment or mandatory prepayment of principal of the DLOC A (including payments made after any acceleration thereof); or (d) the prepayment of the DLOC A on a day which is not a Payment Date, as applicable. If a Rate Contract has been entered into in connection with this Note, any full or partial prepayments of principal amounts due under this Note may require termination or adjustment of the Swap Obligations under such Rate Contract and may result in a payment due from Borrower per the terms and conditions of such Rate Contract.

17. Increased Costs. If on or after the date hereof the adoption of any Applicable Law, or any change therein, or any change in the interpretation or administration thereof by any Government Authority, including the central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive of any such authority (a) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System of the United States) against assets of, deposits with or for the account of, or credit extended by, Lender; or (b) shall impose on Lender any other condition affecting the applicable Interest Rate or its obligation to make the DLOC A; and the result of any of the foregoing is to increase the cost to Lender of making or maintaining the DLOC A at the Interest Rate, or to reduce the amount of any sum received or receivable by Lender under this Note with respect thereto, by an amount deemed by Lender to be material, then, within 15 days after delivery of written evidence of such increase or reduction and demand by Lender, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such increased cost or reduction.

18. Capital Adequacy. If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in of, any Applicable Law of any court, central bank, regulator or other Government Authority affects or would affect the amount of capital required or expected to be maintained by Lender, or person controlling Lender, and Lender determines (in its sole discretion) that the rate of return on its or such controlling person's capital as a consequence of its commitments or the DLOC A made by Lender is reduced to a level below that which Lender or such controlling person could have achieved but for the occurrence of any such circumstance, then, in any such case upon notice from time to time by Lender to Borrower, Borrower shall within 15 days after delivery of written evidence by Lender in reasonable detail of such circumstance pay directly to Lender additional amounts sufficient to compensate Lender or such controlling person for such reduction in rate of return. A statement of Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on Borrower. In determining such amount, Lender may use any method of averaging and attribution that it (in its sole discretion) shall deem applicable.

19. Applicability of General Provisions. All provisions of the Article in the Loan Agreement titled "***General Provisions***", as well as the defined terms in the Loan Agreement, including in the Schedule of Defined Terms attached thereto, apply to this Note, the same as if such provisions were set forth in full in this Note.

[SIGNATURE PAGE(S) FOLLOW]

**IN WITNESS WHEREOF**, Borrower has executed this Note as of the date stated above.

**BORROWER:**

**TIG QUESO LLC**, a Delaware limited liability company

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME DE 1 LLC**, a Delaware limited liability company,
**QUESO TIME DE 2 LLC**, a Delaware limited liability company,
**QUESO TIME DE 3 LLC**, a Delaware limited liability company,
**QUESO TIME DE 4 LLC**, a Delaware limited liability company, and
**QUESO TIME DE 5 LLC**, a Delaware limited liability company

By: TIG Queso DE LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME TPA1 LLC**, a Florida limited liability company,
**QUESO TIME TPA2 LLC**, a Florida limited liability company, and
**QUESO TIME TPA3 LLC**, a Florida limited liability company

By: TIG Queso FL LLC, a Delaware limited liability company, Authorized Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME NJ 1 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 10 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 11 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 12 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 17 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 2 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 20 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 3 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 4 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 5 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 6 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 9 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 15 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 18 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 19 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 21 LLC**, a New Jersey limited liability company,
and **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company

By: TIG Queso NJ LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME NY 1 LLC**, a New York limited liability company,
**QUESO TIME NY 2 LLC**, a New York limited liability company,
**QUESO TIME NY 3 LLC**, a New York limited liability company,
and **QUESO TIME NY 4 LLC**, a New York limited liability company

By: TIG Queso NY LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company,
and **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company

By: TIG Queso PA LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**TIG QUESO NY LLC**, a Delaware limited liability company,
**TIG QUESO DE LLC**, a Delaware limited liability company,
**TIG QUESO NJ LLC**, a Delaware limited liability company,
**TIG QUESO PA LLC**, a Delaware limited liability company, and
**TIG QUESO FL LLC**, a Delaware limited liability company

By: TIG Queso LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: Manisha Patel
Manisha Patel, Authorized Member

**EXHIBIT A**

**BENCHMARK REPLACEMENT SETTING**

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document.

(b) Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Note or any other Loan Document.

(c) Notices; Standards for Decisions and Determinations. Lender will promptly notify Borrower of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Lender will promptly notify Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to subsection (d) below. Any determination, decision or election that may be made by Lender pursuant to this ***Exhibit A***, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this Note or any other Loan Document, except, in each case, as expressly required pursuant to this ***Exhibit A***.

(d) Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e) Benchmark Unavailability Period. During a Benchmark Unavailability Period, interest on the DLOC A shall accrue at the Base Rate.

(f) Certain Defined Terms. As used in this Note, each of the following capitalized terms has the meaning given to such term below:

"***Available Tenor***" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Note or

(y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to subsection (d) above.

"***Benchmark***" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (a) of this ***Exhibit A***.

"***Benchmark Replacement***" means with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by Lender for the applicable Benchmark Replacement Date:

(a) Daily Simple SOFR; or

(b) the sum of: (i) the alternate benchmark rate that has been selected by Lender and Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated or bi-lateral credit facilities and (ii) the related Benchmark Replacement Adjustment.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by Lender and Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated or bi-lateral credit facilities.

"***Benchmark Replacement Conforming Changes***" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of ***Section 16*** of this Note and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Note and the other Loan Documents).

"***Benchmark Replacement Date***" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative or not to comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided, that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c) even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Event***" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative or do not, or as a specified future date will not, comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Unavailability Period***" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this ***Exhibit A*** and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this ***Exhibit A***.

"***Daily Simple SOFR***" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by Lender in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans;

provided, that if Lender decides that any such convention is not administratively feasible for Lender, then Lender may establish another convention in its reasonable discretion.

"***Relevant Governmental Body***" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"***Unadjusted Benchmark Replacement***" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

# LOAN AGREEMENT

THIS **LOAN AGREEMENT** (as it may be amended, restated, supplemented, extended or renewed from time to time, this "***Agreement***") is made as of April 14, 2025, between **BANK MIDWEST**, a division of NBH Bank ("***Lender***"), and **TIG QUESO LLC**, a Delaware limited liability company, **QUESO TIME DE 1 LLC**, a Delaware limited liability company, **QUESO TIME DE 2 LLC**, a Delaware limited liability company, **QUESO TIME DE 3 LLC**, a Delaware limited liability company, **QUESO TIME DE 4 LLC**, a Delaware limited liability company, **QUESO TIME DE 5 LLC**, a Delaware limited liability company, **QUESO TIME TPA1 LLC**, a Florida limited liability company, **QUESO TIME TPA2 LLC**, a Florida limited liability company, **QUESO TIME TPA3 LLC**, a Florida limited liability company, **QUESO TIME NJ 1 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 10 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 11 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 12 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 17 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 2 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 20 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 3 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 4 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 5 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 6 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 9 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 15 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 18 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 19 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 21 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company, **QUESO TIME NY 1 LLC**, a New York limited liability company, **QUESO TIME NY 2 LLC**, a New York limited liability company, **QUESO TIME NY 3 LLC**, a New York limited liability company, **QUESO TIME NY 4 LLC**, a New York limited liability company, **QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company, **TIG QUESO NY LLC**, a Delaware limited liability company, **TIG QUESO DE LLC**, a Delaware limited liability company, **TIG QUESO NJ LLC**, a Delaware limited liability company, **TIG QUESO PA LLC**, a Delaware limited liability company, and **TIG QUESO FL LLC**, a Delaware limited liability company (collectively "***Borrower***", with references in the Loan Documents to "Borrower" meaning each Borrower).

**FOR VALUABLE CONSIDERATION**, the parties agree as follows:

## ARTICLE 1
## THE CREDIT FACILITIES

1.1 The Credit Facilities; Collateral. Lender agrees to make the loan or loans identified in the following "***Loan Table***" (each, a "***Loan***" and collectively, the "***Credit Facilities***") to Borrower on the terms and conditions in this Agreement and the other Loan Documents. Each Loan will be evidenced by a separate promissory note (each, a "***Note***") to Lender. References in the Loan Documents to a "Loan" and a "Note" are to each such Loan and Note. Notwithstanding that this Agreement may provide for multiple Loans, all Loans constitute one general obligation of Borrower. Borrower agrees to borrow and repay the Loan, with interest, in accordance with the Note, this Agreement, and the other Loan Documents. The Credit Facilities will be secured by the Collateral. At Closing, the Collateral will include the Collateral described in the "***Collateral Table***" attached as ***Exhibit 1.1***, as well as all other Collateral described in the Loan Documents.

| **Loan Table** | |
|---|---|
| **Loan** | "***Maximum Loan Amount***" |
| Term Loan A | $10,000,000.00 |
| DLOC A | $10,000,000.00 |

1.2 Term Loan A.

(a) Term Loan and Note. Lender agrees to make the Loan described in this Section ("***Term Loan A***" or, for purposes of this Section, this "***Term Loan***") to Borrower on the terms and conditions set forth in this Section and as otherwise provided in this Agreement. This Term Loan will be evidenced by Borrower's Term Loan A Note (the "***Term Loan A Note***") in the Maximum Loan Amount for this Term Loan.

(b) Purpose. Borrower agrees to use the proceeds of this Term Loan exclusively for refinancing existing debt at Closing, and to fund certain other permitted amounts at Closing (to the extent herein provided), in accordance with the terms of this Agreement and the other Loan Documents.

(c) Term Loan Amount. This Term Loan will be in an amount (the "***Term Loan A Amount***") equal to the lesser of (a) $10,000,000.00 (the "***Maximum Loan Amount***"); or (b) 100% of the existing debt being for the Sites refinanced at Closing.

(d) Draw Request. Prior to Closing, Borrower shall deliver to Lender a complete, executed "***Closing Draw Request***" (using Lender's prescribed form) for disbursement of the Term Loan proceeds. At Closing, Lender will fund the Term Loan proceeds by wire transfer in accordance with the instructions contained in such Closing Draw Request.

(e) Closing Fees and Costs. At Closing, Borrower will paya closing fee to Lender equal to 0.20% of the Term Loan A Amount.

1.3 The DLOC A.

(a) DLOC A Commitment; DLOC A Note. Lender agrees to make the Loan described in this Section (the "***DLOC A***") available to Borrower on the terms and conditions set forth in this Agreement. The DLOC A will be in an amount equal to the Maximum Loan Amount for the DLOC A specified in the Loan Table (the "***DLOC A Commitment Amount***"). The DLOC A, and each DLOC A Term Loan described below, will be evidenced by Borrower's DLOC A Note in the DLOC A Commitment Amount (the "***DLOC A Note***"). The DLOC A is a straight line of credit, not a revolving line of credit. Accordingly, principal amounts repaid may not be reborrowed.

(b) DLOC A Purpose. The DLOC A will only be made available, and Borrower agrees to use the proceeds of the DLOC A, exclusively to finance, from time to time: (i) the acquisition of one or more new sites for the use and operation by Borrower as a Permitted Concept (each, an "***Acquisition***", with each new site being an "***Acquisition Parcel***") it being agreed, however, that Acquisitions are restricted to leasehold sites only and that DLOC A proceeds may not be used to acquire fee real property; (ii) one or more projects for the development of New Sites, or the remodeling, re-imaging, refurbishing, or re-equipping of Sites for use as a Permitted Concept (each, a "***Development Project***", with each Site being a "***Development Site***"); and/or (iii) with respect to the DLOC A Draw being made as of the Closing Date only, the refinancing of existing development financing and Transaction Costs approved by Lender in connection with the Closing. Otherwise, DLOC A proceeds may not be used to refinance existing debt.

(c) DLOC A Draws and Draw Requests. Borrower may request Draws under the DLOC A (each, a "***DLOC A Draw***") during the DLOC A Draw Period set out in the following table, subject to the limitations stated herein. For each DLOC A Draw, Borrower shall provide Lender with a "***DLOC A Draw Request***" in the form attached as ***Exhibit 1.3(c)*** (or such other form as Lender may then require).

| | |
|---|---|
| "***DLOC A Draw Period***": The period beginning at Closing and ending on: | April 14 2027 |
| Maximum DLOC A Draws allowed per calendar month: | One. |

| | |
|---|---|
| Maximum permitted DLOC A Draws during DLOC A Draw Period: | 24 |
| Minimum DLOC A Draw Amount: | $50,000, unless Lender otherwise agrees. |
| Limit on aggregate amount of DLOC A Draws for an Acquisition: | 75% of the purchase price of each Acquisition Parcel, as approved by Lender in its sole discretion. |
| Limit on aggregate amount of DLOC A Draws for a Development Project relating to the development of a new Site: | 75% of the Development Project costs, as approved by Lender in its sole discretion. |
| Limit on aggregate amount of DLOC A Draws for a Development Project relating to the remodeling, re-imaging, and refurbishing or re-equipping of an existing Site: | Up to 100% of the Development Project costs, as approved by Lender in its sole discretion. |

Notwithstanding the foregoing, Borrower shall not be entitled to any further DLOC A Draws for a particular Development Project after the earlier of (i) 30 days following the date of Final Completion of such Development Project; or (ii) the last day of the DLOC A Draw Period.

(d) Draw Conditions; Funding. Lender's obligation to fund any DLOC A Draw is subject to Lender's satisfaction with or waiver of, in Lender's sole discretion, each of the DLOC A Draw Conditions listed on ***Exhibit 1.3(d)***. Lender will fund each DLOC A Draw within five Business Days after Lender's receipt of a complete, executed DLOC A Draw Request and Lender's determination that all DLOC A Draw Conditions have been met, such funding to be by wire transfer in accordance with the instructions stated in the DLOC A Draw Request.

(e) No Excess Funding; Repayment. Lender's obligation to fund DLOC A Draws will not at any time exceed the DLOC A Commitment Amount and in no event will Borrower be entitled to any DLOC A Draw if funding such DLOC A Draw would result in the DLOC A Commitment Amount being exceeded. On any date on which the aggregate principal amount of DLOC A Draws exceeds the DLOC A Commitment Amount, Borrower shall, immediately upon demand by Lender, pay Lender an amount equal to or greater than such excess, which amount shall be applied to reduce the total amount of outstanding DLOC A Draws.

(f) DLOC A Fees; Unused Line Fees. At Closing, Borrower will pay Lender a DLOC A fee equal to 0.20% of the DLOC A Maximum Loan Amount. Until the expiration of the DLOC A Draw Period, Borrower shall also pay to Lender an unused commitment fee (the "***Unused Commitment Fee***") for each day, in an amount equal to: (i) the excess, if any, of the daily balance of the DLOC A Commitment Amount during the preceding calendar quarter over the daily principal balance of outstanding DLOC A Draws (not converted to a DLOC A Term Loan) during the preceding calendar quarter multiplied by (ii) 0.15% per annum. The Unused Commitment Fee will accrue and be payable quarterly in arrears on the first day of each calendar quarter following the date hereof.

(g) DLOC A Term Loans. Outstanding DLOC A Draws will be converted to amortizing term loans at the times and on the terms and conditions specified in the DLOC A Note (each, a "***DLOC A Term Loan***"). The DLOC A Commitment Amount will be reduced dollar for dollar by the amount of the DLOC A Term Loan as of such conversion date.

(h) Development Projects. All work associated with a particular Development Project shall be diligently undertaken, pursued, and finally completed at Borrower's sole cost and expense, in a good and workmanlike manner, Lien free, using licensed contractors, and in material compliance with all Applicable Law, as well as the requirements of the Franchise Agreement for the Development Site and, if applicable, the Lease for such Development Site. "***Final Completion***" of a particular Development Project shall be deemed to have occurred at such time as (i) all work associated with the Development Project shall have been completed in accordance with the requirements of this Agreement and the other Loan Documents; and (ii) the

Development Site and the business to be conducted at such Development Site shall be open for business to the public for its intended use as a Permitted Concept. Within 30 days after Final Completion of a particular Development Project, Borrower, at Borrower's sole cost and expense, shall deliver to Lender each of the Final Completion Deliverables also listed on ***Exhibit 1.3(d)***, to the extent not previously provided to Lender.

1.4 Draws and Draw Requests Generally. Lender shall have absolutely no duty or obligation to disburse any Loan proceeds (each such disbursement, a "***Draw***") unless and until Borrower has first submitted to Lender a properly completed and executed draw request in the form required by this Agreement (each, a "***Draw Request***"). Lender shall be entitled to fully rely and act on each Draw Request provided by or on behalf of Borrower and shall have no duty to verify the content of or accuracy of information contained in any such Draw Request, the authority of the person executing such Draw Request or the identity of the sender thereof. Lender does not have and is not undertaking any obligation whatsoever to Borrower to verify the source of a Draw Request provided to Lender or to detect errors in transmission or content, including discrepancies between account names and numbers.

1.5 Transaction Costs; Deposits. Borrower shall pay Lender, at or before Closing, all reasonable out-of-pocket costs and expenses incurred by or on behalf of Lender in connection with Lender's underwriting and closing due diligence and the negotiation, documentation, and closing of the Credit Facilities (including in connection with Lender's evaluation of and determinations with respect to the Closing conditions) (the "***Transaction Costs***"). Transaction Costs include the following, as applicable: (a) Lender's outside legal counsel fees; (b) expenses for UCC search reports, title searches, and title insurance; (c) escrow, recording, and filing fees; (d) transfer or mortgage taxes (if any); (e) costs of site inspections, inspection reports, surveys, appraisals, flood certifications, environmental reports and testing, and other due diligence required by Lender; (f) broker's commissions; and (g) costs and fees of consultants and other professional advisers retained by Lender. At Closing, all deposits paid by Borrower prior to entering into this Agreement, other than rate lock fee deposits (if any), shall be applied to pay Transaction Costs and any other fees, costs and expenses then payable by Borrower. If the deposit exceeds the sum of such items, the excess will be refunded at Closing. Borrower shall pay all broker's commissions in connection with the Credit Facilities, including the commission payable to JG Franchise Consulting, LLC in the amount of $150,000.00.

1.6 General Payment Provisions.

(a) Manner and Place; No Deductions. Principal, interest, and all other amounts due to Lender from time to time under the Notes, this Agreement, and the other Loan Documents, including each Monthly Payment due under the Notes (each, a "***Payment***") shall be made by Automated Clearing House ("***ACH***") debit (and Borrower agrees to execute and deliver to Lender such authorizations and agreements as Lender may require to establish such ACH arrangements) unless Lender gives prior written consent, in its sole discretion, for Payments to be made by wire transfer. Any Payment made by wire transfer and not received by Lender prior to 12:00 o'clock noon (local Greenwood Village, Colorado, time) may, in Lender's sole discretion, be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. All Payments, including Payments made by ACH debit, shall be in U.S. dollars and shall be made from a business deposit account in Borrower's name at a U.S. bank. All Payments shall be made without deduction of present and future Taxes (such amounts to be paid by Borrower) and without any other abatement, reduction, setoff, defense, counterclaim, deferment or recoupment.

(b) Application of Payments Generally. Except as otherwise provided in ***subsection (c)*** below: (i) all Payments of principal and interest required to be made pursuant to a particular Note shall be applied first to accrued and unpaid interest and then to principal; (ii) Payments by or on behalf of Borrower for fees, costs, and other expenses payable pursuant to any Loan Document, including Payments with respect to Transaction Costs, Closing fees and expenses, and other amounts payable by a Credit Party pursuant to any provision of the Loan Documents, shall be applied to the applicable fee, cost or other expense; and (iii) if Lender receives any other Payment, including Collateral proceeds and principal prepayments, Lender shall apply such Payment in such order, manner, and amounts as is specifically provided in the applicable Loan Document pursuant to which such Payment is made, or, in the absence of such a provision, in such order, manner, and amounts as Lender, in its sole discretion, may determine.

(c) Application of Payments After Default. Any other provision of this Agreement, any Note or any other Loan Document to the contrary notwithstanding, during such time as a Default has occurred and is

continuing, all Payments shall be applied in such order and manner and in such amounts as Lender, in its sole discretion, may determine.

## ARTICLE 2
## CLOSING

2.1 Closing. The closing (the "***Closing***") with respect to all of the Loans will occur within three Business Days following satisfaction (or waiver by Lender) of each of the closing conditions (collectively, the "***Closing Conditions***") listed on the attached ***Exhibit 2.1***, regardless of whether a Draw under a particular Loan is made at Closing. The date on which the Closing occurs and Draws, if any, to be made at Closing are funded is the "***Closing Date***." Borrower hereby authorizes Lender to insert the Closing Date on the first page hereof, as the date hereof, and in the various Loan Documents, including the Notes, as the date thereof.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Borrower acknowledges and agrees that the representations and warranties in this Article are a material consideration to Lender; that Lender is relying on their correctness and completeness in entering into this Agreement and making the Credit Facilities and each Draw available to Borrower; and that these representations and warranties are true and accurate as of the date hereof, will be true and accurate as of the Closing, as if made at Closing, and will survive the Closing, regardless of any investigation or inspection by Lender. Accordingly, Borrower represents, warrants, and certifies to and covenants with Lender that:

3.1 Borrower Status. Borrower's exact legal name is set forth on the signature page hereof. Borrower is a domestic U.S. entity, validly existing and in good standing under the laws of the state of its formation, is duly qualified and licensed to do business in the state where each Site is located, and has full power and authority to enter into and perform its obligations under the Loan Documents to which it is a party. Borrower's chief executive office and principal place of business is at the location set forth on the signature page hereof.

3.2 Due Authorization, Execution and Delivery. The Loan Documents have been duly authorized and validly executed and delivered by Borrower. The individual(s) executing the Loan Documents on behalf of Borrower have been duly authorized to do so in accordance with resolutions duly adopted by Borrower's board of directors (or similar governing body), members, or partners, as the case may be.

3.3 No Conflicts; No Defaults. The authorization, execution, delivery, consummation, and performance by Borrower of the Loan Documents does not and will not conflict with, violate, or breach (a) any provision of Borrower's organizational documents; (b) any Applicable Law; or (c) any Contractual Obligation of Borrower. Borrower is not in default under and, to the best of Borrower's knowledge, no event has occurred that, with the giving of notice or the passage of time, or both, would constitute a default under any Contractual Obligation of Borrower.

3.4 Binding Obligations. This Agreement and the other Loan Documents to which a Credit Party is a party constitute the legal, valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally, and general principles of equity.

3.5 Litigation and Condemnation. There is no action, suit, investigation, proceeding or arbitration at law or in equity, including condemnation proceedings or proceedings in lieu of condemnation, pending or, to the best of Borrower's knowledge, threatened against or affecting (a) any Credit Party or any of its or their assets or revenues; or (b) any of the Loan Documents or any of the transactions contemplated thereby.

3.6 Administrative, Criminal and Governmental Matters and Investigations. There are no administrative or criminal matters or investigations, government investigations or audits, or other similar matters currently pending, or, to the best of Borrower's knowledge, threatened that involve any Credit Party nor has any Credit Party been involved in any such matters within the past seven years.

3.7 Bankruptcy and Similar Matters. There are no bankruptcy, insolvency, or similar proceeding currently pending or, to the best of Borrower's knowledge, threatened that involve any Credit Party. During the past seven years: (a) no assets of any Credit Party have been the subject of any foreclosure or similar proceeding or been transferred by deed in lieu; (b) no Credit Party has filed (or had filed against such Credit Party) a petition under the U.S. Bankruptcy Reform Act of 1978, 11 U.S.C. §101, *et seq*. (the "***Bankruptcy Code***") or obtained a discharge of its debts under the Bankruptcy Code; and (c) no Person that is a principal officer, executive, member, manager or equity owner of a Credit Party held a similar position in an entity that, during the time such Person held such position or within one year after leaving such position, filed (or had filed against it) a petition under the Bankruptcy Code or that obtained a discharge of its debts under the Bankruptcy Code.

3.8 Solvency. Both before and after giving effect to consummation of the transactions contemplated by the Loan Documents to be consummated at or concurrently with the Closing and the payment and accrual of all Transaction Costs, and other costs, fees, and expenses payable in connection with the foregoing, the Credit Parties taken together, and Borrower, individually, are Solvent.

3.9 Anti-Money Laundering; Anti-Terrorism. No Credit Party nor, to Borrower's knowledge, any Related Party thereof, is (a) owned or controlled by a Sanctioned Person, or (b) located, organized or resident in a Sanctioned Country. Borrower is in compliance with all applicable Sanctions and with the FCPA and any other applicable anti-corruption law, in all material respects. Borrower has instituted and maintain policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws.

3.10 Title to Assets; Permitted Exceptions. Borrower owns all assets reflected in its most recent balance sheet delivered to Lender, except for assets disposed of in the ordinary course of business since the date of such balance sheet. Borrower is the owner of all of the Collateral, free and clear of all Liens and other matters affecting title to such assets, other than the Permitted Exceptions.

3.11 Outstanding Indebtedness. As of the Closing Date and after giving effect to the Closing, Borrower has no outstanding Indebtedness, other than (a) the Obligations; and (b) trade debt incurred and paid in the ordinary course of business and in any event within 60 days after incurrence.

3.12 Compliance with Laws; Permits. Each Site and the operations of each Credit Party at such Site comply with all Applicable Law, except for such noncompliance that has not had, and could not reasonably be expected to have, a Material Adverse Effect. All governmental permits required to use and operate such Site for the Permitted Concept, including liquor licenses, if any, have been obtained and are in full force and effect, except for permits, the failure of which to obtain or maintain has not had, and could not reasonably be expected to have, a Material Adverse Effect.

3.13 Site Conditions, Zoning, Access, and Utilities. Each Site, including all buildings and other improvements associated with such Site, is in good condition and repair; well maintained, ordinary wear and tear excepted; fully equipped and operational; free (to the best of Borrower's knowledge) from structural defects; and safe and properly lighted. Each Site is unconditionally zoned by the appropriate Government Authority for the use of such Site for the Permitted Concept. Permanent, legal access is available to each Site from a physically open and dedicated public right-of-way. Adequate public or private utilities are available at each Site to permit operation of such Site as a Permitted Concept, and all utility connection fees and use charges have been paid in full.

3.14 Franchise Agreement. Borrower has delivered to Lender a fully executed, complete copy of each Franchise Agreement as of the Closing Date. Upon execution, and/or Lender's request, from time to time, Borrower shall deliver to Lender a fully executed, complete copy of each Franchise Agreement. Each Franchise Agreement is in full force and effect, the entire interest of the franchisee thereunder is owned by one or more of the Credit Parties, and such interest has not been assigned, transferred, mortgaged, or otherwise encumbered other than pursuant to Lender's Liens. No notice of default from Franchisor has been received by any Credit Party with respect to any Franchise Agreement that has not been cured, and no notice of default to Franchisor has been given that has not been cured. To the best of Borrower's knowledge, no event has occurred and no condition exists, including with respect to any required remodeling or re-imaging, that, with the giving of notice or the lapse of time or both, would constitute a default under any Franchise Agreement.

3.15 Lease Status. Borrower has delivered to Lender a fully executed, complete copy of each Lease as of the Closing Date. Upon execution, and/or Lender's request, from time to time, Borrower shall deliver to Lender a fully executed, complete copy of each Lease. Each Lease is in full force and effect, Borrower is the sole owner of the entire leasehold interest thereunder, and such interest has not been assigned, transferred, subleased, mortgaged, or otherwise encumbered other than pursuant to Liens in Lender's favor. No notice of default from Lessor has been received by any Credit Party that has not been cured and no notice of default to Lessor has been given that has not been cured. To the best of Borrower's knowledge, no event has occurred and no condition exists, including with respect to any required remodeling or re-imaging, that, with the giving of notice or the lapse of time or both, would constitute a default under any Lease. The Lease is the only agreement between Lessor and Borrower with respect to the Leased Site subject to such Lease.

3.16 Taxes. All federal, state, local and foreign income, franchise and other material tax returns and reports (collectively, "***Tax Returns***") required to be filed by any Tax Affiliate have been filed with the appropriate Government Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes reflected therein or otherwise due and payable have been paid prior to the date on which any Liabilities may be added thereto for non-payment, except to the extent subject to a Good Faith Contest. No Tax Return is under audit or examination by any Government Authority and no notice of such an audit or examination or any assertion of any claim for Taxes has been given or made by any Government Authority. Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in full and complete compliance with Applicable Law, and such withholdings have been timely paid to the respective Government Authorities. No Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent. "***Tax Affiliate***" means Borrower and its subsidiaries (if any) and any Borrower Affiliate with which Borrower files or is eligible to file consolidated, combined or unitary tax returns. "***Taxes***" means all taxes, including income taxes, excess profits taxes, sales taxes, gross receipts taxes, payroll taxes, withholding taxes, ad valorem real and personal property taxes and assessments, and all other taxes, duties, imposts, levies, assessments, deductions, withholdings, and charges imposed by any Government Authority, and all Liabilities with respect thereto, excluding taxes imposed on or measured by Lender's net income.

3.17 Evaluation Information. All information provided to Lender by or on behalf of any Credit Party in connection with the Credit Facilities (collectively, the "***Evaluation Information***") is correct and complete in all material respects as of the date thereof. Borrower acknowledges that Lender is relying on the Evaluation Information in entering into this Agreement and making the Credit Facilities available to Borrower. None of the Credit Parties has any knowledge of any material change in any of the Evaluation Information that has not been disclosed to Lender in writing.

3.18 Full Disclosure. There is no fact known to any Credit Party that materially and adversely affects the business, operations, assets or condition (financial or otherwise) of any of the Credit Parties that has not been disclosed herein or in the Evaluation Information. None of the representations or warranties made by any Credit Party in the Loan Documents or any exhibit, report, statement or certificate furnished by or on behalf of any Credit Party pursuant thereto, as of the date such representations and warranties are made or deemed made, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.19 Commercial Purpose of Credit Facilities. The purpose of the Credit Facilities is a commercial business purpose and not a personal, family, or household purpose. No portion of the Collateral is being used by Borrower or any other Person for any personal, family or household purposes.

3.20 ERISA. None of the Credit Parties maintains, or has any Liabilities with respect to, any employee benefit plan or multiemployer plan, as defined in the Employee Retirement Income Security Act of 1974 ("***ERISA***").

3.21 Non-Foreign Status. Borrower is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate" or "foreign person" as those terms are defined by the Internal Revenue Code of 1986.

3.22 Hazardous Waste. With respect to each Site and all business and operations conducted thereon, Borrower and each other Credit Party is compliant with the provisions of all applicable environmental, health and safety laws, rules, regulations and ordinances. There are no hazardous waste materials, toxic materials, hazardous waste dump sites or toxic or chemical waste cleanup requirements currently on or currently being conducted on the Site. Neither Borrower nor any other Credit Party has any knowledge that such Site has ever been the subject of an environmental protection agency (state or federal) inquiry, investigation or inspection or any other state or federal agency having jurisdiction over such matters in connection with clean up or other efforts.

3.23 Beneficial Ownership Certification. As of the Closing Date, the information included in each Beneficial Ownership Certification is true and correct in all respects.

3.24 Subsidiaries and Affiliates.

(a) Borrower has advised Lender, and Lender acknowledges, that Queso Time NJ 16 LLC, a New Jersey limited liability company and Queso Time PA 5 LLC, a Pennsylvania limited liability company (collectively, the "***Excluded Affiliates***") operate Store No. 3123 located at 1609 Route 35, Suite 1, Oakhurst, New Jersey 07755 and Store No. 3048 located at 2417 Schoernersville Road, Bethlehem, PA 18017, respectively (collectively, the "***Excluded Sites***") as a Qdoba Mexican Eats restaurant and which are not party to this Agreement.

(b) Borrower has advised Lender, and Lender acknowledges, that TIG Queso FL LLC is a thirty-five percent (35%) member of JNY TIG LLC, which is the sole member of Queso Time FL 1 LLC, Queso Time FL 2 LLC, Queso Time FL3 LLC, and Queso Time FL4 LLC, and possibly additional entities in the future (such entities together with JNY TIG LLC, collectively the "***JNY Venture Entities***"), which own and operate Qdoba Mexican Eats restaurants in Florida.

(c) No Borrower (a) has any Subsidiary that is not a Borrower, other than the Excluded Affiliates, (b) has any Affiliate that is not a Borrower that owns or operates any Permitted Concept, other than the Excluded Affiliates and the JNY Venture Entities, or (c) is engaged in any joint venture or partnership with any other Person, other than TIG Queso FL LLC with the JNY Venture Entities.

## ARTICLE 4
## AFFIRMATIVE COVENANTS

Until such time as all Obligations are fully paid and performed:

4.1 Organization and Status; Preservation of Existence. Borrower will continue to be validly existing and in good standing under the laws of its state of incorporation or formation and will continue to be qualified to do business in the state where each Site is located.

4.2 Collateral. Borrower will (a) keep the Collateral free and clear of all Liens, other than the Permitted Exceptions; (b) use the Collateral only in its trade or business; (c) keep the tangible Collateral at each Site and maintain such tangible Collateral in good operating condition and repair and in material compliance with manufacturers' recommendations, normal wear and tear excepted; and (d) own and keep at each Site all equipment, including all machinery, furniture, appliances, trade fixtures, tools, office and record keeping equipment, and inventory required to be maintained by Borrower at such Site pursuant to the Franchise Agreement for such Site and that are reasonably necessary for the proper and prudent operation of such Site as the Permitted Concept.

4.3 Taxes. Borrower shall timely pay or cause to be paid, prior to delinquency, all Taxes which may at any time be assessed, levied or imposed upon Borrower, any Site, the Collateral, the Loan Documents, the Obligations, or the rents, issues, profits, damages, income and other benefits now or hereafter derived from any of the Sites, or which may arise in respect of the occupancy, use, possession or operation thereof.

4.4 Insurance.

(a) Insurance Requirements. Borrower shall obtain and keep in full force and effect insurance of the types and in amounts customarily carried in lines of business and in geographic areas similar to Borrower's and as Lender may specify from time to time in a letter or other written communication from Lender to Borrower referencing the Loan or this Section (each, an "***Insurance Requirements Letter***"), including (i) property insurance (Special Form) for 100% of full replacement value; (ii) business income insurance; (iii) builder's risk insurance, for any period during which construction shall take place on a Site; (iv) commercial general liability insurance, including excess/umbrella coverage and, if liquor, beer, or wine may be sold at or from the Site, liquor liability coverage; (v) worker's compensation insurance; (vi) flood insurance, for Mortgage Sites, as provided in the Mortgage; (vii) earthquake insurance, for Mortgage Sites located in an area designated by the US Geological Survey as high hazard; and (viii) such other policies and coverages as may be necessary to comply with Applicable Law or as Lender may otherwise require. Each required insurance policy and coverage (each, a "***Policy***") and each required binder, certificate, or other evidence of coverage (collectively, with the Policy, the "***Policy Documents***") shall satisfy the requirements set forth in this Section and in any Insurance Requirements Letter (collectively, the "***Insurance Requirements***"), unless, in a particular case, Lender, in its sole discretion and in writing, modifies or waives a particular Insurance Requirement. All Insurance Requirements are at the sole cost and expense of Borrower and apply to each Site. If, in addition to Borrower, any other Credit Party has an insurable interest in a particular Site, the Insurance Requirements shall apply with equal force to such other Credit Party, as if such Credit Party were a Borrower. Borrower's compliance or non-compliance with the Insurance Requirements shall not limit Borrower's liability for the acts or omissions of Borrower or any other Credit Party as provided herein or in any of the other Loan Documents.

(b) Policy Requirements. Each insurer must be licensed to do business in each state where a Site is located and, except for NFIP approved flood insurance carriers, must be rated A-:VIII or better by Best's Key Rating Guide. Each Policy Document shall name Lender and its successors and/or assigns, and affiliates, as their interests may appear, as additional insureds and as mortgagee and loss payee, as applicable, and shall state Borrower's correct address and list Borrower as the named insured. Each Policy shall (i) provide that the Policy will not be terminated, cancelled or substantially modified without at least 30 days' prior written notice to Lender (10 days for non-payment) and be written for a period of at least 12 consecutive months; (ii) include a waiver of subrogation by the insurer as to claims against Lender, its employees, agents, and affiliates and provide that such Policy cannot be cancelled or suspended on account of the conduct of Borrower, its affiliates, or any of their respective officers, directors, employees, or agents; (iii) be written on an "occurrence" basis and provide that all coverage under such Policy is primary, that any "no other insurance" clause in such Policy excludes policies of insurance maintained by Lender or its affiliates, and that such Policy will not be brought into contribution with any insurance maintained by Lender or its affiliates; (iv) contain a standard without contribution mortgagee clause endorsement in favor of Lender, its successors, assigns, and affiliates, as their interests may appear; and (v) include an agreement by the insurer that any loss will be payable in accordance with the terms of the Policy notwithstanding any act or neglect of Borrower, anyone acting for Borrower, or any tenant or other occupant of a Site. At least 30 days prior to the expiration of each Policy, Borrower shall furnish Lender written evidence that such Policy has been renewed or replaced by delivering to Lender a copy of the replacement Policy or other documentation reasonably satisfactory to Lender evidencing that the required insurance is in full force and effect. Policy deductibles must be stated and may not exceed $10,000, unless otherwise provided herein or as Lender, in its sole discretion, may agree in writing.

(c) Lender Insurance. **SPECIAL NOTICE**: Unless Borrower provides Lender with evidence that the required Policies have been obtained, are in full force and effect, and meet the Insurance Requirements, Lender may purchase insurance at Borrower's expense to protect Lender's interests. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance satisfying the Insurance Requirements. Borrower shall reimburse Lender, upon demand, for the costs of such insurance obtained by Lender, together with interest thereon at the rate of 10% per annum from the date such insurance was purchased to the date of such reimbursement.

4.5 Casualty.

(a) Casualty; Continuation of Obligations. Borrower shall at all times bear the entire risk of any loss, theft, damage to, or destruction of, any Collateral from any cause whatsoever, including as a result of a taking by eminent domain (a "***Casualty***"). If a Casualty occurs, whether or not covered by insurance, Borrower will promptly give Lender written notice thereof, describing the nature and extent thereof. No Casualty shall relieve Borrower of any of its Obligations, including its obligation to make regularly scheduled Note payments.

(b) Restoration Obligation. Promptly following the occurrence of a Casualty, Borrower shall, at its expense, commence and diligently complete the repair, restoration, replacement, and rebuilding of the Collateral as nearly as possible to its value, condition and character immediately prior to the Casualty (a "***Restoration***"). Borrower shall not be excused from Borrower's Restoration obligation, regardless of whether there are Insurance Proceeds available to Borrower or whether any such Insurance Proceeds are sufficient in amount, and the application or release by Lender of any Insurance Proceeds shall not cure or waive any Default under this Agreement or the other Loan Documents or invalidate any act done pursuant thereto.

(c) Application of Insurance Proceeds. All insurance proceeds with respect to any Casualty (the "***Insurance Proceeds***") shall be payable to Lender, and Borrower authorizes and directs any affected insurance company to pay the Insurance Proceeds directly to Lender. If Borrower receives any Insurance Proceeds relating to such Casualty, Borrower shall promptly pay such proceeds to Lender. All Insurance Proceeds will be applied by Lender to payment of the Obligations in such order as Lender, in its sole discretion, shall determine. To the extent that Insurance Proceeds are applied to prepay principal on the Loan, no prepayment fee will be charged in connection with such prepayment. Notwithstanding the foregoing, if no Default has occurred and is continuing, the Insurance Proceeds, less costs, fees and expenses incurred by Lender and Borrower in the collection thereof, including adjuster's fees and expenses and reasonable attorneys' fees and expenses (the "***Net Insurance Proceeds***"), shall be made available to Borrower as follows: (i) if the Net Insurance Proceeds are less than $25,000, the Net Insurance Proceeds shall be paid to Borrower and applied by Borrower to the cost of the Restoration; and (ii) if the Net Insurance Proceeds are $25,000 or greater, the Net Insurance Proceeds shall be held and disbursed by Lender, or as Lender may from time to time direct, as the Restoration progresses, to pay or reimburse Borrower for Restoration costs, upon Borrower's written request accompanied by evidence, reasonably satisfactory to Lender, that: (A) the Restoration is in compliance with Applicable Law and all private restrictions and requirements; (B) the amount requested has been paid or is then due and payable and is properly a part of such cost; (C) there are no Liens for labor or materials previously supplied in connection with the Restoration; (D) if the estimated cost of the Restoration exceeds the Net Insurance Proceeds (exclusive of proceeds received from Borrower's business income insurance), Borrower has deposited into an escrow satisfactory to Lender such excess amount, which sum will be disbursed pursuant to escrow instructions satisfactory to Lender; and (E) the balance of such Net Insurance Proceeds, together with the funds deposited into escrow, if any, will, after making the payment requested, be sufficient to pay the balance of the Restoration costs. Upon receipt by Lender of evidence reasonably satisfactory to it that the Restoration has been completed, the cost thereof has been paid in full, and that there are no Liens for labor or materials supplied in connection therewith, the balance, if any, of such Net Insurance Proceeds shall be paid to Borrower.

4.6 Obligations regarding Representations and Warranties. Borrower will do all things necessary or appropriate such that the representations and warranties of Borrower and the other Credit Parties contained in any of the Loan Documents remain true, complete, and correct.

4.7 Franchise Agreement. Borrower will timely comply with and perform all of its obligations under each Franchise Agreement, including all remodeling and re-imaging obligations, and will give Lender prompt written notice of the occurrence of any default by any Credit Party or Franchisor under such Franchise Agreement and of any notice of default given to any Credit Party by Franchisor. Borrower will send Lender copies of all notices given by a Credit Party to Franchisor concurrently with the giving of such notices to Franchisor. Borrower will keep each Franchise Agreement in full force and effect and will exercise all available options, such that the term of each Franchise Agreement, as so extended, will not expire prior to the Credit Facilities Maturity Date.

4.8 Lease Obligations. For each Leased Site, Borrower will timely comply with and perform all of lessee's obligations under each Lease, including any remodeling and re-imaging obligations, and will give Lender prompt written notice of the occurrence of any default by Borrower or Lessor and of any notice of default given to any Credit Party by Lessor. Borrower will also give Lender prompt written notice of any bankruptcy filing by or against Lessor of which Borrower has knowledge. Borrower will send Lender copies of all notices given by any Credit Party to Lessor concurrently with the giving of such notices to Lessor. Borrower will keep each Lease in full force and effect and will exercise all available options under the Lease, such that the term of the Lease, as extended, will not expire prior to the Credit Facilities Maturity Date. Upon Lender's request, Borrower shall use commercially reasonable efforts to obtain from Lessor (and any lender to Lessor), each in a form acceptable to Lender (a) landlord lien waivers and access rights; and (b) subordination, non-disturbance, and attornment agreements.

4.9 Requirement to Operate as Permitted Concept. Borrower shall at all times (a) occupy each Site and diligently operate its business at each Site as the Permitted Concept; ***provided however***, that Borrower may cease operations at a particular Site during the course of a Restoration, to the extent that operations cannot reasonably be conducted during such Restoration; and (b) maintain each Site, or use reasonable efforts to cause each Site to be maintained in accordance with the Lease, including all buildings and other improvements associated with the Site, in good condition and repair, ordinary wear and tear excepted and safe and properly lighted. Borrower will set aside and maintain adequate reserves for repair, replacement and maintenance of each Site in accordance with its obligations under the applicable Lease. Borrower shall not convert such Site or other Collateral to an alternative use while this Agreement is in effect, without Lender's consent, in Lender's sole discretion.

4.10 Compliance with Applicable Laws; Permits; Contractual Obligations. Borrower will comply with all Applicable Law, except for such non-compliance as could not reasonably be expected to have a Material Adverse Effect. Borrower will obtain and maintain in full force and effect at all times all permits that are required to use and operate each Site as a Permitted Concept, including any required liquor licenses. Borrower shall pay, perform and discharge all obligations, as and when do, all of its Contractual Obligations.

4.11 Payment of Indebtedness. Borrower will, and will cause each Credit Party to, pay and discharge, when due and prior to delinquency, all of its Indebtedness, including, within 60 days of incurrence, all trade debt.

4.12 Books and Records. Borrower will keep proper books and records in which complete and correct entries are made pursuant to GAAP and Applicable Law of all financial transactions and Borrower's assets and business.

4.13 Inspections. Each Credit Party shall, during normal business hours and upon reasonable advance written notice of at least seventy-two (72) hours (unless a Default shall have occurred and be continuing, in which case no notice shall be required and Lender shall have access at any and all times): (a) provide access to each Site to the Lender Parties and their representatives, as often as Lender reasonably deems appropriate; and (b) permit the Lender Parties and their representatives to inspect, audit and make copies (or take originals if reasonably necessary) of such Credit Party's books and records, and to inspect, review, evaluate and make physical inspections and appraisals of the Collateral in any manner and through any medium that Lender considers advisable, and, in each such case, each Credit Party agrees to provide Lender, at Borrower's cost and expense, such clerical and other assistance as Lender may reasonably request.

4.14 Sanctions and Anti-Corruption Laws. Borrower will maintain compliance with, and will maintain in effect policies and procedures designed to promote compliance by it and its directors, officers, employees, and agents with, all applicable Sanctions, the FCPA and any other applicable anti-corruption laws.

4.15 Financial Reporting.

(a) Quarterly Reports for Borrower and each other Credit Party.

(i) Within 45 days after the end of each Fiscal Quarter of Borrower (including the last Fiscal Quarter in each Fiscal Year), Borrower shall deliver to Lender complete Financial Statements for the Fiscal Quarter then ended.

Case 2:26-cv-00561-... Document 1-4 Filed 08/04/26 Page 12 of 108

(ii) Within 45 days after the end of each Fiscal Quarter of Borrower (including the last Fiscal Quarter in each Fiscal Year), Borrower shall deliver to Lender bank and brokerage statements evidencing liquidity of Guarantor for the Fiscal Quarter then ended.

(b) Annual Reports for Borrower and each other Credit Party.

(i) Within 120 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Borrower for the Fiscal Year then ended.

(ii) Within 45 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Guarantor for the Fiscal Year then ended.

(c) Tax Returns. Within the earlier of (i) 30 days of filing such Tax Returns with the appropriate Government Authorities; or (ii) 120 days after the end of each Fiscal Year, Borrower shall deliver to Lender true and complete copies of all such Tax Returns filed by each of the Credit Parties.

(d) Intentionally Omitted.

(e) Other Information. Within 15 days following Lender's written request, Borrower will also deliver to Lender such additional Financial Statements and information (financial or otherwise) as Lender may reasonably request from time to time, to verify compliance with the terms and conditions of the Loan Documents, including with any financial covenants.

(f) Financial Statement Requirements. All Financial Statements shall be prepared in accordance with GAAP on a consistent basis from period to period. Quarterly Financial Statements may be company-prepared only; however, the annual Financial Statements shall have been audited by a certified public accounting firm reasonably acceptable to Lender. "***Financial Statements***" means, for Borrower and each Credit Party that is an entity, (i) a consolidated and consolidating balance sheet, including retained earnings, as of the end of the relevant fiscal period, together with related consolidating profit and loss statements, cash flows (if available), shareholders' equity, and all related schedules for the fiscal period then ended; and (ii) individual unit level profit and loss statements for the fiscal period quarter for all units operated by each Credit Party. In those cases where a Credit Party is an individual or a trust, Financial Statements shall mean statements of assets and liabilities, bank and brokerage statements, statements of trust property (if the Credit Party is a trust), tax returns, and such other information as Lender may reasonably request. "***Fiscal Quarter***" and "***Fiscal Year***" means, respectively, the quarterly accounting periods and the annual accounting periods of Borrower consistent with Borrower's accounting and reporting practices in effect on the Closing Date. Borrower's Fiscal Year ends December 31.

(g) Compliance Certificates. Each delivery of Financial Statements shall be accompanied by a compliance certificate from each Credit Party, in the form of ***Exhibit 4.15(g)*** (a "***Compliance Certificate***"), duly executed by the treasurer, chief financial officer, or other appropriate officer of such Credit Party.

4.16 Financial Covenants. Borrower shall comply with each of the following financial covenants:

(a) Pre-Compensation Consolidated FCCR. As measured for Borrower and its consolidated Subsidiaries on the last day of each of Borrower's Fiscal Quarters, commencing with the first Fiscal Quarter of 2025 and for each Fiscal Quarter thereafter, Borrower and its consolidated Subsidiaries must have a Pre-Compensation Consolidated FCCR equal to or greater than 1.20:1.

(b) Post-Compensation Consolidated FCCR. As measured for Borrower and its consolidated Subsidiaries on the last day of each of Borrower's Fiscal Quarters, commencing with the first Fiscal Quarter of 2025 and for each Fiscal Quarter thereafter, Borrower and its consolidated Subsidiaries must have a Post-Compensation Consolidated FCCR equal to or greater than 1.10:1.

(c) Effective Leverage Ratio. As measured for Borrower and its consolidated Subsidiaries on the last day of each of Borrower's Fiscal Quarters, commencing with the first Fiscal Quarter of 2025 and for each Fiscal Quarter thereafter, Borrower and its consolidated Subsidiaries must have a ratio of Consolidated Effective Funded Debt to Consolidated EBITDAR, as stated in the following table during the respective periods:

| **Period** | **Ratio** |
|---|---|
| The first Fiscal Quarter of 2025, through the fourth Fiscal Quarter, 2025: | ≤ 6.00:1 |
| The first Fiscal Quarter of 2026, through the fourth Fiscal Quarter, 2026: | ≤ 5.75:1 |
| The first Fiscal Quarter of 2027, through the fourth Fiscal Quarter 2027: | ≤ 5.50:1 |
| The first Fiscal Quarter of 2028, through the fourth Fiscal Quarter, 2028: | ≤ 5.25:1 |
| The first Fiscal Quarter of 2029, and for all Fiscal Quarters thereafter: | ≤ 5.00:1 |

(d) Liquidity Requirement. As measured for Guarantor and Borrower on the last day of each Fiscal Quarter, commencing with the first Fiscal Quarter of 2025 and for each Fiscal Quarter thereafter, Guarantor and Borrower must maintain in the aggregate Liquid Assets at least equal to $1,000,000.00. "***Liquid Assets***" shall mean (i) with respect to Guarantor, cash, cash equivalents and/or publicly traded/quoted marketable securities reasonably acceptable to Lender, held in account(s) maintained with financial institution(s) or brokerage firm(s) reasonably acceptable to Lender, and (ii) with respect to Borrower, cash held in account(s) maintained with financial institution(s) or brokerage firm(s) reasonably acceptable to Lender. Each Compliance Certificate delivered by Borrower pursuant to ***Section 4.15(g)*** of this Agreement shall set forth the amount of Liquid Assets of Guarantor and Borrower, and Borrower shall deliver to Lender, together with each Compliance Certificate, all such statements and materials evidencing such compliance.

4.17 Notice of Litigation and Other Defaults. Borrower will give prompt written notice to Lender of the following of which Borrower has knowledge: (a) any lawsuit or proceeding instituted by or against it in any court or before any arbitrator, commission or regulatory body or any such proceeding which is threatened against it; (b) any other action, event or condition of any nature which could reasonably be expected to have a Material Adverse Effect, or which, with notice or lapse of time or both, would constitute an event of default or a default under any other instrument or agreement to which it is a party or by or to which it or any of its assets may be bound or subject; (c) the occurrence of any Default and the action Borrower proposes to take with respect thereto; and (d) any default, claim, litigation or other adverse action by Franchisor against Borrower, any JNY Venture Entity or any Excluded Affiliate.

4.18 Estoppel Certificates. From time to time and within 15 days after a request from Lender, Borrower will execute and deliver to Lender a certificate, in the form supplied by Lender, certifying (a) the unpaid principal of and interest on the Note as of the date of the certificate and whether Borrower or any other Credit Party claims any offset or defense against any such amounts; (b) whether, to the best of Borrower's knowledge, there are then any existing Defaults by Borrower in the performance of its Obligations under any of the Loan Documents, and, if there are any such Defaults, specifying the nature and extent thereof; and (c) as to such other facts and circumstances as Lender may reasonably request.

4.19 Further Assurances.

(a) Each Credit Party shall ensure that all written information, exhibits and reports furnished to Lender do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Lender and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b) Promptly upon request by Lender, the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as Lender may reasonably require from time to time in order (i) to carry out more effectively the

purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Loan Documents any of the assets of Borrower and the rights or interests covered by any of the Loan Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to Lender the rights granted or now or hereafter intended to be granted to Lender under any Loan Document; provided, that each Credit Party shall not be required to execute and deliver the same (nor shall Lender sign under any power of attorney) which increase a Credit Party's obligations and/or liabilities under the Loan Documents (other than in de minimis respects) or decrease a Credit Party's rights under the Loan Documents (other than in de minimis respects) and such documents and instruments shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in such documents and instruments will be given by Borrower only as of the Closing Date.

(c) Without limiting the generality of the foregoing and except as otherwise approved in writing by Lender, except for the Excluded Affiliates, the Credit Parties shall cause each of their Subsidiaries (which is not already a Credit Party), whether now existing or hereafter created or acquired, to join in this Agreement and the other Loan Documents as a "Borrower" and to assume and be liable for, jointly and severally with each other Borrower, the Obligations and to cause each such Subsidiary to grant to Lender a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's assets to secure the Obligations. If any Credit Party or any subsidiary of any Credit Party acquires an Acquisition Parcel, each Acquisition Parcel, upon acquisition shall be deemed a "Site" and part of the Collateral, subject to all terms, conditions, and requirements in the Loan Documents applicable to Sites and Collateral. If such Acquisition Parcel is subject to a Lease, the Acquisition Parcel shall also be deemed a "Leased Site" for all purposes. For any fee interest in any Acquisition Parcel or any leasehold interest in any Acquisition Parcel, to the extent that Lender determines the value of such leasehold interest is material, simultaneously with such acquisition, Borrower shall satisfy, or cause to be satisfied, such further real estate requirements as Lender deems necessary in its sole discretion.

4.20 Cross-Collateralization. In addition to securing payment and performance of the Obligations with respect to the Credit Facilities and Loan Documents, **THE PARTIES INTEND AND AGREE THAT THE COLLATERAL ALSO SECURES PAYMENT AND PERFORMANCE BY EACH RELATED AGREEMENT OBLIGOR OF ITS RESPECTIVE OBLIGATIONS UNDER THE RELATED AGREEMENTS TO WHICH IT IS A PARTY**, all for the benefit of Lender and any other holder or owner of the Obligations under the Related Agreements. Borrower understands and agrees that the provisions in this Section are an express bargained-for element of the transactions contemplated by this Agreement and that Lender would not have entered into this Agreement or made the Credit Facilities available to Borrower without these provisions being included.

4.21 Principal Depository Bank and Cash Management. Borrower Representative will maintain Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of Borrower Representative's business (the ***"Principal Deposit Accounts"***). If required by Lender, Borrower Representative shall at all times subject the Principal Deposit Accounts to control agreements in form and substance acceptable to Lender.

4.22 Beneficial Ownership Certification.

(a) Promptly following the addition of any New Entity as a co-Borrower under the Loan Documents, Borrower shall provide Lender with all information and documentation with respect to such New Entity reasonably requested by Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws, including, if such New Entity is a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such New Entity.

(b) In the event of any material change in the information provided to Lender in connection with Lender's compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws, Borrower shall provide Lender such updated documentation

and information necessary to maintain such compliance with respect to each co-Borrower, including, if such co-Borrower is a "legal entity customer" under the Beneficial Ownership Regulation, a new Beneficial Ownership Certification for such co-Borrower, prior to or within 10 days after any such change.

4.23 Account Collateral. Borrower has granted Lender a first priority security interest in the Account Collateral as additional security for the Obligations, together with all rights of a secured party with respect thereto, and authorized Lender to file any financing statement or statements required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein in connection with the Account Collateral. Notwithstanding any other provision of the Loan Documents, during any period that an Event of Default exists, the Account Collateral may be held, drawn on, disbursed, and applied to the items for which such sums or collateral were established or to payment of the Obligations in accordance with and pursuant to ***Section 1.6(c)***. Lender's right to withdraw and apply such funds after the occurrence and continuation of an Event of Default shall be in addition to all other rights and remedies provided to it under the Loan Documents.

4.24 Use of Proceeds. Borrower shall not directly or indirectly use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds of the Loan to any Person (a) to fund any activities of or business with any Sanctioned Person or in any Sanctioned Country, or (b) in any other manner that will result in a violation by any Person (including Lender or Participant) of Sanctions.

4.25 Post-Closing Obligations. Borrower shall satisfy each of the following within the time periods set forth below (collectively, the "***Post-Closing Obligations***"):

(a) Within sixty (60) days after the Closing Date, Borrower shall deliver to Lender a fully executed License Agreement (lease) with respect to Site No. 3251 (Rutgers Busch Campus) substantially in the draft form previously disclosed to Lender, together with a waiver of any landlord lien of the lessor/licensor thereunder in a form acceptable to Lender, if not expressly waived therein.

(b) Within twenty (20) days after the Closing Date, Borrower shall deliver to Lender evidence satisfactory to Lender that TIG Queso LLC has been formally approved and registered to do business in New York and Florida.

(c) Within twenty (20) days after the Closing Date, Borrower shall deliver to Lender evidence satisfactory to Lender that the articles of organization of Queso Time TPA1 LLC, Queso Time TPA2 LLC and Queso Time TPA3 LLC have been amended to reflect member management by the current members.

(d) Within fifteen (15) days after the Closing Date, Borrower shall deliver to Lender fully executed landlord lien subordinations, on forms acceptable to Lender. for Site Nos. 2774 and 2916.

Failure of Borrower to timely satisfy the Post-Closing Obligations shall constitute an automatic Event of Default, without any further notice and cure.

## ARTICLE 5
## NEGATIVE COVENANTS

Until such time as all Obligations are fully paid and performed:

5.1 No Name or Other Organizational Changes. No entity Credit Party shall (a) amend, restate, supplement, or terminate its organizational documents in a manner that could reasonably be expected to have a Material Adverse Effect; or (b) change any of the following from what it is as of the Closing: (i) its name; (ii) its place of business or, if there is more than one principal place of business, its chief executive office; (iii) its mailing address; (iv) the location of its books and records; (v) the type of legal entity that it is; (vi) the organization identification number issued by its state of incorporation or organization, if it has one; however if such Credit Party does not have such a number and later obtains one, such Credit Party will immediately notify Lender of such number; or (vii) its state of incorporation or organization, without, in each instance, giving Lender at least 45 days' prior written

notice thereof and taking all actions deemed necessary or appropriate by Lender to continuously protect and perfect Lender's Liens in the Collateral.

5.2 Accounting Changes. No Credit Party shall change its accounting treatment, or reporting practices, except as required by GAAP or Applicable Law and then only after giving effect to ***Section 8.23*** or change its Fiscal Year from that in effect on the date hereof.

5.3 Maintenance of Existence; Consolidations and Mergers. No entity Credit Party shall dissolve, liquidate, or otherwise cease to exist or merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; ***provided, however***, that the foregoing shall not operate to prevent a transaction that results in the Obligations being paid and performed in full.

5.4 Business and Operational Changes. No Credit Party shall (a) make any changes in any of such Credit Party's business objectives, purposes, or operations that could reasonably be expected to adversely affect repayment of the Obligations or that could reasonably be expected to have a Material Adverse Effect; (b) carry on any business, operations or activities substantially different from those carried on by such Credit Party at the date hereof, including business, operations and activities reasonably related thereto; or (c) by itself or through any sale, lease or other transfer, convert any Site or other Collateral to an alternative use.

5.5 No Liens. No Credit Party shall incur, maintain or otherwise suffer to exist any Lien upon or with respect to any Collateral, except for Permitted Exceptions.

5.6 Franchise Agreement Changes. No Credit Party shall: (a) agree to any Franchise Agreement amendment that could reasonably be expected to materially and adversely affect (i) the rights and privileges of the franchisee thereunder; or (ii) the rights, privileges, and remedies of Lender under the Loan Documents with respect to the Collateral or the Franchise Agreement; or (b) assign, transfer, mortgage, pledge or otherwise encumber any Franchise Agreement or any interest therein to any Person other than Lender. Borrower will send Lender a copy of all Franchise Agreement amendments promptly following execution thereof by all parties thereto.

5.7 Lease Changes. With respect to each Leased Site, no Credit Party shall: (a) agree to a Lease amendment that could reasonably be expected to materially and adversely affect (i) the rights and privileges of the lessee thereunder; or (ii) the rights, privileges, and remedies of Lender under the Loan Documents, with respect to the Collateral or the Lease; (b) enter into any sublease with respect to any Site, except for subleases to another Borrower; or (c) assign, transfer, mortgage, pledge or otherwise encumber any Lease or any interest therein to any Person other than Lender. Borrower will send Lender a copy of all Lease amendments promptly following execution thereof by all parties thereto.

5.8 Prohibited Transactions. No Credit Party shall do or permit to be done, voluntarily or involuntarily, or by operation of law or otherwise, any of the following (each, a "***Prohibited Transaction***") without the prior written consent of Lender, in its sole discretion: (a) sell, lease, mortgage, pledge, license, assign, transfer, or otherwise encumber or dispose of any Collateral to any Person, except for (i) sales of inventory in the ordinary course of business; and (ii) so long as no Default has occurred and is continuing, sales or other dispositions of obsolete equipment consistent with past practices, so long as such items are replaced by items of equal or greater value and utility; (b) sell, mortgage, pledge, assign, transfer, or otherwise encumber or dispose of its interest in this Agreement or the other Loan Documents; (c) except for Permitted Equity Transfers, engage in or allow (i) direct or indirect transfers of beneficial ownership of, or the right and power to vote, stock or partnership, membership or other ownership interests, whether in one or a series of transactions, in any Credit Party; or (ii) creation or issuance of new or additional equity interests in any Credit Party; (d) pledge, assign, or otherwise encumber or dispose of any interest in any Credit Party as collateral for any obligation of a Credit Party or any other Person; or (e) enter into any agreement to do, or which would or could result in, any of the foregoing.

5.9 Affiliate Transactions; Use of Funds. Except for transactions between Borrowers, no Credit Party shall enter into a transaction between such Credit Party and another Credit Party or any Affiliate of any Credit Party unless the transaction is on terms substantially as advantageous as those which could be obtained in a comparable arm's length transaction with an independent third party. Borrower shall not use any proceeds of the Credit Facilities or the

Collateral for personal, family, or household purposes. For the sake of clarity, Borrower shall not use any proceeds of the Credit Facilities, the Collateral, or from the operations of the Sites for the benefit of the Excluded Sites or for the benefit of the Excluded Affiliates.

5.10 Equity Distributions. Borrower shall not make any dividend or distribution for or on account of equity interests in Borrower if, either before or after giving effect to such dividend or distribution, a Default or Event of Default would occur or has occurred and is continuing.

5.11 ERISA. Borrower shall not establish, maintain or incur any Liabilities with respect to, any ERISA employee benefit plan or multiemployer plan.

5.12 No Further Indebtedness. Borrower shall not create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, other than the Obligations and trade indebtedness incurred in the ordinary course of business with respect to approved Sites. For the sake of clarity, Borrower shall not enter into any Contractual Obligation whereby any Affiliate that is not a Borrower is receiving funds, goods or services or any other benefit, including, without limitation, any guaranties or other Contractual Obligations involving or benefiting the JNY Venture Entities or the Excluded Affiliates.

5.13 Restrictions on the Prepayment of Indebtedness. Borrower shall not: (a) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof any Indebtedness, other than Indebtedness in favor of a Lender Party; (b) set apart any property for such purpose, whether directly or indirectly and whether to a sinking fund or otherwise; or (c) make any payment in violation of any subordination agreement relating to any Indebtedness; ***provided, however***, that Borrower may, to the extent otherwise permitted by the Loan Documents, (x) prepay the Obligations; and (y) make regularly scheduled or otherwise required repayments or redemptions of Indebtedness existing on the date hereof, but only, in the case of subordinated debt, to the extent permitted by the subordination agreement relating thereto.

5.14 Management Agreements. Borrower shall not enter into any management agreement or amend, modify or terminate any management agreement, or incur any management fees.

## ARTICLE 6
## DEFAULTS AND REMEDIES

6.1 Defaults. The following constitute events of default (each, an "***Event of Default***"):

(a) Monetary Default. If any Obligation for the payment of money is not paid (i) in the case of any scheduled monthly payments due under the Notes or any other regularly scheduled payments under the Loan Documents, within 10 days of the due date therefor (the "***Outside Payment Date***") (provided, however, on a one-time basis during any twelve (12) month period, the failure of Borrower to timely pay a scheduled payment by the Outside Payment Date shall not constitute an Event of Default if paid by Borrower within five (5) days of written notice from Lender to Borrower), (ii) in the case of payments due on the Credit Facilities Maturity Date, on the Credit Facilities Maturity Date, and (iii) in the case of any other payments if no specific due date is specified, then within 10 days of written demand from Lender.

(b) Misrepresentations. If (i) any representation or warranty of any Credit Party contained in any of the Loan Documents was untrue or incorrect in any material respect when made or deemed made, or (ii) if a Credit Party renders any statement or account which is untrue, incorrect, or incomplete in any material respect (each, a "***Misrepresentation***"), unless such Misrepresentation (A) was not knowingly or intentionally made, (B) is capable of being cured (i.e., the facts and circumstances underlying the applicable Misrepresentation can be changed such that the applicable representation as made or delivered will be true and accurate), and (C) is so cured within five (5) business days after the earlier of (1) the date on which Borrower first has knowledge that such Misrepresentation exists, and (2) the date on which Lender first notifies Borrower in writing that such Misrepresentation exists.

(c) Certain Covenant Breaches. If Borrower (i) shall fail to maintain insurance in accordance with the requirements of this Agreement or any of the other Loan Documents; (ii) is not in compliance with any financial covenant contained in ***Article 4***; or (iii) breaches any of the covenants contained in ***Article 5***. An Event of Default under ***clause (ii)*** or ***clause (iii)*** shall conclusively be deemed to be a continuing Event of Default until Lender, in its sole discretion, waives such Event of Default in writing.

(d) Non-Monetary Events of Default. If any Credit Party fails to observe or perform any of the covenants, conditions, or obligations of this Agreement or any of the other Loan Documents, other than those referred to in the other subsections of this ***Section 6.1***, and such failure continues without being fully cured for more than 30 days following written notice to such Credit Party of such failure. However, if such failure is not willful or intentional, does not place any rights or interest in any Collateral in immediate jeopardy, and is within the reasonable power of such Credit Party to promptly cure after receipt of notice thereof, all as determined by Lender in its reasonable discretion, then such failure shall not constitute an Event of Default (unless otherwise expressly provided) if during such 30-day period, such Credit Party begins to cure the failure and then diligently pursues the cure to completion, except that in no event will the cure period under this subsection exceed 90 days from the date such Credit Party receives the notice from Lender. If such Credit Party fails to cure such failure within the time periods provided in this subsection, an Event of Default shall be deemed to have occurred without further notice or demand of any kind being required.

(e) Dissolution or Division. Any Credit Party that is an entity is dissolved, is the subject of a division or its existence is terminated or there is commenced against any such Credit Party any action or proceeding which seeks as one of its remedies the dissolution of such Credit Party or termination of its existence.

(f) Bankruptcy, Insolvency, and Certain Other Proceedings. Occurrence of any of the following:

(i) Insolvency; Business Cessation. Any Credit Party (A) ceases to be Solvent; (B) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (C) voluntarily ceases to conduct its business in the ordinary course; or (D) takes any action to effectuate or authorize any of the foregoing;

(ii) Insolvency Proceedings. Any Credit Party shall institute or have instituted against it any proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, receivership, or relief of debtors, (A) seeking to adjudicate it bankrupt or insolvent; (B) seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, composition of it or its debts or any similar order; or (C) seeking entry of an order for relief or appointment of a custodian, receiver, trustee, conservator, liquidating agent, liquidator, or other official with similar powers, for it or for any substantial part of its property; and in the case of any such proceeding or other action instituted against (but not by or with the consent of) such Credit Party, either (y) such proceeding or action shall remain undismissed or unstayed for a period of 60 days or more; or (z) any action sought in such proceedings shall occur;

(iii) Failure of Enforceability or Lien. If (A) any provision of any Loan Document shall, at any time after the delivery of such Loan Document, fail to be valid and binding on, or enforceable against, a Credit Party; (B) any Loan Document purporting to grant a Lien to secure any Obligation shall, at any time after the delivery thereof, fail to create a valid and enforceable Lien on any Collateral purported to be covered thereby; (C) any such Lien shall fail or cease to be a perfected Lien with the priority required in the relevant Loan Document; or (D) a Credit Party shall state in writing that any of the events described in the preceding clauses of this subsection has occurred; or

(iv) Actions in Furtherance. Any Credit Party shall take any action to authorize or effectuate, or otherwise further, any action or circumstance described in the preceding clauses of this ***Section 6.1(f)***.

(g) Litigation. A final judgment or judgments for the payment of money shall be rendered against any Credit Party, unless (i) the same shall be (A) fully covered by insurance and the issuer(s) of the applicable policies shall have acknowledged full coverage in writing within 30 days of judgment or (B) vacated, stayed, bonded, paid or discharged within a period of 45 days from the date of such judgment; or (ii) payment of such money judgment would not have a Material Adverse Effect.

(h) Death or Incompetency of Guarantor. A Guarantor dies or becomes incompetent; ***provided, however***, that in the event of a death or incompetency, an Event of Default shall not occur if either (i) such Guarantor's estate or conservator, as applicable, assumes unconditionally the obligations arising under the Guaranty in a manner satisfactory to Lender, and Lender determines in its reasonable discretion that such deceased Guarantor's estate or Guarantor, through Guarantor's conservator, as applicable, maintains a tangible net worth and liquidity that is not less than the tangible net worth and liquidity of the applicable Guarantor at such Guarantor's death or incompetency, or (ii) a substitute Guarantor acceptable to Lender, in Lender's sole and absolute discretion, is provided within 30 days of such death or incompetence.

(i) Other Defaults. If (i) there is a default with respect to any Related Agreement that is not cured within any applicable notice or cure period; (ii) a default occurs in the payment or performance when due (after giving effect to any applicable notice and grace periods), whether by acceleration or otherwise, of any Indebtedness or other material Contractual Obligation of any Credit Party; (iii) any Franchise Agreement or Lease terminates or expires prior to the performance and payment in full of the Credit Facilities; or (iv) any other event or circumstance designated elsewhere in this Agreement or the other Loan Documents as an Event of Default shall occur.

(j) Crimes and Forfeitures. Any officer, director, manager, or owner of a Credit Party shall be charged with, indicted for, or convicted of a crime (other than misdemeanor traffic violations), a punishment for which could include the forfeiture of any assets of such Credit Party or of any equity interest in such Credit Party, the loss of eligibility for any permit, imprisonment, or a material fine or other material monetary penalty.

6.2 Remedies. Upon the occurrence and during the continuance of an Event of Default, Lender may (a) terminate or suspend (at Lender's sole option) the obligation to fund Draws; and/or (b) declare all or any part of the Obligations to be due and payable without presentment, demand, protest or further notice of any kind. Upon any Event of Default described in ***Section 6.1(f)***, the obligation to fund Draws shall automatically terminate and all of the Obligations shall be immediately due and payable. Borrower waives any notice of intent to accelerate the Obligations and notice of acceleration. In addition to terminating or suspending Draws and declaring the Obligations due and payable, Lender may exercise, at its option, concurrently, successively or in any combination, all rights and remedies now or in the future available under any of the Loan Documents or at law or in equity, and none of such rights or remedies are exclusive. In addition to any remedies set forth in the Loan Documents, Lender shall have the right to setoff and apply any amounts held in any deposit accounts of Borrower held with Lender or an Affiliate of Lender against the Obligations. Neither the acceptance of this Agreement nor its enforcement shall prejudice or in any manner affect Lender's rights to realize upon or enforce its rights with respect to any security now or in the future held by Lender, and Lender is entitled to enforce this Agreement and its rights and remedies with respect to any such security in such order and manner as it may in its sole discretion determine.

6.3 No Waiver or Cure. Neither the application of a default rate of interest in the circumstances described in the Notes or any of the other Loan Documents nor the imposition of any late fee shall be interpreted to extend any cure period set forth in any Note or any other Loan Document; to cure any Default; or to otherwise limit or waive any of Lender's rights or remedies under this Agreement, the Notes, or any other Loan Document.

6.4 Full Payment Required. The acceptance by Lender of any sum after the same is due shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums hereby secured or to declare a subsequent Event of Default. The acceptance by Lender of any sum in an amount less than the sum then due shall be deemed to be an acceptance on account only and upon condition that it shall not constitute a waiver of Borrower's obligation to pay the entire sum then due, and Borrower's failure to pay such entire sum then due shall, at Lender's election, constitute an immediate Event of Default without the necessity for any further notice, notwithstanding such acceptance of such amount on account.

6.5 Right to Cure; Interest; Late Fees. Lender may (but has no obligation to) pay, perform, and discharge any and all costs, expenses and liabilities that are the responsibility of any Credit Party under any Loan Document, if such Credit Party fails to timely pay, perform or discharge the same after 10 days prior written notice to such Credit Party of Lender's intent to take such action. All amounts reasonably expended by Lender in so doing shall (a) be part of the Obligations, secured by Lender's Liens; (b) bear interest at the rate of 10% per annum from the date Lender made payment until paid; and (c) be immediately due and payable to Lender on demand. All other amounts at any time owed by any Credit Party to Lender, other than amounts due and payable pursuant to the Note, shall bear interest at the rate of 10% per annum from the date due until paid. Late fees shall be due and payable as provided in the Note.

## ARTICLE 7
## LENDER TRANSFERS

7.1 Lender Transfers. Lender, from time to time and without the consent of any Credit Party, may assign, sell, or transfer all or any portion of its right, title, and interest, including servicing rights, in the Credit Facilities, the Loan Documents; or any Loan, in each case whether as part of a securitization or by participation, assignment, sale or other transfer (each, a "***Lender Transfer***," with the interests that are the subject of the Lender Transfer being referred to as the "***Transferred Interests***"). From and after the date of a Lender Transfer, Lender shall automatically be released from liability for the performance of any obligation arising out of or relating to the Transferred Interests. Each Credit Party shall execute such modifications to the Loan Documents or other documents as shall, in Lender's reasonable judgment, be necessary or desirable in connection with any Lender Transfer. Upon a Lender Transfer (including transfer of a participation interest) of less than all of the Credit Facilities (a "***Partial Assignment***"), each Credit Party agrees that: (a) Lender may become a fiscal agent, administrative agent, or servicer of the Credit Facilities or may delegate servicing or agent responsibilities to another Person; (b) the granting of consents or approvals pursuant to the Loan Documents may require the compliance with participation agreements, servicing agreements, co-lending agreements or other agreements governing the Partial Assignment, including the joinder or agreement of other Persons holding an interest pursuant to the Partial Assignment or providing servicing with respect to the Credit Facilities; and (c) Lender will not be in breach or violation of this Agreement or the other Loan Documents or be deemed to have acted unreasonably after a Partial Assignment if Lender withholds a consent or approval by reason of Lender's inability to obtain the required joinder or agreement of such other Persons.

## ARTICLE 8
## GENERAL PROVISIONS

8.1 Defined Terms; Applicability of General Provisions. Capitalized terms used herein and in the other Loan Documents and not otherwise defined herein or therein have the meanings set forth on the "***Schedule of Defined Terms***" attached as ***Exhibit 8.1***. The Schedule of Defined Terms also includes various rules of construction and interpretation that the parties agree are applicable to each Loan Document. Unless otherwise specifically provided, all terms defined herein, on the Schedule of Defined Terms, or in any other Loan Document shall have the same defined meanings when used in any certificate or other document made or delivered pursuant hereto or thereto. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein provided. The provisions of this Article and the Schedule of Defined Terms apply equally to each Loan Document and each Credit Party, the same as if such provisions were set forth in full in each other Loan Document

8.2 Modifications, Approvals, Waivers and Consents. None of the terms and provisions of this Agreement or the other Loan Documents may be amended, extended, renewed, terminated, or supplemented, nor shall Lender have waived any of its rights under any of the Loan Documents, by any course of dealing or other action or inaction of the parties, unless and until the Credit Parties obtain Lender's prior written consent with respect to any such matter, which consent may be withheld or conditioned in Lender's sole discretion, unless otherwise expressly provided in the Loan Documents. Lender's approval or waiver of, or consent to, any matter shall not be deemed an approval or waiver of, or consent to, the same or any other matter on any future occasion. All approvals, waivers, and consents granted by Lender for any matter shall be narrowly construed to cover only the parties and facts identified in such approval, waiver or consent. No failure to exercise and no delay in exercising, on Lender's part, any right, remedy, power or privilege hereunder or pursuant to any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or pursuant to any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.3 Binding Effect. Each of the Loan Documents shall become effective when executed by the required Credit Parties and Lender and shall be binding upon and inure to the benefit of the Credit Parties and Lender, and, in each case, their respective heirs, executors, representatives, successors and permitted assigns.

8.4 Costs, Expenses and Fees. Any action taken by a Credit Party with respect to the Loan or any Loan Document, even if required thereunder or at Lender's request, shall be at Borrower's sole cost and expense. Borrower agrees to pay Lender, or reimburse Lender within 10 days of written demand therefor, for all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees and expenses, incurred by or on behalf of the Lender Parties in connection with: (a) the interpretation or administration of the Loan and Loan Documents, including Lender's evaluation of, and determinations with respect to, any conditions precedent that must, at any time, be satisfied by Borrower; (b) the preparation, negotiation, execution, and consummation of any modification, termination, or waiver of any Loan Document, including any commitment or proposal letter related thereto; (c) any request for Lender consent to or approval of any matter; (d) internal audit reviews, field inspections, Collateral examinations, and Collateral releases and substitutions; (e) any refinancing or restructuring of the Loan in the nature of a "work-out"; (f) the enforcement or preservation of any right or remedy under any Loan Document or with respect to any Obligation or the Collateral, or any other related right or remedy, whether at law or in equity; (g) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Loan Document, any Collateral, or any Obligation (including preparation for and/or response to any subpoena or request for document production relating thereto); and (h) any other matter stated herein or in any other Loan Documents to be at the expense of Borrower or any other Credit Party. Lender may charge, and Borrower agrees to pay, a reasonable processing and review fee in connection with the foregoing matters. Lender may also charge Borrower such additional fees as Lender may require, as consideration to Lender in connection with, and as a condition precedent to, any such matter. From time to time, Lender may impose fees or charges, which Borrower agrees to pay, for returned checks, multiple payoff quotes, additional document copies, processing non-ACH payments, release fees, and such other services as it may provide to any Credit Party during the term of the Loan.

8.5 Broker Involvement. Except for JG Franchise Consulting, LLC, Borrower represents and warrants to and covenants with Lender that no Credit Party has dealt with any broker, agent, finder or other intermediary, and Lender represents and warrants to and covenants with Borrower that no Lender Party has dealt with any broker, agent, finder or other intermediary, in each case in connection with the Loan and the transactions contemplated by this Agreement and the other Loan Documents.

8.6 Indemnities. Borrower agrees to indemnify, hold harmless and defend each of the Lender Parties (each, an "***Indemnitee***") for, from and against all Liabilities that may be imposed on, incurred by or asserted against an Indemnitee in any matter relating to or arising out of: (a) any Loan Document or Obligation (or repayment thereof) or the use of Loan proceeds; (b) any commitment letter, proposal, or term sheet with any Person; (c) Borrower's operations at or relating to the Sites; (d) the Collateral, including its design, construction, operation, alteration, maintenance, or use by Borrower or any other Person; (e) any permitted disclosure of Credit Party Information; (f) any misrepresentation or inaccuracy in any representation or warranty in any Loan Document; (g) any breach or failure by any Credit Party to pay or perform the Obligations; or (h) any other act, event or transaction related, contemplated in or attendant to any of the foregoing, including any actual or prospective investigation, litigation or other proceeding relating to any of the foregoing, whether or not such Indemnitee initiated such investigation, litigation or other proceeding or is a party thereto and without regard to legal theory, including pursuant to Applicable Law, common law, equity, contract, tort, or otherwise (collectively, the "***Indemnified Matters***"). Notwithstanding the foregoing, Borrower shall not have any liability hereunder to any Indemnitee with respect to any Indemnified Matter, to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, Borrower and each other Credit Party waive and agree not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Lender Party.

8.7 Survival. Any indemnification or other protection provided to a Lender Party pursuant to any Loan Document, all representations and warranties made in any Loan Document, the provisions of this ***Article 8***, and all other provisions of the Loan Documents that are stated to survive, shall survive repayment in full and performance of

the Obligations and inure to the benefit of any Person that at any time held a right thereunder and, thereafter, its successors and permitted assigns.

8.8 Limitation of Liability. In no event shall Lender, any Credit Party, or any Affiliate of Lender or any Credit Party be liable to any Person on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). Lender and each Credit Party hereby waive, release and agree (and shall cause each of its respective Affiliates to waive, release and agree) not to sue upon any claim for special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor; ***provided, however***, that nothing herein shall be deemed a waiver of Lender's rights to sue upon or otherwise recover on all amounts due Lender under the Loan Documents, including with respect to the Obligations and the Collateral.

8.9 Relationship of the Parties. The relationship between Lender, on the one hand, and the Credit Parties, on the other hand, is solely that of lender and debtor. Lender has no fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between Lender and any Credit Party by virtue of, any Loan Document or any transaction contemplated therein. No Loan Document provision is intended, nor shall be deemed or construed, to make Lender in any way responsible for the debts, obligations or losses of any Credit Party.

8.10 Notices. All notices, demands, requests, and other communications (collectively, "***Notices***") required or authorized to be made by the Loan Documents shall be in writing and addressed (a) if to Borrower, to the notice address for the Borrower Representative as on the signature page hereto or to such other address as the Borrower Representative may provide to Lender in a Notice given after the date hereof with a copy to Borrower's counsel, Albert M. Belmont, III, Bochetto & Lentz, P.C., 1524 Locust Street, Philadelphia, PA 19102; (b) if to any other Credit Party, to the notice address for such Credit Party specified in the Loan Documents executed by such Credit Party or to such other address as such Credit Party may provide to Lender in a Notice given after the date hereof; and (c) if to Lender, at Lender's notice address on the signature page hereto or to such other address as Lender may provide to the Credit Parties in a Notice given after the date hereof. Notices may be given by hand delivery; by overnight delivery service, freight prepaid; or by U.S. mail, postage paid, and shall be effective and deemed to have been received (x) upon personal delivery to a responsible individual at the appropriate notice address, if Notice is given by hand delivery; (y) one Business Day after delivery to an overnight delivery service, if Notice is given by overnight delivery service; and (z) two Business Days following deposit in the U.S. mail, if Notice is given by U.S. mail.

8.11 Governing Law. **THE LAWS OF THE STATE OF COLORADO (WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES) SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT**.

8.12 Jurisdiction and Service of Process. Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of Colorado located in Arapahoe County or of the United States for the District of Colorado, sitting in Denver, Colorado, and each Credit Party unconditionally accepts, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; ***provided, however***, that nothing in this Agreement shall limit or restrict Lender's right to commence any proceeding in the federal or state courts located in the state in which a particular Site is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under any Loan Document. Lender and each Credit Party irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions. Each Credit Party irrevocably waives personal service of any and all legal process, summons, notices and other documents of any kind and consents to such service in any suit, action or proceeding brought in the United States by any means permitted by Applicable Law, including by the mailing thereof to such Credit Party (by registered or certified mail, postage prepaid) to such Credit Party's notice address, determined as provided in ***Section 8.10*** (and shall be effective when such mailing shall be effective as provided in ***Section 8.10***. Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

8.13 Waiver of Jury Trial. **LENDER AND EACH CREDIT PARTY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE**.

8.14 Severability. Any provision of any Loan Document being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of any Loan Document or any part of such provision in any other jurisdiction.

8.15 Document Execution. This Agreement and the other Loan Documents may be executed in any number of counterparts and by different parties in separate counterparts, each of which, when so executed, shall be deemed an original and all of which, taken together, shall constitute one integrated agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Except as otherwise expressly provided in any Loan Document, the E-Transmission of an executed signature page to a Loan Document shall be as effective as delivery of a manually executed counterpart thereof. The parties may, but are not required to, transmit or otherwise make or communicate any Loan Document as an E-Transmission, except that the Credit Parties shall deliver, as a further condition to Closing, live pen and ink signatures for those Loan Documents to be delivered on or before Closing, that Lender, in its sole discretion, designates as requiring live signatures. From time to time after Closing, each Credit Party agrees to deliver to Lender, upon Lender's request, a live pen and ink signature page for any Loan Document. Where this Agreement or any other Loan Document, including any executed signature pages, is communicated by E-Transmission: (a) this Agreement, such other Loan Document and such signature pages shall conclusively be deemed sufficient to satisfy any requirement for a "writing," "authentication," "signature," or "original" pursuant to any Loan Document or Applicable Law and shall be admissible as an original in any legal proceeding arising out of or relating to this Agreement or any of the other Loan Documents; and (b) each such E-Transmission shall have the same legal effect as a live pen and ink signed paper original. Neither Lender nor any Credit Party shall contest the validity or enforceability of any Loan Document, on the basis that such Loan Document, or one or more signatures hereto or thereto was the subject of an E-Transmission; ***provided, however***, that nothing herein shall limit a party's right to contest whether this Agreement or such other Loan Document has been altered after E-Transmission or whether the E-Transmission was delivered to an appropriate representative of Lender. "***E-Transmission***" means the communication of any document, including signature pages, by e-mail or any system used to receive or transmit faxes electronically.

8.16 Tombstones; Use of Lender Name. Each Credit Party consents to the publication by Lender of any tombstones, press releases, advertising or other promotional materials (including via E-Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark. Lender shall provide a draft of any such press release, advertising or other promotional material to Borrower Representative for review and comment prior to the publication thereof. Each Credit Party agrees not to issue any press release or other public disclosure using the name or logo of or otherwise referring to Lender or any of its Affiliates, the Loan Documents, or any transaction contemplated thereby, without Lender's prior consent, except to the extent required to do so under Applicable Law and then only after consulting with Lender prior thereto.

8.17 Time of the Essence; Time Periods. Time is of the essence for performance of the Obligations under each of the Loan Documents. Unless otherwise expressly stated in a particular Loan Document, the time for performance of any obligation or taking any action under such Loan Document shall be deemed to expire at 5:00 o'clock p.m. on the last day of the applicable time period provided for in such Loan Document. If the time for performance of any obligation or taking any action under such Loan Document expires on a day other than a Business Day, the time for performance or taking such action shall be extended to the next succeeding Business Day. Unless otherwise expressly stated, references in any of the Loan Documents to a particular time of day shall be to local time in Greenwood Village, Colorado.

8.18 Authorization to Provide Information. Each Credit Party authorizes its banks, creditors (including trade creditors), vendors, suppliers, Franchisor, and customers to disclose and release to the Lender Parties any and all information they may request from time to time regarding (a) any depository, loan or other credit account of such Credit Party; (b) the status of the Franchise Agreement; (c) the affairs and financial condition of such Credit Party, or

any operator of the Sites; and (d) the business operations at the Sites, including Site level and entity level operating results. Each Credit Party also expressly authorizes the Lender Parties, from time to time while any of the Obligations are outstanding to perform background, credit, judgment, lien and other checks, searches, inspections and investigations and to obtain personal and business credit reports and asset reports with respect to such Credit Party and to answer questions about its credit experience with such Credit Party. All of the information which the Lender Parties obtain from time to time in accordance with this Section, together with all other information which the Lender Parties now possess or in the future may acquire with respect to any of the Credit Parties, the Collateral, the Credit Facilities, or the business operations at the Sites, whether pursuant to the Loan Documents or otherwise, is referred to as "***Credit Party Information***."

8.19 Permitted Disclosures of Credit Party Information. Each Credit Party authorizes the Lender Parties (each, an "***Authorized Person***") to disclose Credit Party Information: (a) to Franchisor upon the occurrence and during the continuation of a Default; (b) to any proposed transferee, purchaser, assignee, servicer, participant, lender, investor, ratings agency, or other Person with respect to any proposed Lender Transfer or sale of any of the Collateral; (c) to any other Authorized Person or any insurance or title company in connection with the transactions contemplated by the Loan Documents, including any action, suit, or proceeding arising out of, in connection with, or relating to, this Agreement or the other Loan Documents, the Credit Facilities, or any other transaction contemplated hereby; (d) to the extent such information is or becomes available to an Authorized Person from sources not known by such Authorized Person to be subject to disclosure restrictions; (e) to the extent disclosure is required by Applicable Law or other legal process or is requested or demanded by any Government Authority; and (f) as may otherwise be authorized in writing by Borrower. Borrower and each other Credit Party also authorize and consent to the use by the Authorized Persons of data relating to Borrower's operations, including unit-level and corporate level operating results, to produce and distribute various industry statistical analyses and data compilations, provided that all such analyses and data compilations will be aggregated and will not be specifically attributable to the Sites, Borrower, any other Credit Party, or any operator or lessee of the Sites. Each Credit Party agrees that the disclosures permitted by this Section and any other disclosures of Credit Party Information authorized pursuant to any of the Loan Documents may be made even though any such disclosure may involve the transmission or other communication of Credit Party Information from the nation of residence or domicile of such Credit Party or an Authorized Person to another country or jurisdiction, and each Credit Party waives the provisions of any data privacy law, rule, or regulation of any applicable Government Authority that would otherwise apply to the disclosures authorized in this Section.

8.20 Corrections and Insertions. Lender may correct patent errors in the Loan Documents and fill in all blanks in this Agreement and the other Loan Documents consistent with the agreement of the parties.

8.21 Transaction Characterization. The Loan Documents are a contract to extend a Financial Accommodation (as such term is used in the Bankruptcy Code) for Borrower's benefit.

8.22 Further Assurances. At any time and from time to time, upon Lender's written request and at Borrower's sole expense, Borrower shall promptly execute and deliver any and all such further instruments and documents and take such further action as Lender may reasonably deem necessary or advisable to (a) fully implement and obtain the full benefits of this Agreement and the other Loan Documents; (b) protect, preserve, maintain and enforce Lender's rights in (and the priority of Lender's Liens on) any Collateral; and (c) enable Lender to exercise all of its rights, remedies and powers granted in the Loan Documents.

8.23 Accounting Requirements. All accounting terms shall be construed, and all accounting determinations required to be made pursuant to any Loan Document, including with respect to financial covenant compliance, shall, unless otherwise expressly provided, be made, in accordance with GAAP. However, if there is a change in GAAP following the date of this Agreement and that change is implemented by Borrower, such change shall not be given effect if such change would affect a calculation that measures compliance with, or entitles any Credit Party to any rights under, any provision of the Loan Documents unless Borrower and Lender agree in advance and in writing to modify such provisions to reflect such change. Unless such provisions are modified, all Financial Statements, compliance certificates and similar documents provided pursuant to the Loan Documents shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change. Notwithstanding any other provision contained herein or any of the other Loan Documents, (i) all terms of an accounting or financial nature used in this Agreement or any of the other Loan Documents shall be construed, and all computations of amounts and ratios provided for in this Agreement or any of the other Loan

Documents shall be made, without giving effect to any election under FAS 159 (ASC 825) (or any other financial accounting standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party at "fair value," as defined therein, and (ii) all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the effectiveness of FASB ASC 842 shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purpose of this Agreement (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with FASB ASC 842 (on a prospective or retroactive basis or otherwise) to be treated as Capital Leases in the financial statements.

8.24 Interpretation. The Loan Documents shall be interpreted and construed in a fair and impartial manner without regard to such factors as which party prepared the document, the relative bargaining powers of the parties or a party's domicile, but shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties.

8.25 Co-Borrower Provisions.

(a) Joint and Several Liability. References in this Agreement and the other Loan Documents to "Borrower" are to each Borrower signing this Agreement. Each Borrower's liability with respect to the Obligations is joint and several, notwithstanding the provisions of ***subsection (c)*** below, including any allocation of losses and liabilities pursuant to such subsection or otherwise. Each Borrower is a direct, primary and independent obligor, and no Borrower shall be deemed to be a guarantor, accommodation party or otherwise secondarily liable for the Obligations. Each Borrower represents and warrants to and covenants with Lender that (i) Borrowers are engaged in operations that require financing on a joint basis and, accordingly, each Borrower will materially benefit, directly or indirectly, from the Loan; (ii) the Loan has been offered to Borrowers on a joint basis and would not be available to Borrowers on an individual basis on the terms and conditions stated in this Agreement; and (iii) the benefits received by each Borrower are reasonably equivalent to the obligations undertaken by each Borrower.

(b) Representative. Each Borrower hereby appoints TIG QUESO LLC, a Delaware limited liability company ("***Borrower Representative***") as its representative and agent, and Borrower Representative accepts such appointment, for the purposes of (i) making the Closing Draw Request, Draw Requests and otherwise taking actions with respect to Draws, including giving Lender disbursement instructions, wire and deposit instructions, and telephonic confirmations; (ii) delivering certificates, including compliance certificates; (iii) selecting interest rate options, if applicable; (iv) giving and receiving all Notices and consents hereunder or under any of the other Loan Documents; (v) requesting and providing information with respect to accounts payable matters; financial reporting matters, property tax matters (if applicable); insurance matters, and all other account servicing matters; and (vi) taking all other actions (including in respect of compliance with covenants) on behalf of Borrower under the Loan Documents or otherwise with respect to each Loan. Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers. Each warranty, covenant, agreement and undertaking made on behalf of a Borrower by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

(c) Obligations and Allocations among Borrowers. If any Borrower (the "***Overpaying Borrower***") pays (whether directly or by application of Collateral), or is otherwise held liable for, obligations in excess of the Pro Rata Share of the Overpaying Borrower, the other Borrowers will pay the amount of such excess to the Overpaying Borrower and will indemnify the Overpaying Borrower for, from and against any claims, damages, loss or liability arising from or related to such overpayment. Borrowers agree to maintain books and records accurately reflecting each Borrower's Pro Rata Share. This subsection is only intended to allocate payments, losses, and liabilities among Borrowers in order that (i) as between Borrowers, each Borrower is ultimately liable for its Pro Rata Share; and (ii) the value to each Borrower of the resulting rights and claims against other Borrowers pursuant to this subsection will assure that no Borrower is rendered "insolvent" by virtue of the Obligations for purposes of any Applicable Law relating to fraudulent conveyances and similar claims. The rights and obligations among Borrowers pursuant to this subsection shall survive the payment and performance of the Obligations. "***Pro Rata Share***" means the amount of Loan

proceeds actually advanced to or for the benefit of each Borrower as reflected on the books and records of such Borrower. Each Borrower has expressly assumed the risk that such Borrower's actual liability may exceed such Borrower's Pro Rata Share and that overpayments may not actually be reimbursed or indemnified.

8.26 Credit Party Experience and Advisers; No Lender Advice. Each Credit Party represents, warrants, and covenants that (a) such Credit Party (i) **IS EXPERIENCED IN COMPLEX AND SOPHISTICATED BUSINESS MATTERS AND COMMERCIAL FINANCING TRANSACTIONS OF THE TYPE CONTEMPLATED BY THE LOAN DOCUMENTS**; (ii) **HAS HAD SUFFICIENT TIME TO CAREFULLY REVIEW ALL PROVISIONS, TERMS AND CONDITIONS OF EACH LOAN DOCUMENT AND CONSULT WITH SUCH INVESTMENT, TAX, LEGAL, FINANCIAL AND OTHER ADVISERS AS SUCH CREDIT PARTY HAS DEEMED APPROPRIATE**; and (iii) **HAS DETERMINED THAT THE LOAN DOCUMENTS COMPLETELY AND ACCURATELY REFLECT THE FINAL BUSINESS DEAL OF THE PARTIES**; and (b) **NO LENDER PARTY OR ANY EMPLOYEE, AGENT, REPRESENTATIVE, OR ADVISER OF A LENDER PARTY HAS PROVIDED ANY CREDIT PARTY WITH ANY INVESTMENT, TAX, LEGAL, OR FINANCIAL ADVICE OR ACTED AS AN ADVISOR TO ANY CREDIT PARTY WITH RESPECT TO SUCH MATTERS**.

8.27 Entire Agreement. **THE LOAN DOCUMENTS COLLECTIVELY CONSTITUTE THE FINAL EXPRESSION AND ENTIRE WRITTEN AGREEMENT OF LENDER AND THE CREDIT PARTIES WITH RESPECT TO THE SUBJECT MATTER THEREOF; SUPERSEDE ALL PRIOR AND CONTEMPORANEOUS AGREEMENTS, DISCUSSIONS, AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF, WRITTEN OR ORAL, INCLUDING PRIOR LETTERS OF INTEREST, PROPOSAL LETTERS, COMMITMENT LETTERS, FEE LETTERS, CONFIDENTIALITY AGREEMENTS, OR OTHER AGREEMENTS, INVOLVING ANY CREDIT PARTY OR LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE, OR EFFECT; AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY ALLEGED ORAL AGREEMENT.** Notwithstanding the foregoing, all Closing Conditions shall continue in effect until such time as the Closing occurs.

8.28 Keep Well. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under the Loan Documents in respect of Swap Obligations under any Secured Rate Contract (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under any other Loan Document, voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Secured Rate Contract have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement. Each Qualified ECP Guarantor intends that this Section constitute, and this Section shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

8.29 Attachments. The following items are attached to and are an integral part of this Agreement:

| | |
|---|---|
| ***Exhibit 1.1***: | Collateral Table |
| ***Exhibit 1.3(c)***: | DLOC A Draw Request |
| ***Exhibit 1.3(d)***: | DLOC A Draw Conditions and Development Project Final Completion Deliverables |
| ***Exhibit 2.1:*** | Closing Conditions |
| ***Exhibit 4.15(g)***: | Form of Compliance Certificate |
| ***Exhibit 8.1***: | Schedule of Defined Terms |

[SIGNATURE PAGES FOLLOW]

**EXECUTED** effective as of the date first set forth above.

**BORROWER:**

**TIG QUESO LLC**, a Delaware limited liability company

By: ______________________________
Manisha Patel, Authorized Member

**QUESO TIME DE 1 LLC**, a Delaware limited liability company,
**QUESO TIME DE 2 LLC**, a Delaware limited liability company,
**QUESO TIME DE 3 LLC**, a Delaware limited liability company,
**QUESO TIME DE 4 LLC**, a Delaware limited liability company, and
**QUESO TIME DE 5 LLC**, a Delaware limited liability company

By: TIG Queso DE LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: ______________________________
Manisha Patel, Authorized Member

**QUESO TIME TPA1 LLC**, a Florida limited liability company,
**QUESO TIME TPA2 LLC**, a Florida limited liability company, and
**QUESO TIME TPA3 LLC**, a Florida limited liability company

By: TIG Queso FL LLC, a Delaware limited liability company, Authorized Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: ______________________________
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME NJ 1 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 10 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 11 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 12 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 17 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 2 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 20 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 3 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 4 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 5 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 6 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 9 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 15 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 18 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 19 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 21 LLC**, a New Jersey limited liability company,
and **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company

By: TIG Queso NJ LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME NY 1 LLC**, a New York limited liability company,
**QUESO TIME NY 2 LLC**, a New York limited liability company,
**QUESO TIME NY 3 LLC**, a New York limited liability company,
and **QUESO TIME NY 4 LLC**, a New York limited liability company

By: TIG Queso NY LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company,
and **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company

By: TIG Queso PA LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: ______________________
Manisha Patel, Authorized Member

**TIG QUESO NY LLC**, a Delaware limited liability company,
**TIG QUESO DE LLC**, a Delaware limited liability company,
**TIG QUESO NJ LLC**, a Delaware limited liability company,
**TIG QUESO PA LLC**, a Delaware limited liability company, and
**TIG QUESO FL LLC**, a Delaware limited liability company

By: TIG Queso LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: ______________________
Manisha Patel, Authorized Member

Principal Place of Business and Address for Notices:

416 Ridge Avenue
Middletown, Delaware 19709
Attn: Manisha Patel

**ACCEPTANCE OF APPOINTMENT AS BORROWER REPRESENTATIVE:**

The undersigned is executing this Agreement for the purpose of accepting the appointment of the undersigned as Borrower Representative pursuant to ***Section 8.25(b)*** above.

**BORROWER REPRESENTATIVE:**

**TIG QUESO LLC**, a Delaware limited liability company

By: Manisha Patel
Manisha Patel, Authorized Member

Principal Place of Business and Address for Notices:
416 Ridge Avenue
Middletown, Delaware 19709

**LENDER:**

**BANK MIDWEST**, a division of NBH Bank

By: ______________________________
Name: Steven Doulong
Title: Vice President

Address for Notices:

NBH Bank
P.O. Box 26528
Kansas City, MO 64196-6528

## EXHIBIT 1.1
## COLLATERAL TABLE

At Closing, the Collateral will include a first priority blanket lien on and security interest in all of Borrower's tangible and intangible personal property, wherever located, including all such property located at or used in connection with the Sites identified below. The Collateral will also include first priority Mortgages on those Sites identified below as Mortgage Sites.

| **Store ID No./Name** | **Permitted Concept** | **Ownership Interest** (Fee or Lease) | **Owner of referenced interest** | **Street Address** | **City** | **State** | **Mortgage Site** (Yes/No) |
|---|---|---|---|---|---|---|---|
| 2920 | Qdoba Mexican Eats | Lease | Queso Time DE4 LLC | 1211 N Dupont Hwy | Dover | DE | No |
| 1718 | Qdoba Mexican Eats | Lease | Queso Time DE 3 LLC | 58 E Main St | Newark | DE | No |
| 2960 | Qdoba Mexican Eats | Lease | Queso Time DE 1 LLC | 5609 Concord Pike | Wilmington | DE | No |
| 2986 | Qdoba Mexican Eats | Lease | Queso Time DE 2 LLC | 3230 Fashion Center Blvd | Newark | DE | No |
| 3083 | Qdoba Mexican Eats | Lease | Queso Time TPA1 LLC | 2524 S. Falkenburg Road | Tampa | FL | No |
| 3124 | Qdoba Mexican Eats | Lease | Queso Time TPA2 LLC | 17509 Preserve Walk Lane | Tampa | FL | No |
| 2633 | Qdoba Mexican Eats | Lease | Queso Time NJ 1 LLC | 561 Route 1 South | Edison | NJ | No |
| 2798 | Qdoba Mexican Eats | Lease | Queso Time NJ 2 LLC | 55 Rockafeller Rd | Piscataway | NJ | No |
| 2924 | Qdoba Mexican Eats | Lease | Queso Time NJ 3 LLC | 770 US Route 1 N | Iselin | NJ | No |
| 2747 | Qdoba Mexican Eats | Lease | Queso Time NJ 5 LLC | 3535 US-1 Suite 179 | Princeton | NJ | No |
| 3050 | Qdoba Mexican Eats | Lease | Queso Time NJ 9 LLC | 33 U.S. Highway 9 | Manalapan | NJ | No |
| 2893 | Qdoba Mexican Eats | Lease | Queso Time NJ 10 LLC | 26-31 Rt. 208 | Fair Lawn | NJ | No |
| 2963 | Qdoba Mexican Eats | Lease | Queso Time NJ 11 LLC | 64 Halsey St | Newark | NJ | No |
| 2779 | Qdoba Mexican Eats | Lease | Queso Time NJ 12 LLC | 2268 Us Highway 22 E | Union | NJ | No |
| 3127 | Qdoba Mexican Eats | Lease | Queso Time NJ 17 LLC | 393 Route 17 South | Paramus | NJ | No |
| 2716 | Qdoba Mexican Eats | Lease | Queso Time NJ 6 LLC | 905 Bayonne Crossing Way | Bayonne | NJ | No |
| 2566 | Qdoba Mexican Eats | Lease | Queso Time NJ 4 LLC | 1630 Kings Hwy | Cherry Hill | NJ | No |
| 3251 | Qdoba Mexican Eats | Lease | Queso Time NJ 20 LLC | 604 Bartholomew Rd | Piscataway | NJ | No |
| 2752 | Qdoba Mexican Eats | Lease | Queso Time NY 1 LLC | 2335 Richmond Ave | Staten Island | NY | No |

Case 8:26-bk-00244-MS-CPT Document 1-1 Filed 02/04/26 Page 33 of 158

| **Store ID No./Name** | **Permitted Concept** | **Ownership Interest** (Fee or Lease) | **Owner of referenced interest** | **Street Address** | **City** | **State** | **Mortgage Site** (Yes/No) |
|---|---|---|---|---|---|---|---|
| 2863 | Qdoba Mexican Eats | Lease | Queso Time NY 2 LLC | 7001 Amboy Rd | Staten Island | NY | No |
| 2989 | Qdoba Mexican Eats | Lease | Queso Time NY 3 LLC | 1275 Woodrow Rd | Staten Island | NY | No |
| 3063 | Qdoba Mexican Eats | Lease | Queso Time NY 4 LLC | 2750A Hylan Blvd | Staten Island | NY | No |
| 2774 | Qdoba Mexican Eats | Lease | Queso Time PA3 LLC | 2669 Macarthur Rd | Whitehall | PA | No |
| 3000 | Qdoba Mexican Eats | Lease | Queso Time PA 1 LLC | 690 Rockhill Drive | Bensalem | PA | No |
| 2693 | Qdoba Mexican Eats | Lease | Queso Time PA 10 LLC | 500 Broad St | Collegeville | PA | No |
| 2607 | Qdoba Mexican Eats | Lease | Queso Time PA 11 LLC | 100 Welsh Rd | Horsham | PA | No |
| 3005 | Qdoba Mexican Eats | Lease | Queso Time PA 2 LLC | 2 Summit Square Shopping Center | Langhorne | PA | No |
| 2860 | Qdoba Mexican Eats | Lease | Queso Time PA 6 LLC | 1991 Sproul Rd | Broomall | PA | No |
| 2582 | Qdoba Mexican Eats | Lease | Queso Time PA 7 LLC | 1107 West Chester Pike | West Chester | PA | No |
| 2916 | Qdoba Mexican Eats | Lease | Queso Time PA 8 LLC | 200 W Ridge Pike | Conshohocken | PA | No |
| 2606 | Qdoba Mexican Eats | Lease | Queso Time PA 9 LLC | 261 Old York Rd | Jenkintown | PA | No |
| 3115 | Qdoba Mexican Eats | Lease | Queso Time NJ 15 LLC | 1951 East Edgar Road | Linden | NJ | No |
| 3252 | Qdoba Mexican Eats | Lease | Queso Time PA 12 LLC | 1570 Egypt Road | Oaks | PA | No |
| 3189 | Qdoba Mexican Eats | Lease | Queso Time TPA3 LLC | 1330 4th Street North | Saint Petersburg | FL | No |
| 3152 | Qdoba Mexican Eats | Lease | Queso Time NJ 18 LLC | 200 Mill Creek Drive, Suite 101 | Secaucus | NJ | No |
| 3213 | Qdoba Mexican Eats | Lease | Queso Time NJ 19 LLC | 1053 Route 73, Suite G | Marlton | NJ | No |
| 3214 | Qdoba Mexican Eats | Lease | Queso Time DE 5 LLC | 4435 Kirkwood Highway, Suite A | Wilmington | DE | No |
| 3268 | Qdoba Mexican Eats | Lease | Queso Time NJ 22 LLC | 3452 Broidy Road | Joint Base MDL Fort Dix Burlington | NJ | No |
| 3244 | Qdoba Mexican Eats | Lease | Queso Time NJ 21 LLC | 1070 Whitehorse-Mercerville Road, Unit 18 | Hamilton | NJ | No |

**EXHIBIT 1.3(c)**
**DLOC A DRAW REQUEST**

**BANK MIDWEST**
P.O. Box 26528
Kansas City, MO 64196-6528

Re: Loan Agreement dated ____________, 2025 (as amended from time to time, the "***Agreement***"), between **TIG QUESO LLC**, a Delaware limited liability company, and various affiliates described therein (collectively, "***Borrower***") and **BANK MIDWEST**, a division of NBH Bank ("***Lender***"). Capitalized terms used in this DLOC A Draw Request (the "***Draw Request***") and not defined herein have the meanings given thereto in the Agreement.

1. Request; Disbursement Instructions. Borrower requests a DLOC A Draw of $_________________ (the "***Requested Draw***"), to be disbursed by wire transfer to the payee(s) and account(s) designated in the Disbursement Schedule. If disbursement is to an escrow agent, then escrow agent is authorized to further disburse such funds in accordance with a settlement statement prepared by escrow agent and signed by Borrower and approved by Lender.

| **DISBURSEMENT SCHEDULE** | |
|---|---|
| **Payee and Wire Transfer Instructions** | **Amount** |
| Payee Name: ____________________<br>Account Name: ____________________<br>Account Number: ____________________<br>ABA #: ____________________<br>Bank Name: ____________________<br>Street Address: ____________________<br>City, State, and Zip Code: ____________________<br>Additional Comments or Instructions: ____________________ | $_________________ |
| Payee Name: ____________________<br>Account Name: ____________________<br>Account Number: ____________________<br>ABA #: ____________________<br>Bank Name: ____________________<br>Street Address: ____________________<br>City, State, and Zip Code: ____________________<br>Additional Comments or Instructions: ____________________ | $_________________ |

2. Requested Draw Date. _________________, 20__. Borrower acknowledges that it may take up to ***five Business Days*** after all conditions to funding have been fully satisfied or otherwise waived by Lender to fund the Requested Draw and, consequently, the funding may not occur on the Requested Draw Date.

3. Conditions to Draw. Borrower understands and agrees that Lender's obligation to fund the Requested Draw is subject to Lender's satisfaction with or waiver of, in Lender's sole discretion, each of the DLOC A Draw Conditions set forth on ***Exhibit 1.3(d)*** to the Agreement.

4. Borrower Representations, Warranties, and Covenants: As a material inducement to Lender to fund the Requested Draw, Borrower represents and warrants to and covenants with Lender that:

(a) Representations and Warranties. Both before and after funding the Requested Draw, the representations and warranties of each Credit Party in the Loan Documents, including ***Article 3*** of the Agreement, are true and correct in all material respects, as though made as of the date of this Draw Request and will be true and correct as of the date the Requested Draw is funded, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such date.

(b) No Defaults. As of the date of this Draw Request, no Default has occurred that is continuing. The funding of the Requested Draw will not result in the occurrence of a Default. Borrower is and will be in compliance with the financial covenants in ***Section 4.16*** of the Agreement, both before and, on a pro forma basis, immediately after the Requested Draw is funded.

(c) Authorization and Execution. This Draw Request is being executed by Borrower Representative, on behalf of each Borrower, pursuant to ***Section 8.25(b***) of the Agreement, with the same force and effect as if executed by each Borrower. The individual executing this Draw Request is duly authorized to do so.

(d) Purpose. The Requested Draw will be used as follows, with respect to the listed Site(s):

| Proposed Use of Draw | Name of Entity Using Draw | Store # | Concept | Street Address | City | ST | ZIP | Leasehold or Fee Site? |
|---|---|---|---|---|---|---|---|---|
| ☐ Acquisition<br>☐ Development | | | | | | | | |
| ☐ Acquisition<br>☐ Development | | | | | | | | |

(e) Incurrence Tests. Taking the Requested Draw into account, the incurrence tests included in ***Section 4*** of the DLOC A Draw Conditions on ***Exhibit 1.3(d)*** to the Agreement are satisfied. Attached are the Financial Statements and covenant calculations used to determine that such incurrence tests are satisfied. The Financial Statements are complete and correct and have been prepared in accordance with GAAP from period to period and otherwise in compliance with the requirements in the Agreement.

Dated: ____________, 20__.

**BORROWER REPRESENTATIVE**:

**TIG QUESO LLC**, a Delaware limited liability company

By: ____________________________________________
Name: __________________________________________
Title: Authorized Member

**BORROWER**: Please attach, at the end of this DLOC A Draw Request, the Financial Statements and covenant calculations referred in ***Paragraph 4(e)*** above.

**EXHIBIT 1.3(d)**
**DLOC A DRAW CONDITIONS**
**AND FINAL COMPLETION DELIVERABLES**

**DLOC A DRAW CONDITIONS**: Prior to funding a DLOC A Draw, each of the following conditions precedent (the "***DLOC A Draw Conditions***") shall have been satisfied, at Borrower's sole cost and expense, all as determined by Lender in its sole discretion, unless, Lender, in its sole discretion, waives any such DLOC A Draw Condition:

1. Representations and Warranties. The representations and warranties of Borrower set forth in the Draw Request are and will be true, correct and complete, both before and after funding the DLOC A Draw.

2. Payment of Costs, Expenses and Fees. All costs, expenses and fees to be paid by Borrower on or before the date of the DLOC A Draw, including all related Transaction Costs, shall have been paid in full.

3. No Material Adverse Effect. No Material Adverse Effect shall have occurred since Closing, and there shall be no facts or circumstances existing and not previously disclosed in writing to Lender with respect to any Credit Party, the Collateral, the seller, if any, of the Collateral, any other Person representing or otherwise acting on behalf of a Credit Party, or the transaction that, in Lender's reasonable judgment, are inconsistent in a material and adverse manner with any such information disclosed to Lender prior to Closing.

(a) Incurrence Tests. After giving effect to each requested DLOC A Draw on a pro-forma basis, Borrower shall (a) be and remain in compliance with all of the financial covenants required under ***Section 4.16*** of this Loan Agreement, and (b) shall maintain a ratio of Consolidated Effective Funded Debt to Consolidated EBITDAR for Borrower and its consolidated Affiliates, measured as of the last day of Borrower's most recently ended Fiscal Quarter and computed as if the DLOC A Draw had been funded on such last day, equal to or less than the ratio stated in the following table during the respective periods:

| Period | Ratio |
|---|---|
| The first Fiscal Quarter of 2025, through the fourth Fiscal Quarter, 2025: | ≤ 5.50:1 |
| The first Fiscal Quarter of 2026, through the fourth Fiscal Quarter, 2026: | ≤ 5.25:1 |
| The first Fiscal Quarter of 2027, and for all Fiscal Quarters thereafter: | ≤ 5.00:1 |

4. Acquisitions. If the DLOC A Draw will fund an Acquisition:

(a) Borrower Equity. Concurrently with the closing of the Acquisition, Borrower shall have paid that portion of the Acquisition purchase price not funded by Lender, as well as all other costs associated with the Acquisition and not financed by Lender.

(b) Acquisition Documents; Concurrent Closing. Lender shall have received complete, executed copies of the purchase agreement and related documents for each Acquisition Parcel, the terms of which shall be acceptable to Lender, and the Acquisition shall close concurrently with the DLOC A Draw funding.

(c) New Entities. If a particular Acquisition Parcel will be acquired by an entity other than Borrower (a "***New Entity***"), Lender shall have received and approved (i) evidence that the New Entity is an Affiliate of Borrower and is in good standing under the laws of its formation state and in the state where such Acquisition Parcel is located and that the Person(s) executing documents on behalf of the New Entity are duly authorized to do so; and (ii) such additional Loan Documents, executed by the New Entity, as Lender deems necessary or advisable to ensure, among other things, that, concurrently with the acquisition of the Acquisition Parcel, the New Entity is a co-Borrower, jointly and severally, with each other Borrower.

(d) Site Due Diligence. Lender shall have completed its credit underwriting and due diligence review with respect to the Acquisition and each Acquisition Parcel.

(e) Collateral Requirements. Borrower shall have delivered to Lender such Mortgage, security agreements, and other documents as Lender may require from Borrower and any other Person having any interest in each Acquisition Parcel and/or the business to be conducted thereat, each in form acceptable to Lender, granting to Lender a first priority Lien on each such Acquisition Parcel and all related personal property, with each such document, upon execution, to be deemed to be a Loan Document; and all such documents and related UCC financing statements shall have been properly filed or recorded in the appropriate governmental office.

(f) Insurance. Borrower shall have delivered to Lender evidence that all insurance required pursuant to ***Section 4.4*** of the Agreement and the Insurance Requirements, including any required flood insurance, has been obtained and is in full force and effect with respect to each Acquisition Parcel.

(g) Title Insurance; Survey. Lender shall have received from a title company acceptable to Lender an ALTA lender's title policy for each Acquisition Parcel for which Lender will require a Mortgage, in such form and amounts and with such endorsements as Lender may require, insuring that Lender's Mortgage is a first priority Lien on such Acquisition Parcel, subject only to exceptions approved by Lender. If, in order to obtain such title insurance, the title company requires an ALTA survey of the Acquisition Parcel, Borrower shall have provided to Lender an ALTA survey of such Acquisition Parcel from a licensed surveyor acceptable to Lender.

(h) Environmental Conditions. Lender shall have received, from consultants approved by Lender, such environmental reports, including phase I environmental site assessments, for each Acquisition Parcel in which Borrower is acquiring the fee real property interest and for each Acquisition Parcel for which Lender will require a Mortgage, and Lender shall have approved the environmental condition of such Acquisition Parcel.

(i) Appraisal. Lender shall have received an appraisal of each Acquisition Parcel for which Lender will require a Mortgage, dated no more than 60 days prior to the date of the Draw Request, that is compliant with Applicable Law and such additional requirements as Lender may specify, performed by state certified appraisers selected by Lender. Lender will order the appraisal.

(j) Franchise Agreements. Fully executed, complete copies of the Franchise Agreements for each Acquisition Parcel, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

(k) Leases. Fully executed, complete copies of the Leases for each Acquisition Parcel, which Leases shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, status certificates, and consents with respect to such agreements as Lender may require.

5. Development Projects. If the Requested Draw will fund a Development Project:

(a) Budget; Borrower Equity. Prior to making the first DLOC A Draw Request for a particular Development Project, Borrower shall have delivered to Lender and Lender shall have approved a Development Project budget of all costs to be incurred in connection with the Development Project, and Borrower shall have paid (or shall pay concurrently with the funding of the DLOC A Draw) that portion of total Development Project costs that are not being financed by Lender.

(b) New Entities. If a site that is proposed to be included in a Development Project is owned by an entity other than Borrower (a "***New Entity***") and such site will not be the subject of an Acquisition, Lender shall have received and approved (i) evidence that the New Entity is an Affiliate of Borrower and is in good standing under the laws of its formation state and in the state where such site is located and that the Person(s) executing documents on behalf of the New Entity are duly authorized to do so; and (ii) such additional Loan Documents, executed by the New Entity, as Lender deems necessary or advisable to ensure, among other things, that the New Entity is a co-Borrower, jointly and severally, with each other Borrower, whereupon such site will be deemed to be a Site as well as a Development Site.

(c) Collateral Requirements. Borrower shall have delivered to Lender such security agreements, and other documents as Lender may require from the Person(s) owning each Development Site and from any other Person having any interest in each Development Site and/or the business to be conducted thereat, each in form acceptable to Lender, granting to Lender a first priority Lien on each such Development Site and all related personal property, with each such document, upon execution, to be deemed to be a Loan Document; and all such documents and related UCC financing statements shall have been properly filed or recorded in the appropriate governmental office.

(d) Insurance. Borrower shall have delivered to Lender evidence that all insurance required pursuant to ***Section 4.4*** of the Agreement and the Insurance Requirements, including any required flood insurance, has been obtained and is in full force and effect with respect to each Development Site.

(e) Environmental Conditions. Lender shall have received, from consultants approved by Lender, such environmental reports, including phase I environmental site assessments, for each Development Site in which Borrower owns the fee real property interest and for each Development site for which Lender has or will require a Mortgage, and Lender shall have approved the environmental condition of such Development Site.

(f) Title Insurance; Survey. Lender shall have received from a title company acceptable to Lender an ALTA lender's title policy for each Development Site for which Lender has or will require a Mortgage, in such form and amounts and with such endorsements as Lender may require, insuring that Lender's Mortgage is a first priority Lien on such Development Site, subject only to exceptions approved by Lender. If, in order to obtain such title insurance, the title company requires an ALTA survey of the Development Site, Borrower shall have provided to Lender an ALTA survey of such Development Site from a licensed surveyor acceptable to Lender.

(g) Appraisal. Prior to the first DLOC A Draw for the Development Project, Lender shall have received an "as completed" appraisal of each Development Site for which Lender has or will require a Mortgage, dated no more than 60 days prior to the date of the first Draw Request, that is compliant with Applicable Law and such additional requirements as Lender may specify, performed by state certified appraisers selected by Lender. Lender will order the appraisal.

(h) General Contractor. Lender shall have approved the general contractor for the Development Project, which approval shall not be unreasonably withheld.

(i) Permits. Borrower shall have obtained and provided to Lender: (i) prior to the first DLOC A Draw for such Development Project, all building and other permits and licenses as are required by the applicable Government Authority in connection with such Development Project; and (ii) prior to each subsequent DLOC A Draw for such Development Project, such inspection reports, permits and approvals as are required by the applicable Government Authority at the applicable stage of the progress of construction, including any updates to the permits, licenses, and approvals referenced in ***clause (i)***.

(j) Lien Waivers. Borrower shall have delivered to Lender: (a) conditional lien waivers (conditioned only on the payment of the money specified) from all contractors, subcontractors, and suppliers who have performed work or provided labor or materials as part of such Development Project and who will receive proceeds from the requested DLOC A Draw; and (b) unconditional lien waivers for all prior DLOC A Draws.

(k) Inspections. If the Development Project budget exceeds $2,500,000, Lender and/or a third-party construction consultant retained by Lender shall have conducted such inspections of the Development Project as Lender shall require, and Lender shall have approved all inspection reports provided by such construction consultant, if applicable. All such inspections shall be for Lender's sole benefit.

(l) Invoices. If required by Lender, Borrower shall have delivered to Lender copies of each invoice or receipt for items to be funded from the DLOC A Draw, if such invoice or receipt is greater than $50,000.

**FINAL COMPLETION DELIVERABLES**: The "***Final Completion Deliverables***" are as follows:

1. Lease. A fully executed, complete copy of the Lease for each Development Site that is a Leased Site.

2. Title Insurance and Surveys. For each Development Site that is a Mortgage Site, such title insurance policies and endorsements as Lender may require in its sole discretion, together with an ALTA "as built" survey certified to Lender and the title company, if required by the title company to issue the title insurance and endorsements required by Lender.

3. Lien Waivers. For each Development Site that is a Mortgage Site, Lender shall have received and approved, in its sole discretion, unconditional lien waivers and releases reflecting final payment from the general contractor, each construction contractor, each subcontractor, and each supplier.

4. Final Inspections. Lender and/or a third-party construction consultant retained by Lender shall have conducted such final inspections of the Development Project as Lender shall require, and Lender shall have approved all inspection reports provided by such construction consultant, if applicable. All such inspections shall be for Lender's sole benefit.

5. Final Permits. Borrower shall have obtained and provided to Lender all final building and other permits and licenses as are required by the applicable Government Authority in connection with such Development Project, including the final certificate of occupancy.

6. Franchise Agreements. Fully executed, complete copies of the Franchise Agreements for each Development Site, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

**EXHIBIT 2.1**
**CLOSING CONDITIONS**

Lender's obligation to close the Loan is subject to Lender's satisfaction with or waiver of, in Lender's sole discretion, the following conditions, including required deliverables, each at Borrower's expense:

1. Due Diligence. Lender shall have received and approved all items, documents and information required by Lender in connection with its credit underwriting and due diligence for the Loan and shall have completed such credit underwriting and due diligence with respect to Borrower, Guarantor, the Loan, the Collateral, and all aspects of the Site as Lender deems appropriate, and the results of such underwriting and due diligence are satisfactory to Lender, in its sole discretion.

2. Payments. All costs, expenses and fees to be paid by Borrower on or before Closing shall have been paid, which payment may be made at the direction of Borrower (and with Lender's reasonable approval) from the Loan proceeds to the extent such proceeds exceed the aggregate amount of the indebtedness being refinanced with the Loan.

3. No Default; Representations. No Default has occurred and is continuing or would occur as a result of the consummation of the transactions at the Closing. All representations and warranties of each of the Credit Parties in Loan Documents signed by such Credit Party are true, correct, and complete in all material respects.

4. Executed Loan Documents. Lender shall have received the following Loan Documents, together with all such other documents and instruments as Lender may require, in each case duly executed and, where appropriate, acknowledged, by all parties thereto, other than Lender, each in form and substance satisfactory to Lender:

(a) This Agreement;

(b) The Term Loan A Note;

(c) The DLOC A Note;

(d) The Guaranty;

(e) A security agreement, pledge agreement and/or collateral assignment from each person having an interest in the personal property Collateral, including all Persons named as franchisees in the Franchise Agreement for the Site; and

(f) A Borrower authorization.

5. Financing Statements. Lender shall have received evidence that appropriate financing statements have been properly filed with the appropriate Government Authority and that the security interests of Lender in all personal property Collateral are in first lien position, subject only to applicable permitted exceptions.

6. Deliverables. Borrower shall have delivered to Lender, or Lender shall otherwise have obtained, and Lender shall have approved, the following, together with such other information and documentation as Lender may reasonably require, all at Borrower's expense:

(a) Evidence that Existing Debt Paid. Evidence that all outstanding seller financing, indebtedness owed to any of Borrower's shareholders, members, partners, or principals and all other indebtedness owed to any third party, excluding indebtedness held by Lender or its affiliates, has been paid in full.

(b) Insurance. Evidence that all insurance that Borrower is required to have at Closing pursuant to ***Section 4.4*** has been obtained, is in full force and effect, and complies with the requirements of the Loan Documents.

(c) Franchise Agreements. Fully executed, complete copies of the Franchise Agreements, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

(d) Leases. Fully executed, complete copies of the Leases, which Leases shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, status certificates, and consents with respect to such agreements as Lender may require.

(e) Legal Opinions. Such legal opinions as Lender may require, in form and substance and from counsel satisfactory to Lender.

(f) Excluded Sites. Written fully executed amendments or other agreements releasing TIG Queso LLC, TIG Queso PA LLC and TIG Queso NJ LLC, as an obligor from all obligations under or related to the Excluded Sites, including without limitation, the franchise agreements, leases and existing debt with respect to the Excluded Sites, and evidence satisfactory to Lender that the franchise agreements for the Collateral Sites are not cross-defaulted with the Excluded Sites.

7. Site Visits/Conditions. Lender shall have made the Site visits as may be required by Lender and approved the location and site characteristics of each Site.

8. In-Person Meetings. Satisfactory in-person meetings with ownership and/or management of Borrower as required by Lender.

9. Other Conditions. All other conditions to Lender's obligations to close the Loan have been satisfied.

**EXHIBIT 4.15(g)**
**COMPLIANCE CERTIFICATE FORM**

**BANK MIDWEST**
P.O. Box 26528
Kansas City, MO 64196-6528

Re: Loan Agreement dated ______________, 2025 (as amended from time to time, the "***Agreement***"), between **TIG QUESO LLC**, a Delaware limited liability company, and various affiliates described therein (collectively, "***Borrower***") and **BANK MIDWEST**, a division of NBH Bank ("***Lender***"). Capitalized terms used in this Compliance Certificate and not defined herein have the meanings given to those terms in the Agreement.

The undersigned certifies the following to Lender, as of the date of this Compliance Certificate:

1. The attached Financial Statements are complete and true and have been prepared in accordance with GAAP from period to period and otherwise in compliance with the requirements stated in the Agreement.

2. Borrower is in compliance with all financial covenants contained in the Agreement, including each of the financial covenant requirements set forth below. The covenant calculations used in determining compliance with the following financial covenants are attached to this Compliance Certificate as ***Schedule 1***.

(a) Pre-Compensation Consolidated FCCR must be ≥ 1.20:1 for the period ending _______, 20__. The ratio as of the end of such period is ____:1.

(b) Post-Compensation Consolidated FCCR must be ≥ _1.10:1 for the period ending _______, 20__. The ratio as of the end of such period is ____:1.

(c) Ratio of Consolidated Effective Funded Debt to Consolidated EBITDAR must be as stated in the following table during the respective periods. The ratio at the end of such period is _______:1.

| Period | Ratio |
|---|---|
| The first Fiscal Quarter of 2025, through the fourth Fiscal Quarter, 2025: | ≤ 6.00:1 |
| The first Fiscal Quarter of 2026, through the fourth Fiscal Quarter, 2026: | ≤ 5.75:1 |
| The first Fiscal Quarter of 2027, through the fourth Fiscal Quarter 2027: | ≤ 5.50:1 |
| The first Fiscal Quarter of 2028, through the fourth Fiscal Quarter, 2028: | ≤ 5.25:1 |
| The first Fiscal Quarter 2029, and for all Fiscal Quarters thereafter: | ≤ 5.00:1 |

(d) Liquid Assets of Guarantor and Borrower must be at least $1,000,000.00 for the period ending _______, 20__. The Liquid Assets at the end of such period is $_________________.

3. No Default has occurred that is continuing, except for the following, as to which Borrower is taking the actions listed in order to cure such Default: If none, so state.

| DEFAULT | CURE ACTIONS |
|---|---|
| | |

Case 8:26-mc-00034-MSS-CPT Document 1 Filed 02/20/26 Page 43 of 58

4. Since the Closing Date and except as disclosed in prior Compliance Certificates delivered to Lender, neither Borrower nor any other Credit Party has:

Changed its legal name, identity, jurisdiction of incorporation, organization or formation or organizational structure or formed or acquired any subsidiary except as follows: ___________________;

Acquired the assets of, or merged or consolidated with or into, any Person, except as follows: ___________________________; or

Changed its address or otherwise relocated, except as follows: ______________.

Dated: ___________, 20__

**BORROWER REPRESENTATIVE:**

**TIG QUESO LLC**, a Delaware limited liability company

By: ______________________________________________
Name: ____________________________________________
Title: Authorized Member

Before submitting this Compliance Certificate to Lender, please attach the financial covenant compliance calculations at the end of the document.

**EXHIBIT 8.1**
**SCHEDULE OF DEFINED TERMS**

1. Defined Terms. The following terms have the meanings set forth below:

"***Account Collateral***" means (a) all deposit accounts of Borrower held by Lender; (b) all cash, checks, wire transfers, drafts, certificates, instruments and funds deposited or held in, credited to or made to such deposit accounts; (c) all interest, dividends, cash, and other property received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (d) all "proceeds" (as defined in the UCC), replacements and substitutions of any or all of the foregoing.

"***Affiliate***" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, (a) owns more than twenty percent (20%) of the Person specified or (b) Controls or is Controlled by or is under common Control with the Person specified.

"***Applicable Law***" means, as to a Person, any law (statutory or common), ordinance, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or Government Authority, in each case applicable to or binding on such Person or any of its assets or to which such Person or any of its assets is subject.

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Business Day***" means any day of the year that is not a Saturday, Sunday or a day on which banks are required or authorized to close in Greenwood Village, Colorado or New York, New York.

"***Capital Lease***" means any lease or similar arrangement that is classed as a capital lease pursuant to GAAP.

"***Collateral***" means all real and personal property, tangible and intangible, as to which Lender is granted a Lien pursuant to any Loan Document, and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a Lien in favor of Lender, with references to "Collateral" to include all or any portion of or interest in any of the Collateral.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"***Consolidated EBITDAR***" means, the aggregate sum, for such 12-month period, for Borrower and its consolidated Subsidiaries, of all net income, interest expense, income taxes, depreciation, amortization, and Operating Lease Expenses, but less non-recurring miscellaneous income and plus non-recurring miscellaneous expenses (as allowed by Lender), each as determined in accordance with GAAP.

"***Consolidated Effective Funded Debt***" means the aggregate sum, for Borrower and its consolidated Subsidiaries, of (i) the outstanding principal balance, as of the last day of the fiscal period being measured, of all Indebtedness, and (ii) all Operating Lease Expenses for such 12-month period, multiplied by 8.00.

"***Contractual Obligation***" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument, or other undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound or subject, including each Franchise Agreement and each Lease.

"***Control***" and "***Controlled***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"***Credit Facilities Maturity Date***" means May 1, 2030.

"***Credit Party***" means Borrower, each Guarantor and each other Person (other than Lender) that is or may become a party to this Agreement or any other Loan Document.

"***Customer Diligence Rules***" means the Beneficial Ownership Regulation, the Bank Secrecy Act of 1970, as amended and applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act.

"***Customer Onboarding Requirements***" means Lender's standard policies, procedures and requirements relating to Customer Diligence Rules (which may include (a) customary searches, yielding results reasonably satisfactory to Lender and confirming that no Credit Party or its applicable direct or indirect owner is the subject of Sanctions, (b) receipt of an updated organizational chart and (c) receipt of a Beneficial Ownership Certification), the reasonable costs of which shall be borne by Borrower.

"***Default***" means any Event of Default (as defined in ***Article 6***) or any event or circumstance that, with the passage of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"***Excluded Rate Contract Obligation***" means, with respect to any Credit Party, any guarantee of any Swap Obligations under a Secured Rate Contract if, and only to the extent that and for so long as, all or a portion of the guarantee of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Swap Obligation under a Secured Rate Contract (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Credit Party or the grant of such security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract. If a Swap Obligation under a Secured Rate Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Secured Rate Contract that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"***FCPA***" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"***Franchise Agreement***" means the franchise agreement, area development agreement, or similar agreement relating to a particular Site, granted by the franchisor named in such agreement ("***Franchisor***"), together with all amendments, assignments, restatements, extensions, supplements, and exhibits thereto, that grants to Borrower the right to develop and operate such Site as the Permitted Concept.

"***GAAP***" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination.

"***Good Faith Contest***" means the contest as to which all of the following conditions have been satisfied: (a) Borrower delivers prompt notice to Lender of such contest and the nonpayment of any contested amount; (b) no Default or Event of Default exists; (c) such contest is diligently pursued and made and performed in accordance with Applicable Law; (d) nonpayment of the amounts being contested will not result in the sale, loss, forfeiture or diminution of the Collateral or impairment of any Lien in favor of Lender; (e) Borrower either, in Lender's reasonable discretion, (i) deposits adequate reserves with Lender for the payment of the applicable amounts being contested, together with all interest and penalties thereon, or (ii) provides evidence that Borrower holds sufficient funds to pay such amount, and (f) promptly after such contest or in the event litigation is commenced by the holder thereof, Borrower shall pay any such amounts (and fees, penalties, interest and other sums payable).

"***Government Authority***" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative,

judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"***Guaranty***" means a guaranty agreement pursuant to which one or more Persons (each, a "***Guarantor***", with references in the Loan Documents to "Guarantor" to mean and include each such Guarantor) guarantees payment and performance of all of the Obligations.

"***Indebtedness***" means, without duplication, all of the following, whether or not matured: (a) indebtedness for borrowed money, including the outstanding balances of any revolving lines of credit; (b) obligations evidenced by bonds, debentures, notes, or similar instruments; (c) reimbursement and other obligations with respect to letters of credit and acceptances; (d) obligations representing the deferred purchase price of property or services; (e) obligations created or arising under any conditional sale or other title retention agreement; (f) obligations with respect to Capital Leases; and (g) any other obligation for borrowed money or other financial accommodation (direct or contingent), whether evidenced by a note, instrument, guaranty or other writing and whether contingent, unliquidated or disputed.

"***Lease***" means the lease for a particular Site (each, a "***Leased Site***"), if Borrower's interest in such Site is a leasehold, together with all amendments, assignments, restatements, extensions, supplements, and exhibits thereto, as in effect on the Closing and in the future (the landlord/lessor under such Lease, being referred to as "***Lessor***").

"***Lender Party***" means each of Lender and its Affiliates.

"***Liabilities***" means all claims, actions, suits, judgments, damages, losses, liabilities, obligations, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature, including fees, charges and disbursements of financial, legal and other advisors and consultants (including those incurred in connection with responding to subpoenas or other discovery requests, third party or otherwise) and including interest accrued thereon or as a result thereof, whether joint or several, and whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"***Lien***" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest, including purchase money security interests, and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"***Loan Documents***" means, collectively, this Agreement; each Note; the Guaranty; each Mortgage; and each security agreement, stock pledge agreement, subordination agreement, environmental indemnity agreement, request for Draws, cross-default and/or cross-collateral agreement, and each other document or instrument now or hereafter executed and delivered by any Credit Party in connection with the Credit Facilities or any of the foregoing, with references in the Loan Documents to a particular Loan Document to mean such Loan Document, as it may be amended, restated, supplemented, extended or renewed from time to time. Each Exhibit, Schedule, Table, or Appendix attached to a Loan Document is an integral part of such Loan Document, the same as if set forth in full in the body thereof.

"***Material Adverse Effect***" means any fact, event, circumstance or other effect (including changes in market conditions), whether foreseeable or unforeseeable, that alone or in combination with other facts, events, circumstances, or effects occurring or existing concurrently with such fact, event, circumstance, or effect results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the condition (financial or otherwise), business, performance, operations or assets of any Credit Party; (b) the ability of any Credit Party to perform its obligations under any Loan Document; (c) the validity or enforceability of any Loan Document or the rights and remedies of Lender under any Loan Document; or (d) the Collateral, Lender's Liens in the Collateral, or the priority of such Liens.

"***Mortgage***" means each mortgage, deed of trust, or similar document granting a Lien to Lender with respect to a particular Site (each, a "***Mortgage Site***"), with references in the Loan Documents to "Mortgage" being to each such Mortgage.

"***Obligations***" means all amounts, obligations, liabilities, covenants and duties of every type and description (including for the payment of money), owing by any Credit Party to any Lender Party, or any Secured Swap Provider (other than Excluded Rate Contract Obligations), arising out of, under, or in connection with any Loan Document or any Related Agreement, whether direct or indirect, absolute or contingent, due or to become due, liquidated or not, now existing or hereafter arising, however acquired, and whether or not evidenced by any instrument; ***provided, however***, that Obligations of any Borrower or Guarantor shall not include any Excluded Rate Contract Obligations solely of such Borrower or Guarantor.

"***Operating Lease Expenses***" means all rent paid in cash, including any percentage rent (but excluding from "rent" any Taxes, insurance, common area maintenance, or other similar charges even if denominated as "rent"), incurred by Borrower or any of its consolidated Subsidiaries with respect to each Lease and with respect to any and all other operating leases or subleases during the period of determination, all determined in accordance with GAAP.

"***Permitted Concept***" means the concept set forth for a particular Site in the Collateral Table or such other concept as may be approved by Lender in its sole discretion for a particular Site.

"***Permitted Equity Transfer***" means transfers of direct or indirect ownership interests, or the creation or issuance of new or additional equity interest, in a Credit Party; provided, that, the following conditions are satisfied: (i) after giving effect to any such transfer, individually or in the aggregate, Guarantor continues to (x) Control Borrower (subject to customary "major decision" rights of other direct or indirect owners of equity in Borrower) and (y) own at least ninety-nine percent (99%) of the direct or indirect ownership interests in Borrower; (ii) the transferee is not a Sanctioned Person; (iii) no Event of Default would result from the proposed transfer; and (iv) the Customer Onboarding Requirements have been satisfied prior to any transfer (A) of direct or indirect ownership interests in a Credit Party that would cause the transferee thereof to own twenty percent (20%) or more (or such lesser percentage as may be required by applicable Customer Diligence Rules, after written notice of such change has been given by Lender to Borrower), in the aggregate, of such interests, or (B) that would result in a change in the Person(s) that Control(s) the Credit Party.

"***Permitted Exceptions***" means (a) recorded easements, covenants, conditions, restrictions, encumbrances, and other matters of record affecting the Collateral and approved by Lender in its sole discretion, including each Lease; (b) the Lien for current real property taxes and assessments, not yet due and payable, with respect to any real property Collateral; and (c) Liens in favor of a Lender Party.

"***Person***" means any individual, partnership, corporation, business trust, public benefit corporation, joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Government Authority.

"***Post-Compensation Consolidated FCCR***" means, with respect to the 12-month period of time immediately preceding the date of determination, the ratio, calculated for Borrower and its consolidated Subsidiaries for such time period, each as determined (and defined, as applicable) in accordance with GAAP, of: (i) the sum of net income, interest expense, income taxes, depreciation, amortization, and Operating Lease Expenses, plus or minus other non-cash adjustments or non-recurring items (as allowed by Lender), minus unfinanced capital expenditures at the Sites, minus all federal and state income taxes paid in cash, minus increases in officer or shareholder loan receivables, and minus dividends or distributions paid in cash not otherwise expensed on the applicable income statement(s); to (ii) interest expense (excluding non-cash interest expense and amortization of non-cash financing expenses), principal payments on long term debt, the sum of Operating Lease Expenses and the current portion of all Capital Leases.

"***Pre-Compensation Consolidated FCCR***" means, with respect to the 12-month period of time immediately preceding the date of determination, the ratio, calculated for Borrower and its consolidated Subsidiaries for such time period, each as determined (and defined, as applicable) in accordance with GAAP, of: (i) the sum of net income, interest expense, income taxes, depreciation, amortization, and Operating Lease Expenses, plus or minus other non-cash adjustments or non-recurring items (as allowed by Lender), minus unfinanced capital expenditures at the Sites, minus all federal and state income taxes paid in cash; to (ii) interest expense (excluding non-cash interest expense and amortization of non-cash financing expenses), principal payments on long term debt, the sum of Operating Lease Expenses and the current portion of all Capital Leases.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation under a Secured Rate Contract, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Rate Contracts***" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"***Related Agreement***" means each agreement, document, and instrument, other than the Loan Documents, now or hereafter existing between, or by, any Credit Party or Affiliate of a Credit Party (including as a successor in interest) and, or for the benefit of, Lender or any Lender Affiliate (including, in each case, as a successor in interest) or any Secured Swap Provider, including Secured Rate Contracts, as any such agreement, document, or instrument may be amended, restated, supplemented, extended or renewed from time to time.

"***Related Agreement Obligor***" means and includes each Person obligated under a Related Agreement, other than Lender or any of its Affiliates and the Secured Swap Provider.

"***Related Parties***" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, brokers, trustees, administrators, managers, advisors and representatives, including accountants, auditors, and legal counsel of such Person and of such Person's Affiliates.

"***Sanction***" means sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury or other relevant sanctions authority.

"***Sanctioned Country***" means any country or territory that is the subject of any Sanction.

"***Sanctioned Person***" means a Person that is the subject of any Sanction.

"***Secured Rate Contract***" means any Rate Contract between Borrower and the counterparty thereto, which (i) has been provided or arranged by Lender or an Affiliate of Lender; or (ii) Lender has acknowledged in writing constitutes a "Secured Rate Contract" hereunder.

"***Secured Swap Provider***" means (i) Lender or an Affiliate of Lender (or a Person who was Lender or an Affiliate of a Lender at the time of execution and delivery of a Rate Contract) who has entered into a Secured Rate Contract with Borrower; or (ii) a Person with whom Borrower has entered into a Secured Rate Contract provided or arranged by Lender or an Affiliate of Lender, and any assignee thereof.

"***Site***" means (a) each site listed in the Collateral Table and (b) each other business property that now or hereafter constitutes Collateral or at which any Collateral is located (including each Development Site and, upon acquisition, each Acquisition Parcel), in each case including the buildings and improvements thereon and rights and privileges appurtenant thereto. All references in the Loan Documents to "Site" shall mean each such Site.

"***Solvent***" means, with respect to any Person as of any date of determination, that, as of such date, (a) the value of the assets of such Person (both at fair value and present fair saleable value) is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of such Person; (b) such Person is able to pay all liabilities of such Person as such liabilities mature; and (c) such Person does not have unreasonably small capital. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than 50% of the voting securities or ownership interests are, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"***Swap Obligation***" means, with respect to any Credit Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of Colorado.

2. Interpretative Rules. Unless otherwise expressly provided or the context may otherwise require: (a) the words "***hereof***", "***herein***", "***hereunder***" and words of similar import, when used in a Loan Document, shall refer to such Loan Document as a whole and not to any particular provision hereof or thereof; (b) in the computation of time periods from a specified date to a later specified date, the term "***from***" means "***from and including***" and the words "***to***" and "***until***" each mean "***to but excluding***" and the word "***through***" means "***to and including***" and the term "***including***" means "***including without limitation***"; (c) the term "***incur***" means incur, create, make, issue, assume or otherwise become directly or indirectly liable in respect of or responsible for, in each case whether directly or indirectly, and the terms "incurrence" and "incurred" and similar derivatives shall have correlative meanings; (d) the term "***sole***" means "***sole and absolute***"; (e) Article, Section, subsection, clause, Appendix, Exhibit, Schedule, and Table references in a Loan Document are to such items in or attached to such Loan Document; (f) references to a Loan Document include all exhibits, schedules, and appendices thereto and, unless Lender's consent is required therefor but was not obtained, any amendment, restatement, or supplement thereto; (g) references to any statute, law, ordinance, regulation or rule are to such statute, law, ordinance, regulation or rule, as modified from time to time and to any successor to any such statute, law, ordinance, regulation or rule, in each case as in effect at the time any such reference is operative; (h) Article, Section, subsection, Appendix, Exhibit, Schedule and Table titles and other divisions contained in any Loan Document are without substantive meaning or content of any kind and are not a part of the agreement between the parties; (i) the meaning of any term defined (including by reference) in any Loan Document shall be equally applicable to both the singular and plural forms of such term; and (j) references to days, months, and years are to calendar days, months, or years, unless otherwise defined.

## SECURITY AGREEMENT

THIS **SECURITY AGREEMENT** (as it may be amended, restated, supplemented, extended or renewed from time to time, the "***Agreement***") is made as of April 14, 2025, by **TIG QUESO, LLC**, a Delaware limited liability company, **TIG QUESO LLC**, a Delaware limited liability company, **QUESO TIME DE 1 LLC**, a Delaware limited liability company, **QUESO TIME DE 2 LLC**, a Delaware limited liability company, **QUESO TIME DE 3 LLC**, a Delaware limited liability company, **QUESO TIME DE 4 LLC**, a Delaware limited liability company, **QUESO TIME DE 5 LLC**, a Delaware limited liability company, **QUESO TIME TPA1 LLC**, a Florida limited liability company, **QUESO TIME TPA2 LLC**, a Florida limited liability company, **QUESO TIME TPA3 LLC**, a Florida limited liability company, **QUESO TIME NJ 1 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 10 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 11 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 12 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 17 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 2 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 20 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 3 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 4 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 5 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 6 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 9 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 15 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 18 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 19 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 21 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company, **QUESO TIME NY 1 LLC**, a New York limited liability company, **QUESO TIME NY 2 LLC**, a New York limited liability company, **QUESO TIME NY 3 LLC**, a New York limited liability company, **QUESO TIME NY 4 LLC**, a New York limited liability company, **QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company, **TIG QUESO NY LLC**, a Delaware limited liability company, **TIG QUESO DE LLC**, a Delaware limited liability company, **TIG QUESO NJ LLC**, a Delaware limited liability company, **TIG QUESO PA LLC**, a Delaware limited liability company, and **TIG QUESO FL LLC**, a Delaware limited liability company (collectively, "***Debtor***", with references in this Agreement to "Debtor" meaning each Debtor), for the benefit of **BANK MIDWEST**, a division of NBH Bank ("***Lender***"), as the secured party.

### RECITALS:

A. Lender has agreed to lend Debtor the sum of $20,000,000.00 in the aggregate (the "***Loan***") in accordance with the terms of the Loan Agreement dated the same date as this Agreement between Lender and Debtor (as the same may be amended, restated, supplemented, extended or renewed from time to time, the "***Loan Agreement***"). Capitalized terms used in this Agreement and not defined in this Agreement have the meanings given to such terms in the Loan Agreement.

B. It is a condition precedent to Lender making the Loan that Debtor execute and deliver this Agreement to Lender granting Lender a first priority lien on the UCC Collateral.

### AGREEMENT:

For valuable consideration, Debtor represents and warrants to Lender and covenants and agrees for the benefit of Lender as follows:

1. Grant of Security Interest; the UCC Collateral. Debtor grants to Lender a security interest in all of Debtor's personal property, including, without limitation, the following described property, whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefor and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible UCC Collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith, excluding, however, any and all

"consumer goods," as defined in the UCC: All of Debtor's right, title, and interest in: (a) all types of property included within the term "equipment" as defined by the UCC (except vehicles, boats and airplanes), including machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment; (b) all inventory, including all goods held for sale, raw materials, work in process and materials or supplies used or consumed in Debtor's business; (c) all documents; general intangibles; accounts; contract rights; chattel paper and instruments; money; securities; investment properties; deposit accounts; supporting obligations; letters of credit and letter of credit rights; commercial tort claims; and records, software and information contained in computer media (such as data bases, source and object codes and information therein), together with any equipment and software to create, utilize, maintain or process any such records or data on electronic media; (d) any and all plans and specifications, designs, drawings and other matters prepared for any construction on any real property owned by Debtor or regarding any improvements to any of such real property; and (e) goodwill (collectively, the "***UCC Collateral***"); ***provided, however***, that, except to the extent Franchisor has consented to the collateral assignment of the Franchise Agreements to Lender, the security interest in any franchise, license, or distributorship agreement is subject to the provisions of Section 9-408 of the UCC. The UCC Collateral is a part of the Collateral.

2. Limitation. By accepting this Agreement, Lender confirms and agrees that, notwithstanding the inclusion of general intangibles as part of the UCC Collateral and the creation, attachment and perfection of Lender's security interest in general intangibles in accordance with the provision of Section 9-408(a) of the UCC, except to the extent Franchisor has consented to the collateral assignment of the Franchise Agreements to Lender, such creation, attachment and perfection, as it relates to the Franchise Agreement, is subject to the limitations imposed by Section 9-408(d) of the UCC which provide that such creation, attachment, and perfection (a) is not enforceable against Franchisor; (b) does not impose a duty or obligation on Franchisor; (c) does not require Franchisor to recognize the security interest, pay or render performance to Lender, or accept payment or performance from Lender; (d) does not entitle Lender to use or assign Debtor's rights under the Franchise Agreement; and (e) does not entitle Lender to use, assign, possess, or have access to any trade secrets or confidential information of Franchisor.

3. Secured Obligations. This security interest is given to secure the payment and performance of the Obligations, including all Indebtedness under the Note and all Obligations with respect to the Related Agreements, as such Related Agreements may be amended, restated, supplemented, extended or renewed from time to time. To the extent that any Obligation secured hereby is held by an Affiliate of Lender, rather than directly by Lender, Debtor acknowledges and agrees that Lender is acting both for itself, with respect to the Obligations held by Lender, and as agent for and on behalf of such Affiliate with respect to Obligations held by such Affiliate and that Lender shall be entitled, both on its own behalf and as agent for and on behalf of such Affiliate, to exercise all rights and remedies of the secured party under this Agreement.

4. Use; Ownership. Debtor will (a) keep all of the tangible UCC Collateral at the Site; (b) use the UCC Collateral only in its trade or business; (c) maintain all of the tangible UCC Collateral in good operating order and repair, normal wear and tear excepted; (d) use and maintain the UCC Collateral only in compliance with manufacturers' recommendations and all Applicable Law; (e) keep all of the UCC Collateral free and clear of any and all liens, claims and encumbrances, including purchase money security interests, other than those in favor of Lender or Landlord's liens imposed or implied by law; and (f) remain the sole owner of the UCC Collateral and not sell, lease, mortgage, hypothecate, license, grant a security interest in or otherwise transfer or encumber any of the UCC Collateral (a "***Transfer***") except for (i) sales of inventory in the ordinary course of business and (ii) so long as no Default has occurred and is continuing, sales or other dispositions of obsolescent items of equipment consistent with past practices, so long as such items of obsolete equipment are replaced by items of equal or greater value and utility. Except as provided in the preceding sentence, Debtor will not part with possession of any of the UCC Collateral (except to Lender or for maintenance and repair). In furtherance thereof, Debtor shall not (a) change its name, identity or jurisdiction of organization without, in each case, giving Lender thirty (30) days prior written notice, and (b) authorize the filing of any financing statements, except those naming Lender as the secured party, to be filed with respect to any UCC Collateral.

5. Financing Statements and Further Assurances. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Debtor agrees, on request of Lender, to furnish to Lender such further information, to execute and deliver to Lender such documents and instruments (including UCC financing statements) and to do such other acts and things as Lender may at any time reasonably request relating to the perfection or protection of the security interest in the UCC Collateral created by this Agreement or for the purpose

of carrying out the intent of this Agreement. Without limiting the foregoing, Debtor shall cooperate and do all acts deemed necessary or advisable by Lender to continue in Lender a perfected first security interest in the UCC Collateral and shall obtain and furnish to Lender any subordinations, releases, landlord, lessor, bailee or mortgagee waivers, control agreements, and similar documents as may be from time to time requested by, and in form and substance satisfactory to, Lender. Upon Lender's request, Debtor shall use commercially reasonable efforts to obtain from Lessor (and any lender to Lessor), each in a form acceptable to Lender (a) landlord lien waivers and access rights; and (b) subordination, non-disturbance, and attornment agreements. Debtor will warrant and defend the UCC Collateral and Lender against all claims by all persons in connection with the Obligations.

6. Lender's Authority. Debtor authorizes Lender to file financing statements, continuations, and amendments thereto describing the UCC Collateral and containing any other information required by the applicable UCC, in such form and substance as Lender, in its sole discretion, may determine, including a collateral description of "all assets". Debtor irrevocably grants to Lender the power to sign Debtor's name and generally to act on behalf of Debtor to execute and file applications for title, transfers of title, financing statements, notices of lien, demands for terminations or other security interests in any of the UCC Collateral and other documents pertaining to any or all of the UCC Collateral; ***provided, however***, prior to Lender exercising such power of attorney, Lender shall deliver a written notice to Debtor indicating the action Lender intends to take pursuant to such power of attorney and ten (10) days shall have passed without Debtor having provided evidence reasonably acceptable to Lender that the circumstances which were the basis for Lender's notice to Debtor no longer require the exercise by Lender of such power of attorney, except that no such notice from Lender to Debtor shall be required prior to Lender exercising such power of attorney if any material portion of the Collateral or Lender's Lien on any material portion of the Collateral is in immediate jeopardy, as reasonably determined by Lender. This power is coupled with Lender's interest in the UCC Collateral and is irrevocable during such time as any of the Obligations are outstanding. Debtor shall, if any certificate of title be required or permitted by law for any of the UCC Collateral, obtain and promptly deliver to Lender such certificate showing the lien of this Agreement with respect to the UCC Collateral. Debtor ratifies its prior authorization for Lender to file financing statements and amendments thereto describing the UCC Collateral and containing any other information required by the UCC, if filed prior to the date hereof.

7. Certain Rights and Remedies. If an Event of Default shall have occurred and be continuing, Lender, without any other notice to or demand upon Debtor, shall have in any jurisdiction in which enforcement of this Agreement is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC and any additional rights and remedies that may be provided to a secured party in any jurisdiction in which any of the UCC Collateral is located, including the right to take possession of the UCC Collateral, and for that purpose Lender may, so far as Debtor can give authority therefor, enter upon the Site and remove the same therefrom. Lender may in its discretion require Debtor to assemble all or any part of the UCC Collateral at such location or locations as Lender may reasonably designate. Unless the UCC Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give to Debtor at least 10 calendar days prior written notice of the time and place of any public sale of UCC Collateral or of the time after which any private sale or any other intended disposition is to be made. Debtor acknowledges that ten (10) calendar days prior written notice of such sale or sales shall be reasonable notice. In addition, Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the UCC Collateral and to exercise its rights and remedies with respect thereto.

8. Receivers. If an Event of Default shall have occurred and be continuing and in addition to any other rights and remedies, as a matter of right and without notice to Debtor or anyone claiming under Debtor, and without regard to the then value of the UCC Collateral or the interest of Debtor therein, or the solvency of Debtor or the occurrence of any Event of Default described in ***Section 6.1(f)*** of the Loan Agreement, Lender may seek the appointment of a receiver for Debtor and/or any of the other Credit Parties and/or the UCC Collateral and, to the maximum extent permitted by law, for all other assets of Debtor and such other Credit Parties. Debtor and each other Credit Party waives any right to a hearing or notice of hearing prior to the appointment of a receiver and irrevocably consents to such appointment. Such receiver shall have all of the usual powers and duties of receivers in like or similar cases and all of the powers and duties of Lender in case of entry as provided above and shall continue as such and exercise all such powers until the later of the date of confirmation of sale of the UCC Collateral or the date of expiration of any redemption period, unless such receivership is sooner terminated. All expenses incurred by the receiver or its agents, including obligations to repay funds borrowed by the receiver, shall constitute a part of the Obligations. Any

revenues collected by the receiver shall be applied first to the expenses of the receivership, including reasonable attorneys' fees incurred by the receiver and Lender, together with interest thereon at the Default Rate from the date incurred until paid, and the balance shall be applied toward the Obligations or in such other manner as the court may direct.

9. Marshaling. Lender shall not be required to marshal any present or future collateral security (including but not limited to the UCC Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, Debtor agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Lender's rights and remedies under this Agreement or under of the other Loan Documents, and, to the extent that it lawfully may, Debtor irrevocably waives the benefits of all such laws.

10. Proceeds of Dispositions; Expenses. Debtor shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in protecting, preserving or enforcing Lender's rights and remedies under or in respect of any of the Obligations or any of the UCC Collateral. After deducting all of the foregoing expenses, the residue of any proceeds of collection or sale or other disposition of the UCC Collateral shall, to the extent actually received in cash or converted to cash by sale, lease or other disposition, be applied to the payment of the Obligations in such order or preference as Lender may determine. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the UCC, any excess shall be returned to Debtor. In the absence of final payment and satisfaction in full of all of the Obligations, Debtor shall remain liable for any deficiency.

11. Relation to Other Security Documents. The provisions of this Agreement supplement the provisions of any real estate mortgage or deed of trust granted by Debtor to Lender which secures the payment or performance of any of the Obligations. Nothing contained in any such real estate mortgage or deed of trust shall derogate from any of the rights or remedies of Lender hereunder.

12. Applicability of General Provisions. All of the provisions of the Article in the Loan Agreement entitled "General Provisions" apply to this Agreement, the same as if the provisions of such Article were set forth in full in this Agreement.

13. Choice of Law. **EXCEPT AS MAY BE PROVIDED OTHERWISE IN THE LOAN AGREEMENT, THE LAWS OF THE STATE OF COLORADO (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF) SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.**

14. Binding Effect. This Agreement shall be binding upon and inure to the benefit of Debtor and Lender and their respective successors and permitted assigns, including, any United States trustee, any debtor in possession or any trustee appointed from a private panel.

[REMAINDER OF THE PAGE INTENTIONALLY BLANK]

**EXECUTED** effective as of the date first set forth above.

**DEBTOR:**

**TIG QUESO LLC**, a Delaware limited liability company

By: [signature]
Manisha Patel, Authorized Member

**QUESO TIME DE 1 LLC**, a Delaware limited liability company,
**QUESO TIME DE 2 LLC**, a Delaware limited liability company,
**QUESO TIME DE 3 LLC**, a Delaware limited liability company,
**QUESO TIME DE 4 LLC**, a Delaware limited liability company, and
**QUESO TIME DE 5 LLC**, a Delaware limited liability company

By: TIG Queso DE LLC, a Delaware limited liability company, Sole Member of each of the above Debtors

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: [signature]
Manisha Patel, Authorized Member

**QUESO TIME TPA1 LLC**, a Florida limited liability company,
**QUESO TIME TPA2 LLC**, a Florida limited liability company, and
**QUESO TIME TPA3 LLC**, a Florida limited liability company

By: TIG Queso FL LLC, a Delaware limited liability company, Authorized Member of each of the above Debtors

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: [signature]
Manisha Patel, Authorized Member

**DEBTOR (con't):**

**QUESO TIME NJ 1 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 10 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 11 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 12 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 17 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 2 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 20 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 3 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 4 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 5 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 6 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 9 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 15 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 18 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 19 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 21 LLC**, a New Jersey limited liability company,
and **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company

By: TIG Queso NJ LLC, a Delaware limited liability company, Sole Member of each of the above Debtors

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: ______________________
Manisha Patel, Authorized Member

**QUESO TIME NY 1 LLC**, a New York limited liability company,
**QUESO TIME NY 2 LLC**, a New York limited liability company,
**QUESO TIME NY 3 LLC**, a New York limited liability company,
and **QUESO TIME NY 4 LLC**, a New York limited liability company

By: TIG Queso NY LLC, a Delaware limited liability company, Sole Member of each of the above Debtors

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: ______________________
Manisha Patel, Authorized Member

**DEBTOR (con't):**

**QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company,
and **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company

By: TIG Queso PA LLC, a Delaware limited liability company, Sole Member of each of the above Debtors

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: ______________________________
Manisha Patel, Authorized Member

**TIG QUESO NY LLC**, a Delaware limited liability company,
**TIG QUESO DE LLC**, a Delaware limited liability company,
**TIG QUESO NJ LLC**, a Delaware limited liability company,
**TIG QUESO PA LLC**, a Delaware limited liability company, and
**TIG QUESO FL LLC**, a Delaware limited liability company

By: TIG Queso LLC, a Delaware limited liability company, Sole Member of each of the above Debtors

By: ______________________________
Manisha Patel, Authorized Member

# GUARANTY

This **GUARANTY** (the "***Guaranty***") is made as of April 14, 2025, by **MANISHA PATEL**, an individual ("***Guarantor***"), to and for the benefit of **BANK MIDWEST**, a division of NBH Bank ("***Lender***").

## RECITALS:

A. Lender has agreed to lend certain credit facilities (collectively, the "***Loan***") to TIG QUESO, LLC, a Delaware limited liability company, **TIG QUESO LLC**, a Delaware limited liability company, **QUESO TIME DE 1 LLC**, a Delaware limited liability company, **QUESO TIME DE 2 LLC**, a Delaware limited liability company, **QUESO TIME DE 3 LLC**, a Delaware limited liability company, **QUESO TIME DE 4 LLC**, a Delaware limited liability company, **QUESO TIME DE 5 LLC**, a Delaware limited liability company, **QUESO TIME TPA1 LLC**, a Florida limited liability company, **QUESO TIME TPA2 LLC**, a Florida limited liability company, **QUESO TIME TPA3 LLC**, a Florida limited liability company, **QUESO TIME NJ 1 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 10 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 11 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 12 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 17 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 2 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 20 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 3 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 4 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 5 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 6 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 9 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 15 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 18 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 19 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 21 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company, **QUESO TIME NY 1 LLC**, a New York limited liability company, **QUESO TIME NY 2 LLC**, a New York limited liability company, **QUESO TIME NY 3 LLC**, a New York limited liability company, **QUESO TIME NY 4 LLC**, a New York limited liability company, **QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company, **TIG QUESO NY LLC**, a Delaware limited liability company, **TIG QUESO DE LLC**, a Delaware limited liability company, **TIG QUESO NJ LLC**, a Delaware limited liability company, **TIG QUESO PA LLC**, a Delaware limited liability company, and **TIG QUESO FL LLC**, a Delaware limited liability company (collectively, "***Borrower***") up to $20,000,000.00 pursuant to that certain Loan Agreement of even date herewith, between Lender and Borrower (the "***Loan Agreement***"). Capitalized terms used in this Guaranty and not defined in the Guaranty have the meanings given to such terms in the Loan Agreement.

B. Lender requires, as a condition precedent to making the Loan, that Borrower obtain this Guaranty duly executed by each Guarantor. Lender will be relying on this Guaranty in making the Loan. The making of the Loan by Lender to Borrower is of value to each Guarantor and is reasonably expected to benefit each Guarantor.

## AGREEMENT:

In consideration of Lender making the Loan, as an inducement to Lender to do so, and for other valuable consideration, Guarantor represents and warrants to, and covenants and agrees for the benefit of, Lender as follows:

1. Guaranty. Guarantor unconditionally, absolutely and irrevocably guarantees: (a) the full, prompt, and complete payment when due, whether by acceleration or otherwise, of the entire amount of principal, accrued interest, and premiums due from time to time under the Loan and of all other Obligations of Borrower to Lender under or in respect of any of the Loan Documents, including reimbursements, late charges, interest and default interest (including post-petition interest to the extent a petition is filed by or against Borrower under the Bankruptcy Code), damages, indemnity obligations, collection and court costs, attorneys' fees, advances, and all other expenses and

Case 8:26-mc-00024-MSS-SPF Document 1 Filed 08/24/26 Page 14 of 7

charges of any kind, in each case whether incurred prior to or after the execution of this Guaranty and all without set-off, counterclaim, recoupment, or deduction of any amounts owing or alleged to be owing by Lender to Borrower or Guarantor; and (b) the full and complete payment and performance, when due, of all other Obligations, including all indemnity obligations. All of the indebtedness, obligations, and liabilities described in this Section are referred to in this Guaranty as the "***Guaranteed Obligations***." All payments made pursuant to this Guaranty shall be in U.S. dollars.

2. Nature of Guaranty; Joint and Several Liability of Multiple Guarantors. This Guaranty is an absolute and unconditional guaranty of payment and performance and not of collection. Guarantor's obligations under this Guaranty are primary and are independent of the obligations of any other Credit Party, and a separate action or actions may be brought and executed against any one or more of the Guarantors, whether or not such action is brought against such Credit Party and whether or not such Credit Party is joined in such action or actions. If this Guaranty is signed by more than one Person, references in this Guaranty to Guarantor are to each Guarantor signing this Guaranty, and the liability of each such Guarantor is joint and several.

3. Duration; Indemnification. This Guaranty is effective when received by Lender and, except as may otherwise be specifically provided herein, shall continue in full force and effect until all of the Guaranteed Obligations are fully and finally paid and performed and Lender has no further obligation to make loans or otherwise extend credit to or for the benefit of Borrower. The Guaranteed Obligations shall not be considered fully and finally paid and performed unless and until all payments by Borrower to Lender are no longer subject to any right on the part of any Person, including Borrower, Borrower as a debtor-in-possession, or any trustee in bankruptcy, to require Lender to disgorge such payments or to seek to recoup all or any portion of such payments. Accordingly, this Guaranty shall continue to be effective or be reinstated, as applicable, if at any time the payment or performance of all or any portion of the Guaranteed Obligations is rescinded or reduced in amount or must otherwise be restored or returned by Lender, whether as a "voidable preference" or "fraudulent conveyance," or under any federal or state law, including the Bankruptcy Code or otherwise, all as though such payment or performance had not been made, and Guarantor will indemnify, defend, and hold Lender and each of Lender's Affiliates (each an "***Indemnitee***") harmless for, from and against, any and all Liabilities incurred by Lender in connection with such remission, rescission or restoration; ***provided, however***, that Guarantor shall not have any liability under this Section to any Indemnitee with respect to any indemnified matter to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. This Guaranty shall remain in full force and effect and continue to be effective if (a) any petition is filed by or against Guarantor or any other Credit Party for relief under the Bankruptcy Code; (b) Guarantor or any other Credit Party becomes insolvent or makes an assignment for the benefit of creditors; or (c) a receiver or trustee is appointed for all or any significant part of the assets of Guarantor or any other Credit Party.

4. Representations and Warranties. Each Guarantor acknowledges and agrees that the representations and warranties in this Section are a material consideration to Lender; that Lender is relying on their correctness and completeness in entering into the Loan Agreement and the transactions contemplated by the Loan Documents and in making the Loan(s); and that these representations and warranties are true and accurate as of the date hereof, will be true and accurate as of the Closing, as if made at Closing, and will survive the Closing, regardless of any investigation or inspection by Lender. Additionally, Guarantor shall take, or cause to be taken, all such actions as may be necessary or appropriate to ensure that the representations and warranties in this Guaranty continue to be true and correct in all material respects. Accordingly, each Guarantor represents, warrants, and certifies to and covenants with Lender that:

(a) Due Execution and Delivery. This Guaranty has been duly executed and delivered by Guarantor.

(b) Legal Capacity; Name and Residence Address. As to each Guarantor that is a natural person, such Guarantor's exact legal name is as set forth on the signature page of this Guaranty; such Guarantor has full legal capacity to enter into and perform such Guarantor's obligations under this Guaranty; and such Guarantor's principal residence is at the location set forth on the signature page of this Guaranty.

(c) Permits. No permits, consents, approvals, licenses, or other authorizations from any Person are required in connection with the authorization, execution, delivery, or performance by Guarantor of this Guaranty.

(d) No Violations, Breaches, or Defaults. The entry into and performance by Guarantor of this Guaranty does not and will not violate any judgment, order, law or regulation applicable to Guarantor or result in any breach of, constitute an event of default under, or result in the creation of any lien, charge, security interest or other encumbrance upon any Collateral pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument to which Guarantor is a party or by which Guarantor's assets are bound.

(e) Legal, Valid and Binding. Upon execution by Guarantor of this Guaranty, the Guaranty shall constitute the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity.

(f) Anti-Money Laundering; Anti-Terrorism. Guarantor is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations promulgated by OFAC and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. Neither Guarantor nor any Affiliate of Guarantor is or will become a Person (i) designated by the U.S. government on the list of Specially Designated Nationals and Blocked Persons (the "***SDN List***") or who is otherwise the target of U.S. economic sanctions laws, such that, in either case, a U.S. Person cannot deal with or otherwise engage in business transactions with such Person; or (ii) Controlled by, or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions, such that the entry into, or performance under, this Guaranty or any other Loan Document would violate Applicable Law. Guarantor and its Affiliates are and will remain in compliance with the U.S Patriot Act and other federal or state laws relating to "know your customer" and anti-money laundering and anti-terrorism rules and regulations. No proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977. For purposes of this subsection, "Affiliate" does not include the shareholders of any entity that is publicly traded on a recognized national United States stock exchange.

(g) Investigations and Litigation. There is no action, suit, investigation, proceeding or arbitration at law or in equity, including condemnation proceedings or proceedings in lieu of condemnation, pending or, to the best of Guarantor's knowledge, threatened against or affecting (i) Guarantor or any of its assets or revenues or (ii) any of the Loan Documents or any of the transactions contemplated thereby.

(h) Solvency. Both before and immediately after consummation of the transactions contemplated by the Loan Documents and after giving effect to such transactions, Guarantor is Solvent.

(i) Recourse. As to each Guarantor that is a natural person, as of the date hereof and continuing at all times thereafter, recourse by Lender may be had against (i) such Guarantor's interest in all property (including community property, if applicable) jointly held with any other Person, including such Guarantor's spouse, if such Guarantor is married; and (ii) such Guarantor's separate property. Guarantor represents and warrants that Guarantor is not married.

5. Waivers. Guarantor unconditionally waives and agrees not to assert: (a) any requirement that Lender first make demand upon, or seek to enforce or exhaust remedies against any other Credit Party or other Person or against any of the Collateral or other property of any other Credit Party or other Person before demanding payment from or seeking to enforce any of the provisions of this Guaranty against Guarantor, or any defense based on the release of any other Credit Party, any other guarantor or any other person liable for the indebtedness guaranteed hereunder, including, without limitation, any defense based on C.R.S. 13-50-103 or any successor or similar statute; (b) any rights, benefits and defenses which might otherwise be available to Guarantor pursuant to any requirement of promptness, diligence or notice of acceptance, any other notice, disclosure or demand with respect to any of the Guaranteed Obligations and this Guaranty, any requirement of acceptance hereof, reliance hereon or knowledge hereof by Lender; (c) any other Applicable Law that might operate to limit (i) Guarantor's liability under, or the enforcement

of, this Guaranty or any other Credit Party's liability under, or the enforcement of, the other Loan Documents; or (ii) the right of Lender to recover a deficiency judgment, or to otherwise proceed, against any Person obligated for the payment of the Guaranteed Obligations, after any foreclosure, trustee's sale, or UCC sale, of any Collateral securing payment of the Guaranteed Obligations; (d) any statute of limitations affecting the obligations or liabilities under the Loan Documents of Guarantor or any other Credit Party; (e) diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of default under any of the Loan Documents, and all other notices whatsoever; and (f) any other claim or defense that otherwise would be available based on principles of suretyship or guarantee or otherwise governing secondary obligations.

6. Effect of Certain Matters. Guarantor agrees that its obligations hereunder shall not be affected or impaired by reason of any of the following, all without notice to, or the further consent of, Guarantor: (a) the modification or amendment (whether material or otherwise) of any of the obligations of any other Credit Party under, or of any other provisions of, any of the Loan Documents, whether or not Guarantor joined in or consented to such modification or amendment; (b) Lender's taking or omission to take any action pursuant to any Loan Document, including the giving of any waiver, consent, indulgence, or extension or any failure, omission, delay or lack on the part of Lender to enforce any of the obligations, conditions or other provisions in any Loan Document, or to assert or exercise any right, power or remedy conferred on Lender in any of the Loan Documents; (c) the assignment to or assumption by any third party of any or all of the rights or obligations of any Credit Party under all or any of the Loan Documents; (d) the release or discharge of any other Credit Party from the performance or observance of any obligation, undertaking or condition to be performed by such Credit Party under any Loan Document by operation of law, including any rejection or disaffirmance of any of the Loan Documents in any bankruptcy or similar proceedings; (e) any action, inaction or election of remedies by Lender which results in any impairment or destruction of any subrogation, indemnity, reimbursement or contribution rights of Guarantor or of any rights of Guarantor to proceed against any other Person for reimbursement; (f) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in Applicable Law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under Applicable Law; (g) the termination or renewal of any of the Guaranteed Obligations; (h) the obtaining by Lender of any Collateral or additional Collateral; the release or substitution by Lender of any Collateral; the perfection or failure to perfect any liens or security interests with respect to any Collateral; (i) the use of any Loan proceeds, regardless of whether such use complies with the Loan Documents, it being understood and agreed by Guarantor that Lender has no duty to monitor the use or application of any disbursements of the Loan; (j) any other acts or omissions by Lender that result in the extinguishment or discharge of the obligations of any other Credit Party; (k) any invalidity, irregularity or unenforceability in whole or in part of any of the Loan Documents, or any limitation of the liability of any other Credit Party under the Loan Documents, including any claim that the Loan Documents were not duly authorized, executed, or delivered on behalf of any Credit Party; or (l) the occurrence of any other event or the existence of any other condition that by operation of law or otherwise could result in the release or discharge of a surety, guarantor, or other persons secondarily liable on an obligation.

7. Access to Credit Party Information. Guarantor now has and will continue to have independent means of obtaining information concerning the affairs, financial condition and business of each other Credit Party. Regardless of what information Lender may from time to time have, Lender shall have no obligation to provide to Guarantor any information concerning, or to monitor for the benefit of, Guarantor (a) the business operations of any Credit Party; (b) the performance by any Credit Party of, or the ability of any Credit Party to perform, such Credit Party's obligations pursuant to the Loan Documents; or (c) any other matter.

8. Subordination. All Indebtedness, together with all rights of subrogation, contribution, reimbursement, and indemnity, of any Credit Party to Guarantor, now or in the future (collectively, the "***Intercompany Indebtedness***") is hereby subordinated to the Guaranteed Obligations. Any such Intercompany Indebtedness, if Lender so requests, shall be collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Guarantor under this Guaranty or any other Loan Document.

9. Waiver of Subrogation and Certain Other Rights. Guarantor waives any claim or other right which Guarantor may now have or hereafter acquire against any other Credit Party, or any other Person primarily or secondarily obligated with respect to any of the Guaranteed Obligations or the Collateral that arises from the existence

or performance of the obligations of Guarantor under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution, indemnification or any right to participate in any claim or remedy of Lender against any other Credit Party or Person, or any property securing any of the Guaranteed Obligations which Lender now has or hereafter acquires, whether or not such claim, right or remedy arises in equity or under contract, statute or common law.

10. Notices. All Notices shall be given as provided in the Loan Agreement, if to Guarantor, at the address set forth below, and if to Lender, as provided in the Loan Agreement.

11. Commercial Transaction; No Advice. Guarantor confirms, acknowledges and agrees that (a) this Guaranty is being executed and delivered in connection with a commercial business transaction; (b) none of the Loan proceeds is being or will be used by Guarantor or any other Person for any personal, family, or household purpose; and (c) Guarantor has not received any legal, tax, financial or accounting advice from Lender or any Affiliate of Lender.

12. Binding Effect. This Guaranty is binding on Guarantor and its successors and assigns, and, if Guarantor is an individual, on such individual's heirs, personal representatives, administrators, and executors, and including a debtor-in-possession on behalf of Guarantor, and shall inure to the benefit of Lender, its successors and assigns, including any Person obtaining any rights from Lender in a Lender Transfer.

13. Severability. Any provision of this Guaranty being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of any Loan Document or any part of such provision in any other jurisdiction.

14. Remedies. No delay on the part of Lender in the exercise of any right or remedy under this Guaranty shall operate as a waiver thereof. No single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy. No modification or waiver of any of the provisions of this Guaranty shall be binding upon Lender except as set forth in a writing executed by Lender.

15. Limitation of Liability for Certain Damages. In no event shall Lender or any Affiliate of Lender be liable to Guarantor or any Affiliate of Guarantor on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). **GUARANTOR, FOR ITSELF AND ITS AFFILIATES, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON ANY SUCH CLAIM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.**

16. Governing Law. **THE LAWS OF THE STATE OF COLORADO (WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF) SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS GUARANTY AND THE OTHER LOAN DOCUMENTS, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT.**

17. Jurisdiction and Service of Process. Any legal action or proceeding with respect to this Guaranty shall be brought exclusively in the courts of the State of Colorado located in Arapahoe County or of the United States for the District of Colorado, sitting in Denver, Colorado, and Guarantor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; ***provided, however***, that nothing in this Guaranty shall limit or restrict Lender's right to commence any proceeding in the federal or state courts located in the state in which a particular Site is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under any Loan Document. Lender and Guarantor hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, that either of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions. Guarantor hereby (a) irrevocably waives personal service of any and all legal process, summons, notices and other documents of any kind; (b) consents to such service in any suit, action or proceeding brought in the United States by any means permitted by Applicable Law, including by the mailing thereof to Guarantor's address specified on the signature page hereto; and (c) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

18. Waiver of Jury Trial. **LENDER AND GUARANTOR, TO THE FULLEST EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS GUARANTY, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.**

19. Agreement to Credit Party Provisions. **GUARANTOR HAS RECEIVED AND REVIEWED A COPY OF THE LOAN AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS. GUARANTOR AGREES THAT THE PROVISIONS OF THE ARTICLE IN THE LOAN AGREEMENT TITLED "GENERAL PROVISIONS" APPLY TO THIS GUARANTY, THE SAME AS IF SUCH PROVISIONS WERE SET FORTH IN FULL IN THIS GUARANTY. FURTHERMORE, GUARANTOR ASSUMES AND AGREES TO BE BOUND BY AND TO PERFORM ALL OF THE TERMS, CONDITIONS, AND OBLIGATIONS CONTAINED IN THE LOAN AGREEMENT AND IN ANY OTHER LOAN DOCUMENT THAT ARE STATED TO BE APPLICABLE TO, OR OTHERWISE APPLY TO, GUARANTORS OR CREDIT PARTIES.** Guarantor acknowledges and agrees that Guarantor is a Credit Party.

20. Entire Agreement. This Guaranty embodies the entire agreement of the parties and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof. Guarantor acknowledges and affirms that Guarantor did not rely on any statement, oral or written, not contained in this Guaranty or the other Loan Documents in making Guarantor's decisions to enter into this Guaranty.

[SIGNATURE PAGE FOLLOWS]

Case 2:26-cv-05612 Document 1 Filed 08/24/26 Page 17 of 7

**EXECUTED** effective as of the date first set forth above.

**GUARANTOR:**

Manisha Patel

**MANISHA PATEL**

Address for Notices:

406 Executive Drive
Langhorne, PA 19047

## LOAN ASSUMPTION AND FIRST MODIFICATION AGREEMENT

This **LOAN ASSUMPTION AND FIRST MODIFICATION AGREEMENT** (the "***Modification***") is entered into as of November 13, 2025, by and between **BANK MIDWEST**, a division of NBH Bank ("***Lender***"), and **TIG QUESO LLC**, a Delaware limited liability company, **QUESO TIME DE 1 LLC**, a Delaware limited liability company, **QUESO TIME DE 2 LLC**, a Delaware limited liability company, **QUESO TIME DE 3 LLC**, a Delaware limited liability company, **QUESO TIME DE 4 LLC**, a Delaware limited liability company, **QUESO TIME DE 5 LLC**, a Delaware limited liability company, **QUESO TIME TPA1 LLC**, a Florida limited liability company, **QUESO TIME TPA2 LLC**, a Florida limited liability company, **QUESO TIME TPA3 LLC**, a Florida limited liability company, **QUESO TIME NJ 1 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 10 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 11 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 12 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 17 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 2 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 20 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 3 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 4 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 5 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 6 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 9 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 15 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 18 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 19 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 21 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 22 LLC**, a New Jersey limited liability company, **QUESO TIME NY 1 LLC**, a New York limited liability company, **QUESO TIME NY 2 LLC**, a New York limited liability company, **QUESO TIME NY 3 LLC**, a New York limited liability company, **QUESO TIME NY 4 LLC**, a New York limited liability company, **QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company, **TIG QUESO NY LLC**, a Delaware limited liability company, **TIG QUESO DE LLC**, a Delaware limited liability company, **TIG QUESO NJ LLC**, a Delaware limited liability company, **TIG QUESO PA LLC**, a Delaware limited liability company, and **TIG QUESO FL LLC**, a Delaware limited liability company (collectively, "***Existing Borrower***", with references in this Modification to "Existing Borrower" meaning each Existing Borrower), **MANISHA PATEL** ("***Guarantor***"), and **QUESO TIME NJ 23 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 24 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 25 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 26 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 27 LLC**, a New Jersey limited liability company, **QUESO TIME NJ 28 LLC**, a New Jersey limited liability company, **QUESO TIME TPA4 LLC**, a Florida limited liability company, **QUESO TIME PA 4 LLC**, a Pennsylvania limited liability company, **QUESO TIME PA 13 LLC**, a Pennsylvania limited liability company, and **QUESO TIME DE 6 LLC**, a Delaware limited liability company (collectively, "***Additional Borrower***", with references in this Modification to "Additional Borrower" meaning each Additional Borrower).

## RECITALS

A. In connection with the existing loan(s) described on the Loan Schedule (each, an "***Existing Loan***"), Existing Borrower and Lender have entered into the Loan Agreement dated April 14, 2025 (the "***Loan Agreement***"). Pursuant to each Guaranty dated April 14, 2025 (the "***Guaranty***"), Guarantor guaranteed payment and performance of the Existing Loan(s) and other Obligations.

B. Additional Borrower and Existing Borrower have requested that Lender modify the Loan Documents as provided in this Modification and Lender is willing to do so, subject to the terms and conditions set forth herein. "***Borrower***", under this Modification, shall mean, collectively, Existing Borrower and Additional Borrower.

C. This Modification is one of the Loan Documents, and references in the existing Loan Documents and this Modification to "***Loan Documents***," or any of them, shall be deemed to be a reference to such Loan Documents, as modified by this Modification.

**FOR VALUABLE CONSIDERATION**, the parties agree as follows:

## ARTICLE 1
## PRELIMINARY MATTERS

1.1 Defined Terms. Capitalized terms used in this Modification and not defined in this Modification have the meanings given to such terms in the Loan Agreement. The rules of construction and interpretation set forth in the Loan Agreement are applicable to this Modification and the other Loan Documents.

1.2 Recitals and Loan Schedule. The parties acknowledge the accuracy of the Recitals and agree that the Recitals are part of this Modification. Borrower confirms and agrees that the information regarding the Existing Loan(s) set forth on the "***Loan Schedule***" attached as ***Exhibit 1.2*** is complete and correct.

## ARTICLE 2
## JOINDER OF ADDITIONAL BORROWER

2.1 Joinder of Additional Borrower. By its execution of this Modification, Additional Borrower fully, unconditionally and irrevocably agrees to, jointly and severally with Existing Borrower: (i) assume all of the obligations, liabilities, covenants, representations and warranties of Borrower under the Loan Documents, as amended, restated, or modified pursuant to this Modification and the other Loan Documents; (ii) assume and pay the principal balance of the Loans, as such amount may change from time to time, the interest due thereon, and any and all other monies or indebtedness outstanding under the Loans in accordance with all of the terms, provisions, covenants and conditions of the Loan Documents, as amended, restated, or modified pursuant to this Modification and the other Loan Documents; and (iii) assume, be bound by and liable for, comply with and perform all of the duties, obligations, provisions and covenants of the "Borrower" or "Debtor", as applicable, under the Loan Documents, as amended, restated, or modified pursuant to this Modification and the other Loan Documents. Additional Borrower understands the terms, provisions, covenants, conditions, contents and effect of the Loan Agreement, this Modification and each of the other Loan Documents.

2.2 Collateral of Additional Borrower. Additional Borrower (A) acknowledges and agrees that Additional Borrower holds title to all Collateral of Additional Borrower, together with all rights and interests appurtenant thereto, subject to the provisions of the Loan Documents and to the charge and lien of each assignment, lien, encumbrance and security interest included in the Loan Documents and otherwise subject to the terms and conditions of the Loan Documents and (B) grants, mortgages, conveys and otherwise assigns and transfers to Lender a lien, encumbrance and security interest in and to all of the Collateral owned by Additional Borrower and all after acquired property and other rights and interests that may hereafter be included in the definition of "Collateral" (or similar terms describing security) pursuant to the Loan Documents.

2.3 Collateral. At Closing, the Collateral will also include first priority liens on and security interests in the new Collateral (the "***New Collateral***") described in the New Collateral Table (the "***New Collateral Table***") attached as ***Exhibit 2.3***, and the New Collateral will secure all of the Obligations. Each site identified in the New Collateral Table shall be deemed a "Site", and part of the Collateral for all purposes

2.4 References. Existing Borrower and Additional Borrower acknowledge and agree that upon the effectiveness of this Modification, Existing Borrower and Additional Borrower shall jointly and severally be the "Borrower", "Assignor", "Grantor", and "Debtor", as applicable, under each of the Loan Documents and agree to be bound by all of the terms, conditions and covenants set forth in the Loan Documents applicable to "Borrower", "Assignor", "Grantor" and "Debtor" in all respects and with the same effect as if Additional Borrower and Existing Borrower had executed and delivered each of the Loan Documents, including, without limitation: (i) Existing Borrower and Additional Borrower shall be jointly and severally liable as "Borrower" under the Loan Agreement and

the Notes evidencing the Loan; and (ii) Existing Borrower and Additional Borrower shall be jointly and severally liable as "Debtor" under the Security Agreement dated April 14, 2025.

## ARTICLE 3
## MODIFICATIONS TO LOAN DOCUMENTS

Any other provision of the Loan Documents to the contrary notwithstanding and, unless otherwise specifically stated, until such time as all Obligations under the Loan Documents have been fully paid and performed, Borrower covenants and agrees as follows:

3.1 Revisions to Collateral Table. The Collateral Table attached as ***Exhibit 1.1*** to the Loan Agreement is hereby amended and restated in its entirety with the Collateral Table attached hereto as ***Exhibit 1.1***. References in the Loan Agreement and other Loan Documents to the Collateral Table shall be deemed a reference to the Collateral Table attached hereto.

3.2 Existing Default. Borrower is in default of its obligations under the Loan Documents as a result of TIG QUESO LLC becoming liable for other Indebtedness in violation of ***Section 5.12*** of the Loan Agreement, by guaranteeing certain leases and other obligations of certain Affiliates of Borrower that are not Borrowers under the Loan Documents (the "***Existing Default***"). Under the terms of the Loan Documents as well as applicable law, Lender has all rights and remedies with respect to the Existing Default, and Lender is presently evaluating all available courses of action relating to the Existing Default. Accordingly, without waiving the Existing Default or any other Event of Default, Lender reserves all of its rights and remedies under the Loan Documents and applicable law, including the right to require strict compliance with each and every term and condition of the Loan Documents, and Lender's voluntary forbearance, if any, from exercising any of such rights or remedies is not intended (and should not be construed) as a waiver of the Existing Default or a waiver of its rights and remedies with respect to the Existing Default, all of which are reserved by Lender. Any failure or delay by Lender in exercising any right, power, or remedy under any applicable Loan Document, at law or in equity, or any acceptance of partial performance or partial payment (a) shall not operate as a waiver of such right, power, or remedy, nor shall any single or partial exercise of any such right, power, or remedy preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy, and (b) shall not be sufficient, by itself or together with any other action or inaction by Lender, to establish a course of dealing or course of conduct by Lender (with any such prior course of dealing or conduct, if any, hereby terminated). Prior to the date of this Modification, Borrower has cured the Existing Default as to only four of five Sites.

3.3 Post-Closing Obligations. Borrower shall satisfy each of the following obligations within the time periods set forth below, the failure of which shall constitute an Event of Default under the Loan Documents:

(a) On or before December 31, 2025, Borrower shall deliver to Lender fully executed agreements evidencing the full release of TIG QUESO LLC from any liability under the following leases for the referenced Sites, in a form and substance satisfactory to Lender:

| Site Address | Lease |
|---|---|
| 281 N. West End Blvd.<br>Quakertown, PA<br>{Store 1341} | Trainer's Corner Shopping Center Lease dated September 9, 2024, between Highland Pineville Quakertown PAD Associates, L.P., as lessor |

(b) On or before December 31, 2025, Borrower shall deliver to Lender evidence satisfactory to Lender that the articles of organization of Queso Time TPA4 LLC have been amended to reflect member management by the current members.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Each Credit Party acknowledges and agrees that the representations and warranties in this Article are a material consideration to Lender; that Lender is relying on their correctness and completeness in entering into this

Modification; and that these representations and warranties are true and accurate as of the date hereof, will be true and accurate as of Closing, as if made at Closing, and will survive the Closing regardless of any investigation or inspection by Lender. Accordingly, Borrower and each other Credit Party represent and warrant to Lender:

4.1 Representations and Warranties Continue. In connection with this Modification and for purposes of making the representations and warranties in this Section, each Credit Party has reviewed each of the representations and warranties of such Credit Party in the Loan Documents. All such representations and warranties (taking this Modification into account), are complete and correct as of the date hereof, will continue to be complete and correct as of the Closing, and will survive the Closing.

4.2 No Defaults; No Material Adverse Effects. No Credit Party is in Default under any of the Loan Documents. There has been no change in the financial condition of any Credit Party from the most recent financial statement received by Lender from or on behalf of such Credit Party that would constitute a Material Adverse Effect.

4.3 Due Authorization, Execution and Delivery; Validity. The execution, delivery, and performance by each Credit Party of this Modification and the other Loan Documents to be executed by such Credit Party in connection herewith (collectively, with this Modification, the "***Modification Documents***") have been duly authorized by each Credit Party, and such Modification Documents have been duly executed and delivered on behalf of each such Credit Party. The individual(s) executing the Modification Documents on behalf of each Credit Party have been duly authorized to do so in accordance with resolutions duly adopted by such Credit Party's board of directors (or similar governing body), members, or partners, as the case may be. All of Borrower's organizational documents, and the certificates of Borrower regarding its organizational documents, authority and authorized officers, managers or members, previously delivered to Lender remain in full force and effect, have not been amended, supplemented or rescinded and may be relied upon in connection with the Modification Documents. The Modification Documents constitute the legal, valid and binding obligations of each Credit Party executing such Modification Documents, enforceable against such Credit Party in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally, and general principles of equity.

4.4 No Duress. Each Credit Party has executed those Modification Documents to which it is a party as a free and voluntary act, without duress, coercion or undue influence exerted by or on behalf of Lender or any other Person.

4.5 Solvency. Both before and after giving effect to consummation of the transactions contemplated by this Modification, the Credit Parties taken together, and Borrower, individually, are Solvent.

4.6 Commercial Nature of Loans. The purpose of each Loan is a commercial business purpose and not a personal, family, or household purpose. No portion of the Collateral is being or will be used by any Credit Party or any other Person for any personal, family or household purposes.

4.7 Beneficial Ownership Certification. As of the Closing Date, the information included in each Beneficial Ownership Certification is true and correct in all respects.

## ARTICLE 5
## CREDIT PARTY RATIFICATIONS, CONSENTS, AND RELEASES

5.1 Ratifications. The Loan Documents are ratified and affirmed by Borrower and remain in full force and effect. Lender's Liens in the Collateral shall continue in full force and effect and no Collateral is or shall be released from such Liens. Nothing contained in any Modification Document shall constitute a waiver of any rights or remedies of Lender under the Loan Documents. Guarantor consents and agrees to the terms and conditions of the Modification Documents; and agrees that, notwithstanding this Modification and consummation of the transactions contemplated hereby (including the release of any Collateral), the Guaranty and all of Guarantor's covenants, obligations, agreements, waivers, and liabilities set forth in the Guaranty continue in full force and effect in accordance with their terms, modified only if and to the extent that the guaranteed obligations are modified by the Modification Documents.

5.2 Release. Each Credit Party forever releases, waives, and discharges Lender, its Affiliates, their predecessors, successors, and assigns, and each of their respective officers, directors, shareholders, employees, agents, representatives, and consultants (each, a "***Released Party***") from any and all claims, actions, investigations, demands, damages, and expenses, of whatever kind or nature and however characterized, at law, in equity, or otherwise, that any Credit Party has or may have against any Released Party, known or unknown, foreseen or unforeseen, now existing or arising in the future, based in whole or in part on facts (whether or not now known), existing on or before the date hereof, that relate to or arise out of this Modification, any other Loan Document, the transactions contemplated thereby, or any acts or omissions in connection therewith. Each Credit Party agrees not to assert any claim, sue, or otherwise institute any court or other legal proceeding against any Released Party that is covered by the releases set forth herein. **FURTHER, EACH CREDIT PARTY EXPRESSLY WAIVES ANY PROVISION OF APPLICABLE LAW TO THE EFFECT THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WITH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN SUCH PARTY'S FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY SUCH PARTY, MUST HAVE MATERIALLY AFFECTED SUCH PARTY'S AGREEMENT WITH THE RELEASED PARTIES**.

## ARTICLE 6
## CONDITIONS PRECEDENT; CLOSING

6.1 Closing Conditions Precedent. The obligations of Lender to consummate the transactions contemplated by this Modification are subject to the satisfaction of each of the conditions precedent in this Section and any other conditions precedent to Closing set forth in this Modification (collectively, the "***Closing Conditions***"), in Lender's sole discretion, unless Lender, in its sole discretion, waives satisfaction of a particular Closing Condition in writing.

(a) Documents. Lender shall have received this Modification and such other documents and instruments as are contemplated hereby, including a Borrower authorization, in each case duly executed and, where appropriate, acknowledged, by the Credit Parties and in form and substance satisfactory to Lender.

(b) No Default; Representations. Both before and after giving effect to the Closing, there shall be no Default under the Loan Documents, and each representation and warranty made by Borrower and each other Credit Party pursuant to the Loan Documents shall be true and correct in all material respects.

(c) Absence of Material Adverse Effects. Lender shall have determined that no Material Adverse Effect has occurred since the original funding of the Loan.

(d) Good Standing; Authority. If requested by Lender, Borrower shall have provided Lender with evidence that Borrower and each other entity Credit Party is in good standing under the laws of their state of formation and in each state in which any Collateral is located and that the Persons executing this Modification and the other documents or instruments contemplated hereby, other than Lender, are duly authorized to do so.

(e) Evidence that Existing Debt Paid. Evidence that all outstanding financing, indebtedness owed to any of Borrower's shareholders, members, partners, or principals and all other indebtedness owed to any third party, excluding indebtedness held by Lender or its affiliates, has been paid in full.

(f) Liens. Lender shall have received such UCC search results and other reports as Lender shall reasonably require granting to Lender a first priority Lien on all Collateral and evidencing the continuing first priority of Lender's Liens in the Collateral as security for the payment and performance of all of the Obligations.

(g) Insurance. Borrower shall have provided Lender with evidence satisfactory to Lender that all insurance required by the Loan Documents is in full force and effect.

(h) Transaction Costs. Borrower shall have paid to Lender all out-of-pocket costs and expenses then incurred by or on behalf of Lender in connection with this Modification, Lender's underwriting

and closing due diligence with respect to this Modification, and the negotiation, documentation, and closing of this Modification, including in connection with Lender's evaluation of and determinations with respect to, the Closing Conditions (collectively, "***Transaction Costs***"). Transaction Costs include the following, as applicable: (i) Lender's outside legal counsel fees; (ii) expenses for UCC search reports, litigation and similar searches; (iii) escrow, recording, and filing fees; and (iv) costs and fees of consultants and other professional advisers retained by Lender.

(i) Fees and Expenses. Borrower shall have paid to Lender any outstanding and unpaid fees and costs then due from Borrower pursuant to any of the Loan Documents.

(j) Franchise Agreements. Borrower shall have provided to Lender fully executed, complete copies of the Franchise Agreements for all New Collateral, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

(k) Leases. Borrower shall have provided to Lender fully executed, complete copies of the Leases for all New Collateral, which Leases shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, status certificates, and consents with respect to such agreements as Lender may require.

(l) Beneficial Ownership Certificate. At least five days prior to the Closing Date, with respect to any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, Borrower shall have delivered to Lender a Beneficial Ownership Certification in relation to such Borrower.

6.2 Closing. The closing (the "***Closing***") of this Modification and the transactions contemplated hereby will occur within three Business Days following satisfaction (or waiver by Lender) of each of the Closing Conditions. The date on which Closing occurs is the "***Closing Date***." Borrower hereby authorizes Lender to insert the Closing Date on the first page hereof, as the date hereof, and in the various Loan Documents executed in connection herewith, as the date thereof. Closing must occur on or before 11:00 o'clock a.m. local time in Greenwood Village, Colorado, on November 13, 2025 (the "***Closing Deadline***"). If Closing has not occurred by the Closing Deadline, Lender shall have absolutely no obligation whatsoever to consummate this Modification and the transactions contemplated hereby. Lender may extend the Closing Deadline in Lender's sole discretion. Any extension of the Closing Deadline must be in writing to be valid.

## ARTICLE 7
## ADDITIONAL PROVISIONS

Any other provisions of the Loan Documents to the contrary notwithstanding:

7.1 Governing Law. **THE LAWS OF THE STATE IDENTIFIED IN THE LOAN DOCUMENTS, OTHER THAN THIS MODIFICATION, SHALL, SUBJECT TO ANY LIMITATIONS IN SUCH LOAN DOCUMENTS, GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS MODIFICATION, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT**.

7.2 Time of the Essence. Time is of the essence in this Modification.

7.3 Binding Effect; Conflicts. This Modification shall be binding upon and inure to the benefit of Lender, each Credit Party, and their respective successors, assigns, heirs and personal representatives. If there are conflicts between the terms of this Modification and the terms of any other Loan Document, the provisions hereof shall control.

7.4 Construction. This Modification and the other Loan Documents shall be interpreted and construed in a fair and impartial manner without regard to such factors as which party prepared the document, the relative bargaining powers of the parties or a party's domicile, but shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties.

7.5 Document Execution. This Modification and the other Loan Documents may be executed in any number of counterparts and by different parties in separate counterparts, each of which, when so executed, shall be deemed an original and all of which, taken together, shall constitute one integrated agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.

7.6 Course of Dealing; Further Assurances. No course of dealing between any Credit Party or Affiliate of a Credit Party, and Lender shall be effective to amend, modify or discharge any provision of the Loan Documents. Each Credit Party shall execute, acknowledge (as appropriate) and deliver to Lender such additional agreements, documents and instruments as Lender reasonably requires to carry out the intent of this Modification.

7.7 Credit Party Experience and Advisers; No Lender Advice. Each Credit Party represents, warrants, and covenants that (a) such Credit Party (i) **IS EXPERIENCED IN COMPLEX AND SOPHISTICATED BUSINESS MATTERS AND COMMERCIAL FINANCING TRANSACTIONS OF THE TYPE CONTEMPLATED BY THE LOAN DOCUMENTS**; (ii) **HAS HAD SUFFICIENT TIME TO CAREFULLY REVIEW THIS MODIFICATION AND THE LOAN DOCUMENTS BEING EXECUTED IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY AND CONSULT WITH SUCH INVESTMENT, TAX, LEGAL, FINANCIAL AND OTHER ADVISERS AS SUCH CREDIT PARTY HAS DEEMED APPROPRIATE**; and (iii) **HAS DETERMINED THAT THIS MODIFICATION AND SUCH OTHER LOAN DOCUMENTS COMPLETELY AND ACCURATELY REFLECT THE FINAL BUSINESS DEAL OF THE PARTIES**; and (b) **NO LENDER PARTY OR ANY EMPLOYEE, AGENT, REPRESENTATIVE, OR ADVISER OF A LENDER PARTY HAS PROVIDED ANY CREDIT PARTY WITH ANY INVESTMENT, TAX, LEGAL, OR FINANCIAL ADVICE OR ACTED AS AN ADVISOR TO ANY CREDIT PARTY WITH RESPECT TO SUCH MATTERS**.

7.8 Entire Agreement. **THIS MODIFICATION AND THE OTHER LOAN DOCUMENTS COLLECTIVELY CONSTITUTE THE FINAL EXPRESSION AND ENTIRE WRITTEN AGREEMENT OF LENDER AND THE CREDIT PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF; SUPERSEDE ALL PRIOR AND CONTEMPORANEOUS AGREEMENTS, DISCUSSIONS, AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, WRITTEN OR ORAL, INCLUDING PRIOR LETTERS OF INTEREST, PROPOSAL LETTERS, COMMITMENT LETTERS, CONFIDENTIALITY AGREEMENTS, OR OTHER AGREEMENTS, INVOLVING ANY CREDIT PARTY OR LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE, OR EFFECT; AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY ALLEGED ORAL AGREEMENT.**

[SIGNATURE PAGES FOLLOW]

Executed and effective as of the date first set forth above.

**BORROWER:**

**TIG QUESO LLC**, a Delaware limited liability company

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME DE 1 LLC**, a Delaware limited liability company,
**QUESO TIME DE 2 LLC**, a Delaware limited liability company,
**QUESO TIME DE 3 LLC**, a Delaware limited liability company,
**QUESO TIME DE 4 LLC**, a Delaware limited liability company,
**QUESO TIME DE 5 LLC**, a Delaware limited liability company, and
**QUESO TIME DE 6 LLC**, a Delaware limited liability company

By: TIG Queso DE LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**QUESO TIME TPA1 LLC**, a Florida limited liability company,
**QUESO TIME TPA2 LLC**, a Florida limited liability company,
**QUESO TIME TPA3 LLC**, a Florida limited liability company, and
**QUESO TIME TPA4 LLC**, a Florida limited liability company

By: TIG Queso FL LLC, a Delaware limited liability company, Authorized Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: Manisha Patel
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME NJ 1 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 10 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 11 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 12 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 17 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 2 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 20 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 3 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 4 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 5 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 6 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 9 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 15 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 18 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 19 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 21 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 22 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 23 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 24 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 25 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 26 LLC**, a New Jersey limited liability company,
**QUESO TIME NJ 27 LLC**, a New Jersey limited liability company,
and **QUESO TIME NJ 28 LLC**, a New Jersey limited liability company

By: TIG Queso NJ LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: *Manisha Patel*
Manisha Patel, Authorized Member

**QUESO TIME NY 1 LLC**, a New York limited liability company,
**QUESO TIME NY 2 LLC**, a New York limited liability company,
**QUESO TIME NY 3 LLC**, a New York limited liability company,
and **QUESO TIME NY 4 LLC**, a New York limited liability company

By: TIG Queso NY LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: *Manisha Patel*
Manisha Patel, Authorized Member

**BORROWER (con't):**

**QUESO TIME PA 1 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 10 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 11 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 2 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 3 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 6 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 7 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 8 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 9 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 12 LLC**, a Pennsylvania limited liability company,
**QUESO TIME PA 13 LLC**, a Pennsylvania limited liability company,
and **QUESO TIME PA 4 LLC**, a Pennsylvania limited liability company

By: TIG Queso PA LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: TIG Queso LLC, a Delaware limited liability company, its Sole Member

By: *Manisha Patel*
Manisha Patel, Authorized Member

**TIG QUESO NY LLC**, a Delaware limited liability company,
**TIG QUESO DE LLC**, a Delaware limited liability company,
**TIG QUESO NJ LLC**, a Delaware limited liability company,
**TIG QUESO PA LLC**, a Delaware limited liability company, and
**TIG QUESO FL LLC**, a Delaware limited liability company

By: TIG Queso LLC, a Delaware limited liability company, Sole Member of each of the above Borrowers

By: *Manisha Patel*
Manisha Patel, Authorized Member

**GUARANTOR:**

*Manisha Patel*
**MANISHA PATEL**

**LENDER**:

**BANK MIDWEST**, a division of NBH Bank

By: ______________________________
Name: Steven DeLong
Title: Vice President

**EXHIBIT 1.2**
**LOAN SCHEDULE**

| **Existing Loan** | **Principal Loan Balance as of November 10, 2025*** |
|---|---|
| Term Loan A (Loan No. 1908314179-1) | $9,500,000.02 |
| DLOC A (Loan No. 1908314180-1) | $7,240,172.04 |

*The above does not reflect any amounts advanced concurrent with this Modification.

**EXHIBIT 2.3**
**NEW COLLATERAL TABLE**

At Closing, in addition to all other Collateral under the Loan Documents, the Collateral will include a first priority lien on and security interest in all of Borrower's tangible and intangible personal property located at or used in connection with the Sites identified below. The Collateral will also include first priority Mortgages on those Sites identified below as Mortgage Sites.

| Store ID No./Name | Permitted Concept | Ownership Interest (Fee or Lease) | Owner of referenced interest | Street Address | City | State | Mortgage Site (Yes/No) |
|---|---|---|---|---|---|---|---|
| 3290 | Qdoba Mexican Eats | Lease | Queso Time NJ 23 | 561 Milltown Rd | North Brunswick | NJ | No |
| 3306 | Qdoba Mexican Eats | Lease | Queso Time NJ 24 LLC | 2100 88th St Suite F3 Unit 7 | North Bergen | NJ | No |
| 3319 | Qdoba Mexican Eats | Lease | Queso Time NJ 25 LLC | 1330 Fairview Blvd, Unit G | Delran | NJ | No |
| 3312 | Qdoba Mexican Eats | Lease | Queso Time NJ 26 LLC | 2 Memorial Drive B-5 | Lodi | NJ | No |
| 3323 | Qdoba Mexican Eats | Lease | Queso Time NJ 27 LLC | 370 Rt 130 Space 13 | East Windsor | NJ | No |
| 3337 | Qdoba Mexican Eats | Lease | Queso Time NJ 28 LLC | 950 Route 17 | Ramsey | NJ | No |
| 3328 | Qdoba Mexican Eats | Lease | Queso Time TPA 4 LLC | 10019 N Dale Mabry Hwy | Tampa | FL | No |
| 3256 | Qdoba Mexican Eats | Lease | Queso Time PA 4 LLC | 14 Lightcap Road | Pottstown | PA | No |
| 3300 | Qdoba Mexican Eats | Lease | Queso Time PA 13 LLC | 6216 Hamilton Rd | Wescosville | PA | No |
| 3253 | Qdoba Mexican Eats | Lease | Queso Time DE 6 LLC | 333 Middletown Warrick Rd | Middletown | DE | No |

Case 8:26-cv-02034-MSS-CPT Document 1-7 Filed 08/26/26 Page 133 of 163

**EXHIBIT 1.1**
**COLLATERAL TABLE**

At Closing, the Collateral will include a first priority blanket lien on and security interest in all of Borrower's tangible and intangible personal property, wherever located, including all such property located at or used in connection with the Sites identified below. The Collateral will also include first priority Mortgages on those Sites identified below as Mortgage Sites.

| Store ID No./Name | Permitted Concept | Ownership Interest (Fee or Lease) | Owner of referenced interest | Street Address | City | State | Mortgage Site (Yes/No) |
|---|---|---|---|---|---|---|---|
| 2920 | Qdoba Mexican Eats | Lease | Queso Time DE4 LLC | 1211 N Dupont Hwy | Dover | DE | No |
| 1718 | Qdoba Mexican Eats | Lease | Queso Time DE 3 LLC | 58 E Main St | Newark | DE | No |
| 2960 | Qdoba Mexican Eats | Lease | Queso Time DE 1 LLC | 5609 Concord Pike | Wilmington | DE | No |
| 2986 | Qdoba Mexican Eats | Lease | Queso Time DE 2 LLC | 3230 Fashion Center Blvd | Newark | DE | No |
| 3083 | Qdoba Mexican Eats | Lease | Queso Time TPA1 LLC | 2524 S. Falkenburg Road | Tampa | FL | No |
| 3124 | Qdoba Mexican Eats | Lease | Queso Time TPA2 LLC | 17509 Preserve Walk Lane | Tampa | FL | No |
| 2633 | Qdoba Mexican Eats | Lease | Queso Time NJ 1 LLC | 561 Route 1 South | Edison | NJ | No |
| 2798 | Qdoba Mexican Eats | Lease | Queso Time NJ 2 LLC | 55 Rockafeller Rd | Piscataway | NJ | No |
| 2924 | Qdoba Mexican Eats | Lease | Queso Time NJ 3 LLC | 770 US Route 1 N | Iselin | NJ | No |
| 2747 | Qdoba Mexican Eats | Lease | Queso Time NJ 5 LLC | 3535 US-1 Suite 179 | Princeton | NJ | No |
| 3050 | Qdoba Mexican Eats | Lease | Queso Time NJ 9 LLC | 33 U.S. Highway 9 | Manalapan | NJ | No |
| 2893 | Qdoba Mexican Eats | Lease | Queso Time NJ 10 LLC | 26-31 Rt. 208 | Fair Lawn | NJ | No |
| 2963 | Qdoba Mexican Eats | Lease | Queso Time NJ 11 LLC | 64 Halsey St | Newark | NJ | No |
| 2779 | Qdoba Mexican Eats | Lease | Queso Time NJ 12 LLC | 2268 Us Highway 22 E | Union | NJ | No |
| 3127 | Qdoba Mexican Eats | Lease | Queso Time NJ 17 LLC | 393 Route 17 South | Paramus | NJ | No |
| 2716 | Qdoba Mexican Eats | Lease | Queso Time NJ 6 LLC | 905 Bayonne Crossing Way | Bayonne | NJ | No |
| 2566 | Qdoba Mexican Eats | Lease | Queso Time NJ 4 LLC | 1630 Kings Hwy | Cherry Hill | NJ | No |
| 3251 | Qdoba Mexican Eats | Lease | Queso Time NJ 20 LLC | 604 Bartholomew Rd | Piscataway | NJ | No |
| 2752 | Qdoba Mexican Eats | Lease | Queso Time NY 1 LLC | 2335 Richmond Ave | Staten Island | NY | No |
| 2863 | Qdoba Mexican Eats | Lease | Queso Time NY 2 LLC | 7001 Amboy Rd | Staten Island | NY | No |

| Store ID No./Name | Permitted Concept | Ownership Interest (Fee or Lease) | Owner of referenced interest | Street Address | City | State | Mortgage Site (Yes/No) |
|---|---|---|---|---|---|---|---|
| 2989 | Qdoba Mexican Eats | Lease | Queso Time NY 3 LLC | 1275 Woodrow Rd | Staten Island | NY | No |
| 3063 | Qdoba Mexican Eats | Lease | Queso Time NY 4 LLC | 2750A Hylan Blvd | Staten Island | NY | No |
| 2774 | Qdoba Mexican Eats | Lease | Queso Time PA3 LLC | 2669 Macarthur Rd | Whitehall | PA | No |
| 3000 | Qdoba Mexican Eats | Lease | Queso Time PA 1 LLC | 690 Rockhill Drive | Bensalem | PA | No |
| 2693 | Qdoba Mexican Eats | Lease | Queso Time PA 10 LLC | 500 Broad St | Collegeville | PA | No |
| 2607 | Qdoba Mexican Eats | Lease | Queso Time PA 11 LLC | 100 Welsh Rd | Horsham | PA | No |
| 3005 | Qdoba Mexican Eats | Lease | Queso Time PA 2 LLC | 2 Summit Square Shopping Center | Langhorne | PA | No |
| 2860 | Qdoba Mexican Eats | Lease | Queso Time PA 6 LLC | 1991 Sproul Rd | Broomall | PA | No |
| 2582 | Qdoba Mexican Eats | Lease | Queso Time PA 7 LLC | 1107 West Chester Pike | West Chester | PA | No |
| 2916 | Qdoba Mexican Eats | Lease | Queso Time PA 8 LLC | 200 W Ridge Pike | Conshohocken | PA | No |
| 2606 | Qdoba Mexican Eats | Lease | Queso Time PA 9 LLC | 261 Old York Rd | Jenkintown | PA | No |
| 3115 | Qdoba Mexican Eats | Lease | Queso Time NJ 15 LLC | 1951 East Edgar Road | Linden | NJ | No |
| 3252 | Qdoba Mexican Eats | Lease | Queso Time PA 12 LLC | 1570 Egypt Road | Oaks | PA | No |
| 3189 | Qdoba Mexican Eats | Lease | Queso Time TPA3 LLC | 1330 4th Street North | Saint Petersburg | FL | No |
| 3152 | Qdoba Mexican Eats | Lease | Queso Time NJ 18 LLC | 200 Mill Creek Drive, Suite 101 | Secaucus | NJ | No |
| 3213 | Qdoba Mexican Eats | Lease | Queso Time NJ 19 LLC | 1053 Route 73, Suite G | Marlton | NJ | No |
| 3214 | Qdoba Mexican Eats | Lease | Queso Time DE 5 LLC | 4435 Kirkwood Highway, Suite A | Wilmington | DE | No |
| 3268 | Qdoba Mexican Eats | Lease | Queso Time NJ 22 LLC | 3452 Broidy Road | Joint Base MDL Fort Dix Burlington | NJ | No |
| 3244 | Qdoba Mexican Eats | Lease | Queso Time NJ 21 LLC | 1070 Whitehorse-Mercerville Road, Unit 18 | Hamilton | NJ | No |
| 3290 | Qdoba Mexican Eats | Lease | Queso Time NJ 23 | 561 Milltown Rd | North Brunswick | NJ | No |
| 3306 | Qdoba Mexican Eats | Lease | Queso Time NJ 24 LLC | 2100 88th St Suite F3 Unit 7 | North Bergen | NJ | No |
| 3319 | Qdoba Mexican Eats | Lease | Queso Time NJ 25 LLC | 1330 Fairview Blvd, Unit G | Delran | NJ | No |
| 3312 | Qdoba Mexican Eats | Lease | Queso Time NJ 26 LLC | 2 Memorial Drive B-5 | Lodi | NJ | No |

| Store ID No./Name | Permitted Concept | Ownership Interest (Fee or Lease) | Owner of referenced interest | Street Address | City | State | Mortgage Site (Yes/No) |
|---|---|---|---|---|---|---|---|
| 3323 | Qdoba Mexican Eats | Lease | Queso Time NJ 27 LLC | 370 Rt 130 Space 13 | East Windsor | NJ | No |
| 3337 | Qdoba Mexican Eats | Lease | Queso Time NJ 28 LLC | 950 Route 17 | Ramsey | NJ | No |
| 3328 | Qdoba Mexican Eats | Lease | Queso Time TPA 4 LLC | 10019 N Dale Mabry Hwy | Tampa | FL | No |
| 3256 | Qdoba Mexican Eats | Lease | Queso Time PA 4 LLC | 14 Lightcap Road | Pottstown | PA | No |
| 3300 | Qdoba Mexican Eats | Lease | Queso Time PA 13 LLC | 6216 Hamilton Rd | Wescosville | PA | No |
| 3253 | Qdoba Mexican Eats | Lease | Queso Time DE 6 LLC | 333 Middletown Warrick Rd | Middletown | DE | No |

Barnes & Thornburg

3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326-1092 U.S.A.
(404) 846-1693
Fax (404) 264-4033

www.btlaw.com

Lisa Wolgast
Partner
(470) 832-7535
Lisa.Wolgast@btlaw.com

July 2, 2026

**VIA EMAIL** (jiger@tigcorp.com)
**AND FEDEX**
TIG Queso LLC *et al.*[1]
416 Ridge Avenue
Middletown, Delaware 19709
Attn: Manisha Patel

**VIA FEDEX**
Manisha Patel
406 Executive Drive
Langhorne, Pennsylvania 19047

RE: That certain Loan Agreement dated April 14, 2025, as amended by that certain Loan Assumption and First Modification Agreement dated November 13, 2025 (as amended and/or modified, the "Loan Agreement")[2] by and between Bank Midwest, a division of NBH Bank ("Lender"), and TIG Queso LLC, Queso Time DE 1 LLC, Queso Time DE 4 LLC, Queso Time DE 5 LLC, Queso Time TPA1 LLC, Queso Time TPA2 LLC, Queso Time TPA3 LLC, Queso Time NJ 1 LLC, Queso Time NJ 10 LLC, Queso Time NJ 12 LLC, Queso Time NJ 17 LLC, Queso Time NJ 2 LLC, Queso Time NJ 3 LLC, Queso Time NJ 4 LLC, Queso Time NJ 5 LLC, Queso Time NJ 6 LLC, Queso Time NJ 9 LLC, Queso Time NJ 15 LLC, Queso Time NJ 18 LLC, Queso Time NJ 19 LLC, Queso Time NJ 21 LLC, Queso Time NJ 22 LLC, Queso Time NY 1 LLC, Queso Time NY 2 LLC, Queso Time NY 3 LLC, Queso Time NY 4 LLC, Queso Time PA 1 LLC, Queso Time PA 10 LLC, Queso Time PA 11 LLC, Queso Time PA 2 LLC, Queso Time PA 3 LLC, Queso Time PA 6 LLC, Queso Time PA 7 LLC, Queso Time PA 8 LLC, Queso Time PA 9 LLC, Queso Time PA 12 LLC, TIG Queso NY LLC, TIG Queso DE LLC, TIG Queso NJ LLC, TIG Queso PA LLC, TIG Queso FL LLC, Questo Time NJ 23 LLC, Queso Time NJ 24 LLC, Queso Time NJ 25 LLC, Quest Time NJ 26 LLC, Queso Time NJ 27 LLC, Queso Time 28 LLC, Queso Time TPA4 LLC, Queso Time PA 4 LLC, Queso Time PA 13 LLC, and Queso Time DE 6 LLC (collectively, "Borrower")

---

[1] This letter is to TIG Queso LLC and the other entities defined as "Borrower" herein.
[2] Capitalized terms not defined herein shall have the meaning ascribed in the Loan Agreement.

Ms. Patel:

This firm represents Lender with respect to the above-referenced Loan Documents.

Pursuant to Section 5.6 of the Loan Agreement, Borrower agreed that no Credit Party shall agree to any amendment to the Franchise Agreement that could reasonably be expected to adversely affect the rights, privileges and remedies of Lender and agreed to provide Lender a copy of any amendments to the Franchise Agreement promptly following execution. Lender understands that Borrower entered into an agreement with Franchisor that altered payment terms. Borrower failed to provide Lender a copy of such agreement. Pursuant to Section 6.1(c), a violation of any provision of Article 5 of the Loan Agreement is an Event of Default. You are hereby advised that Borrower is in default under the Loan Agreement because Borrower entered into an amendment to the Franchise Agreement that Lender deems to reasonably adversely affect the rights, privileges and remedies of Lender and failed to provide a copy of any such agreement promptly upon execution (the "Franchise Default"). Demand is hereby made on Borrower that Borrower immediately provide Lender with a copy of all amendments, modifications and other agreements executed by Borrower and Franchisor.

Pursuant to Section 4.9 of the Loan Agreement, Borrower agreed that Borrower shall at all times occupy each Site and diligently operate its business at each Site as a Permitted Concept. Borrower closed Store 2693 in Collegeville, Pennsylvania in violation of Section 4.9. You are hereby advised that Borrower has thirty (30) days of the date that is one (1) Business Day following the date of this letter to cure the foregoing default and provide Lender with evidence of Borrower's cure.

Please be advised that, as a result of the Franchise Default a Lender reserves the right to accelerate the indebtedness and to exercise any rights and remedies available to it under the Loan Agreement, other Loan Documents, applicable law and/or equity. Please be further advised that, if Borrower fails to timely cure the above-referenced default, Lender intends to accelerate the indebtedness and reserves the right to exercise any rights and remedies available to it under the Loan Agreement, other Loan Documents, applicable law and/or equity. Lender reminds Guarantor that Guarantor is liable for all Obligations of Borrower to Lender, i.e., all amounts owed by Borrower to Lender.

Pursuant to Section 4.15 of the Loan Agreement, Lender hereby demands that Borrower and Guarantor provide the following information within fifteen (15) days of the date that is one (1) Business Day from the date of this letter:

- Current Financial Statements for Guarantor
- Current Bank and brokerage statements evidencing liquidity of Guarantor
- 13-week cash flow forecast for Borrower
- Borrower's Financial Statements for Fiscal Year 2024, Fiscal Year 2025
- TTM P4 2026 store level profit and loss statements for Borrower

Notice is hereby given that Lender intends to rely on the exact terms of the Loan Documents and demands exact compliance with all of the terms and conditions of the Loan

Documents. To the extent that Lender, in the course of performance or execution of the Loan Documents, has departed from the terms thereof, or received money under such departure, notice is hereby given of Lender's intent to rely on the exact terms thereof. Neither this notice, any discussions by Lender with Obligors or their representatives, nor acceptance of any payment by Lender constitutes (a) a waiver of any default under the Loan Documents, whether or not referred to herein or in any prior notice of default, (b) an election of remedies with respect to any such default(s) by Lender, all of which are hereby reserved, (c) a waiver, modification, relinquishment or forbearance by Lender of any rights or remedies under the Loan Documents (or at law or in equity), all of which are expressly reserved, or (d) a modification of any of the Loan Documents. Receipt or retention of any payment of any indebtedness pursuant to the Loan Documents, including without limitation the payment noted herein above, shall not be deemed to waive any rights or remedies of Lender thereunder.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender unless and until Lender and Obligors shall have reached agreement on all issues, and such agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender and Obligors.

Govern yourselves accordingly.

Sincerely,

Lisa Wolgast

cc:
**VIA EMAIL** (abelmont@bochettoandlentz.com)
**AND FEDEX**
Albert M. Belmont, III, Esq.
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, Pennsylvania 19102

Barnes & Thornburg

3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326-1092 U.S.A.
(404) 846-1693
Fax (404) 264-4033

www.btlaw.com

Lisa Wolgast
Partner
(470) 832-7535
Lisa.Wolgast@btlaw.com

July 22, 2026

**VIA EMAIL** (jiger@tigcorp.com)
**AND FEDEX**
TIG Queso LLC *et al.*[1]
416 Ridge Avenue
Middletown, Delaware 19709
Attn: Manisha Patel

**VIA FEDEX**
Manisha Patel
406 Executive Drive
Langhorne, Pennsylvania 19047

**VIA FEDEX**
Manisha Patel
400 Foxcroft Drive
Warmister, Pennsylvania 18974

RE: That certain Loan Agreement dated April 14, 2025, as amended by that certain Loan Assumption and First Modification Agreement dated November 13, 2025 (as amended and/or modified, the "Loan Agreement")[2] by and between Bank Midwest, a division of NBH Bank ("Lender"), and TIG Queso LLC, Queso Time DE 1 LLC, Queso Time DE 4 LLC, Queso Time DE 5 LLC, Queso Time TPA1 LLC, Queso Time TPA2 LLC, Queso Time TPA3 LLC, Queso Time NJ 1 LLC, Queso Time NJ 10 LLC, Queso Time NJ 12 LLC, Queso Time NJ 17 LLC, Queso Time NJ 2 LLC, Queso Time NJ 3 LLC, Queso Time NJ 4 LLC, Queso Time NJ 5 LLC, Queso Time NJ 6 LLC, Queso Time NJ 9 LLC, Queso Time NJ 15 LLC, Queso Time NJ 18 LLC, Queso Time NJ 19 LLC, Queso Time NJ 21 LLC, Queso Time NJ 22 LLC, Queso Time NY 1 LLC, Queso Time NY 2 LLC, Queso Time NY 3 LLC, Queso Time NY 4 LLC, Queso Time PA 1 LLC, Queso Time PA 10 LLC, Queso Time PA 11 LLC, Queso Time PA 2 LLC, Queso Time PA 3 LLC, Queso Time PA 6 LLC, Queso Time PA 7 LLC, Queso Time PA 8 LLC, Queso Time PA 9 LLC, Queso Time PA 12 LLC, TIG Queso NY LLC, TIG Queso DE LLC, TIG Queso NJ LLC, TIG Queso PA LLC, TIG Queso FL LLC, Questo Time NJ 23 LLC, Queso Time NJ 24 LLC, Queso Time NJ 25 LLC, Quest Time NJ 26 LLC, Queso Time NJ 27 LLC, Queso Time 28 LLC, Queso Time TPA4 LLC, Queso Time PA 4 LLC, Queso Time PA 13 LLC, and Queso Time DE 6 LLC (collectively, "Borrower")

---

[1] This letter is to TIG Queso LLC and the other entities defined as "Borrower" herein.
[2] Capitalized terms not defined herein shall have the meaning ascribed in the Loan Agreement.

Ms. Patel:

As you know, this firm represents Lender with respect to the above-referenced Loan Documents.

You were previously advised in a letter dated July 10, 2026 that Events of Default occurred under the Loan Agreement and other Loan Documents because, *inter alia*:

(A) Borrower failed to timely comply with and perform all of its obligations under each Franchise Agreement, as evidenced by the Workout Letter dated March 12, 2026 and because Borrower failed to make payments as and when due to Franchisor, including royalty, marketing, technology and rent payments due to Franchisor this week;

(B) Borrower failed to keep each Franchise Agreement in full force and effect;

(C) Borrower failed to timely comply with and perform all obligations under each Lease, and failed to provide Lender with prompt written notice of the occurrence of defaults under Leases;

(D) Borrower failed to occupy each Site and diligently operate its business at each Site as a Permitted Concept, as Borrower closed Store 2693 in Collegeville, Pennsylvania without Lender's prior written consent;

(E) Borrower failed to provide to Lender copies of Borrower's Financial Statements for Fiscal Year 2025, which are to be audited;

(F) Borrower failed to provide to Lender complete bank and brokerage statements evidencing liquidity of Guarantor;

(G) Borrower agreed to amendment(s) to the Franchise Agreement that Lender deems materially and adversely affected Lender's rights, privileges and remedies under the Loan Documents with respect to the Collateral and/or the Franchise Agreements and that materially and adversely affect the rights and privileges of franchisee thereunder;

(H) Borrower failed to provide to Lender a copy of all amendments to the Franchise Agreements following execution;

(I) Borrower entered into one or more agreements to sell or otherwise dispose of the Collateral without Lender's prior written consent;

(J) Borrower failed to make payments as and when due under the Notes.

The foregoing Events of Default occurred and are continuing.

Notice is hereby given that, as a result of the Events of Default, Lender hereby accelerates the indebtedness owed under the Note and other Loan Documents. Lender hereby demands that Borrower and Guarantor pay all amounts owed under the Note, Guaranty and other Loan Documents, which as of July 22, 2026, is as follows:

| | |
|---|---|
| Principal | $18,073,388.09 |
| Accrued Interest (non-default rate) | $170,145.80 |
| Unused Line Fee | $100.45 |
| Late Charges | $75,134.10 |
| **Total** | **$18,318,768.44** |

Please be advised that, unless (a) Borrower and Guarantor sign a forbearance agreement in form and substance acceptable to Lender, with signatures delivered by noon ET on July 23, 2026, and (b) Borrower expands the powers of the chief restructuring officer such that the CRO has the powers of a chief executive officer, with such engagement consummated by noon ET on July 23, 2026, Lender intends to file suit against Borrower and Guarantor seeking payment of the amounts owed and appointment of a receiver over Borrower. Lender reserves all rights and remedies under the Loan Documents, applicable law and equity.

Please be advised that, as a result of the Events of Default, interest is accruing at the Default Rate.

Notice is hereby given that Lender intends to rely on the exact terms of the Loan Documents and demands exact compliance with all of the terms and conditions of the Loan Documents. To the extent that Lender, in the course of performance or execution of the Loan Documents, has departed from the terms thereof, or received money under such departure, notice is hereby given of Lender’s intent to rely on the exact terms thereof. Neither this notice, any discussions by Lender with Obligors or their representatives, nor acceptance of any payment by Lender constitutes (a) a waiver of any default under the Loan Documents, whether or not referred to herein or in any prior notice of default, (b) an election of remedies with respect to any such default(s) by Lender, all of which are hereby reserved, (c) a waiver, modification, relinquishment or forbearance by Lender of any rights or remedies under the Loan Documents (or at law or in equity), all of which are expressly reserved, or (d) a modification of any of the Loan Documents. Receipt or retention of any payment of any indebtedness pursuant to the Loan Documents, including without limitation the payment noted herein above, shall not be deemed to waive any rights or remedies of Lender thereunder.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender unless and until Lender and Obligors shall have reached agreement on all issues, and such agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender and Obligors.

Case 2:26-cv-05612-GJP Document 1-9 Filed 08/04/26 Page 142 of 163

TIG Queso LLC *et al.*
July 22, 2026
Page 4

Govern yourselves accordingly.

Sincerely,

Lisa Wolgast

cc:
**VIA EMAIL** (abelmont@bochettoandlentz.com)
**AND FEDEX**
Albert M. Belmont, III, Esq.
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, Pennsylvania 19102

Albert A. Ciardi, Esq. (via email aciardi@ciardilaw.com)
Ryan Durkin, Esq. (via email rjd@rdurkinlaw.com)
Marisa Rauchway, Esq. (via email mrauchway@potomaclaw.com)
Cathy Tang, Esq. (via email Cathy.Tang@qdoba.com)
Wen Rittsteuer (via email writtsteuer@novo-advisors.com)

Barnes & Thornburg

3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326-1092 U.S.A.
(404) 846-1693
Fax (404) 264-4033

www.btlaw.com

Lisa Wolgast
Partner
(470) 832-7535
Lisa.Wolgast@btlaw.com

July 10, 2026

**VIA EMAIL** (jiger@tigcorp.com)
**AND FEDEX**
TIG Queso LLC *et al.*[1]
416 Ridge Avenue
Middletown, Delaware 19709
Attn: Manisha Patel

**VIA FEDEX**
Manisha Patel
406 Executive Drive
Langhorne, Pennsylvania 19047

**VIA FEDEX**
Manisha Patel
400 Foxcroft Drive
Warmister, Pennsylvania 18974

RE: That certain Loan Agreement dated April 14, 2025, as amended by that certain Loan Assumption and First Modification Agreement dated November 13, 2025 (as amended and/or modified, the "Loan Agreement")[2] by and between Bank Midwest, a division of NBH Bank ("Lender"), and TIG Queso LLC, Queso Time DE 1 LLC, Queso Time DE 4 LLC, Queso Time DE 5 LLC, Queso Time TPA1 LLC, Queso Time TPA2 LLC, Queso Time TPA3 LLC, Queso Time NJ 1 LLC, Queso Time NJ 10 LLC, Queso Time NJ 12 LLC, Queso Time NJ 17 LLC, Queso Time NJ 2 LLC, Queso Time NJ 3 LLC, Queso Time NJ 4 LLC, Queso Time NJ 5 LLC, Queso Time NJ 6 LLC, Queso Time NJ 9 LLC, Queso Time NJ 15 LLC, Queso Time NJ 18 LLC, Queso Time NJ 19 LLC, Queso Time NJ 21 LLC, Queso Time NJ 22 LLC, Queso Time NY 1 LLC, Queso Time NY 2 LLC, Queso Time NY 3 LLC, Queso Time NY 4 LLC, Queso Time PA 1 LLC, Queso Time PA 10 LLC, Queso Time PA 11 LLC, Queso Time PA 2 LLC, Queso Time PA 3 LLC, Queso Time PA 6 LLC, Queso Time PA 7 LLC, Queso Time PA 8 LLC, Queso Time PA 9 LLC, Queso Time PA 12 LLC, TIG Queso NY LLC, TIG Queso DE LLC, TIG Queso NJ LLC, TIG Queso PA LLC, TIG Queso FL LLC, Questo Time NJ 23 LLC, Queso Time NJ 24 LLC, Queso Time NJ 25 LLC, Quest Time NJ 26 LLC, Queso Time NJ 27 LLC, Queso Time 28 LLC, Queso Time TPA4 LLC, Queso Time PA 4 LLC, Queso Time PA 13 LLC, and Queso Time DE 6 LLC (collectively, "Borrower")

---

[1] This letter is to TIG Queso LLC and the other entities defined as "Borrower" herein.
[2] Capitalized terms not defined herein shall have the meaning ascribed in the Loan Agreement.

Ms. Patel:

As you know, this firm represents Lender with respect to the above-referenced Loan Documents. While Lender desires to work cooperatively with Borrower and Franchisor towards a sale of the Collateral that maximizes the value of the Collateral, Lender is sending this letter to provide notice to Borrower and Guarantor of Events of Default under the Loan Agreement and other Loan Documents.

The Loan Agreement requires, among other things, that:

(1) Borrower timely comply with and perform all of its obligations under each Franchise Agreement, and give Lender prompt written notice of the occurrence of any default by any Credit Party under such Franchise Agreement and of any notice of default given to any Credit Party by Franchisor (Loan Agreement, § 4.7);

(2) Borrower keep each Franchise Agreement in full force and effect such that each Franchise Agreement will not expire prior to the Credit Facilities Maturity Date (Loan Agreement, § 4.7);

(3) For each Leased Site, Borrower will timely comply with and perform all of lessee's obligations under each Lease, and will give Lender prompt written notice of the occurrence of any default by Borrower and of any notice of default given to any Credit Party by Lessor (Loan Agreement, § 4.8);

(4) Borrower shall at all times occupy each Site and diligently operate its business at each Site as the Permitted Concept (Loan Agreement, § 4.9);

(5) Within 45 days after the end of each Fiscal Quarter of Borrower, Borrower shall deliver to Lender complete Financial Statements for the Fiscal Quarter then ended (Loan Agreement, § 4.15(a)(i));

(6) Within 45 days after the end of each Fiscal Quarter of Borrower, Borrower shall deliver to Lender bank and brokerage statements evidencing liquidity of Guarantor for the Fiscal Quarter then ended (Loan Agreement, § 4.15(a)(ii));

(7) Within 120 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Borrower for the Fiscal Year then ended (Loan Agreement, § 4.15(b)(i));

(8) Within 45 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Guarantor for the Fiscal Year then ended (Loan Agreement, § 4.15(b)(ii));

(9) Within 15 days following Lender's written request, Borrower shall deliver to Lender such additional Financial Statements and information (financial or otherwise) as Lender may reasonably request (Loan Agreement, § 4.15(e));

(10) Borrower shall give prompt written notice to Lender of any action, event or condition of any nature that could reasonably be expected to have a Material Adverse Effect, or which, with notice or lapse of time or both, would constitute an event of default or default under any other instrument or agreement to which Borrower is a party (Loan Agreement, § 4.17);

(11) No Credit Party shall agree to any Franchise Agreement amendment that could reasonably be expected to materially and adversely affect the rights and privileges of franchisee thereunder or the rights, privileges, and remedies of Lender under the Loan Documents with respect to the Collateral or Franchise Agreement (Loan Agreement, § 5.6);

(12) Borrower shall send Lender a copy of all Franchise Agreement amendments promptly following execution (Loan Agreement, § 5.6); and

(13) No Credit Party shall, without the prior written consent of Lender, enter into any agreement to sell, assignment transfer or otherwise encumber or dispose of the Collateral to any Person (Loan Agreement, § 5.8).

Under the Loan Agreement, an Event of Default occurs when, among other things: (a) Borrower breaches any of the covenants contained in Article 5, or (b) any Credit Party fails to observe any of the covenants or obligations of the Loan Agreement or any of the other Loan Documents, other than those referenced in other subsections of Section 6.1, and such failure continues without being fully cured for more than 30 days following written notice to such Credit Party of such failure.

You are hereby advised that Events of Default have occurred under the Loan Agreement because, among other things:

(A) Borrower failed to timely comply with and perform all of its obligations under each Franchise Agreement, as evidenced by the Workout Letter dated March 12, 2026 and because Borrower failed to make payments as and when due to Franchisor, including royalty, marketing, technology and rent payments due to Franchisor this week;

(B) Borrower failed to keep each Franchise Agreement in full force and effect;

(C) Borrower failed to timely comply with and perform all obligations under each Lease, and failed to provide Lender with prompt written notice of the occurrence of defaults under Leases;

(D) Borrower failed to occupy each Site and diligently operate its business at each Site as a Permitted Concept, as Borrower closed Store 2693 in Collegeville, Pennsylvania without Lender's prior written consent;

(E) Borrower failed to provide to Lender copies of Borrower's Financial Statements for Fiscal Year 2025, which are to be audited;

(F) Borrower failed to provide to Lender complete bank and brokerage statements evidencing liquidity of Guarantor;

(G) Borrower agreed to amendment(s) to the Franchise Agreement that Lender deems materially and adversely affected Lender's rights, privileges and remedies under the Loan Documents with respect to the Collateral and/or the Franchise Agreements and that materially and adversely affect the rights and privileges of franchisee thereunder;

(H) Borrower failed to provide to Lender a copy of all amendments to the Franchise Agreements following execution; and

(I) Borrower entered into one or more agreements to sell or otherwise dispose of the Collateral without Lender's prior written consent.

Please be further advised that Borrower failed to make its July 1, 2026 payment as and when due. Demand is hereby made that Borrower make all payments that were due on July 1, 2026.

Please be advised that, as a result of the Events of Default, the outstanding principal balance of the Notes and Loans shall bear interest at the default rate. Please be further advised that Lender reserves the right to accelerate the indebtedness and to exercise any and all rights and remedies available to it under the Loan Agreement, other Loan Documents, applicable law and/or equity. Lender reminds Guarantor that Guarantor is liable for all Obligations of Borrower to Lender.

In addition to the documents noted above as missing and the documents requested in my correspondence, please also provide a copy of Borrower's bank statements for all bank accounts maintained by Borrower and/or relating to the Collateral and/or revenues thereof.

Notice is hereby given that Lender intends to rely on the exact terms of the Loan Documents and demands exact compliance with all of the terms and conditions of the Loan Documents. To the extent that Lender, in the course of performance or execution of the Loan Documents, has departed from the terms thereof, or received money under such departure, notice is hereby given of Lender's intent to rely on the exact terms thereof. Neither this notice, any discussions by Lender with Obligors or their representatives, nor acceptance of any payment by Lender constitutes (a) a waiver of any default under the Loan Documents, whether or not referred to herein or in any prior notice of default, (b) an election of remedies with respect to any such default(s) by Lender, all of which are hereby reserved, (c) a waiver, modification, relinquishment or forbearance by Lender of any rights or remedies under the Loan Documents (or at law or in

equity), all of which are expressly reserved, or (d) a modification of any of the Loan Documents. Receipt or retention of any payment of any indebtedness pursuant to the Loan Documents, including without limitation the payment noted herein above, shall not be deemed to waive any rights or remedies of Lender thereunder.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender unless and until Lender and Obligors shall have reached agreement on all issues, and such agreement shall have been reduced to a written document that expressly states that it modifies the Loan Documents and is duly executed by Lender and Obligors.

Govern yourselves accordingly.

Sincerely,

Lisa Wolgast

cc:
Albert M. Belmont, III, Esq. (via email abelmont@bochettoandlentz.com)
Ryan Durkin, Esq. (via email rjd@rdurkinlaw.com)
Marisa Rauchway, Esq. (via email mrauchway@potomaclaw.com)
Cathy Tang, Esq. (via email Cathy.Tang@qdoba.com)

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Bank Midwest, a division of NBH Bank

**(b)** County of Residence of First Listed Plaintiff: Colorado
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Barnes & Thornburg LLP, 3340 Peachtree Road, N.E., Suite 2900, Atlanta, Georgia 30326, (470) 832-7535

## DEFENDANTS

TIG QUESO LLC, and all Defendants listed on Exhibit A attached hereto

County of Residence of First Listed Defendant: ____________
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [X] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [X] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
28 U.S.C. § 1332, 28 and U.S.C. § 1391(b)(2)

Brief description of cause:
Suit on note and appointment of receiver

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** $18,318,768.44

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE John R. Padova DOCKET NUMBER 2:26-cv-05215

DATE: Aug 4, 2026

SIGNATURE OF ATTORNEY OF RECORD: /s/ James E. Van Horn

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

**Exhibit A**

| Defendants |
|---|
| |
| QUESO TIME DE 1 LLC |
| QUESO TIME DE 2 LLC |
| QUESO TIME DE 3 LLC |
| QUESO TIME DE 4 LLC |
| QUESO TIME DE 5 LLC |
| QUESO TIME TPA1 LLC |
| QUESO TIME TPA2 LLC |
| QUESO TIME TPA3 LLC |
| QUESO TIME NJ 1 LLC |
| QUESO TIME NJ 10 LLC |
| QUESO TIME NJ 11 LLC |
| QUESO TIME NJ 12 LLC |
| QUESO TIME NJ 17 LLC |
| QUESO TIME NJ 2 LLC |
| QUESO TIME NJ 20 LLC |
| QUESO TIME NJ 3 LLC |
| QUESO TIME NJ 4 LLC |
| QUESO TIME NJ 5 LLC |
| QUESO TIME NJ 6 LLC |
| QUESO TIME NJ 9 LLC |
| QUESO TIME NJ 15 LLC |
| QUESO TIME NJ 18 LLC |
| QUESO TIME NJ 19 LLC |
| QUESO TIME NJ 21 LLC |
| QUESO TIME NJ 22 LLC |
| QUESO TIME NY 1 LLC |
| QUESO TIME NY 2 LLC |
| QUESO TIME NY 3 LLC |
| QUESO TIME NY 4 LLC |
| QUESO TIME PA 1 LLC |
| QUESO TIME PA 10 LLC |
| QUESO TIME PA 11 LLC |
| QUESO TIME PA 2 LLC |
| QUESO TIME PA 3 LLC |
| QUESO TIME PA 6 LLC |
| QUESO TIME PA 7 LLC |
| QUESO TIME PA 8 LLC |
| QUESO TIME PA 9 LLC |
| QUESO TIME PA 12 LLC |
| TIG QUESO NY LLC |
| TIG QUESO DE LLC |

| |
|---|
| TIG QUESO NJ LLC |
| TIG QUESO PA LLC |
| TIG QUESO FL LLC |

# UNITED STATES DISTRICT COURT

for the

| | | |
|---|---|---|
| BANK MIDWEST, a division of NBH Bank<br>*Plaintiff(s)*<br>v.<br><br>TIG QUESO LLC, and all Defendants listed on Exhibit A attached hereto<br>*Defendant(s)* | ) | Civil Action No. 2:26-cv-5612 |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

James E. Van Horn
Barnes & Thornburg LLP
555 12th St NW, Suite 1200
Washington, DC 20004

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________
*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________

was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________

______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________

______________________ , a person of suitable age and discretion who resides there,

on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is

designated by law to accept service of process on behalf of *(name of organization)* ______________

______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

**Exhibit A**

| Defendants |
|---|
| |
| QUESO TIME DE 1 LLC |
| QUESO TIME DE 2 LLC |
| QUESO TIME DE 3 LLC |
| QUESO TIME DE 4 LLC |
| QUESO TIME DE 5 LLC |
| QUESO TIME TPA1 LLC |
| QUESO TIME TPA2 LLC |
| QUESO TIME TPA3 LLC |
| QUESO TIME NJ 1 LLC |
| QUESO TIME NJ 10 LLC |
| QUESO TIME NJ 11 LLC |
| QUESO TIME NJ 12 LLC |
| QUESO TIME NJ 17 LLC |
| QUESO TIME NJ 2 LLC |
| QUESO TIME NJ 20 LLC |
| QUESO TIME NJ 3 LLC |
| QUESO TIME NJ 4 LLC |
| QUESO TIME NJ 5 LLC |
| QUESO TIME NJ 6 LLC |
| QUESO TIME NJ 9 LLC |
| QUESO TIME NJ 15 LLC |
| QUESO TIME NJ 18 LLC |
| QUESO TIME NJ 19 LLC |
| QUESO TIME NJ 21 LLC |
| QUESO TIME NJ 22 LLC |
| QUESO TIME NY 1 LLC |
| QUESO TIME NY 2 LLC |
| QUESO TIME NY 3 LLC |
| QUESO TIME NY 4 LLC |
| QUESO TIME PA 1 LLC |
| QUESO TIME PA 10 LLC |
| QUESO TIME PA 11 LLC |
| QUESO TIME PA 2 LLC |
| QUESO TIME PA 3 LLC |
| QUESO TIME PA 6 LLC |
| QUESO TIME PA 7 LLC |
| QUESO TIME PA 8 LLC |
| QUESO TIME PA 9 LLC |
| QUESO TIME PA 12 LLC |
| TIG QUESO NY LLC |
| TIG QUESO DE LLC |

| |
|---|
| TIG QUESO NJ LLC |
| TIG QUESO PA LLC |
| TIG QUESO FL LLC |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Bank Midwest, a division of NBH Bank

Plaintiff,

v. Civil Action No. 2:26-cv-5612

TIG QUESO LLC, and all Defendants listed on Exhibit A attached hereto

Defendant.

**DISCLOSURE OF CITIZENSHIP IN DIVERSITY JURISDICTION CASES**

Pursuant to Federal Rule of Civil Procedure 7.1(a)(2) where jurisdiction is based on diversity of citizenship, all parties or intervenors in the case must, unless the Court orders otherwise, name and identify the citizenship of every individual or entity whose citizenship is attributable to that party or intervenor.

Parties and intervenors are reminded that the citizenship of a limited liability company, professional corporation, limited partnership, partnership, and unincorporated association is determined by the citizenship of all its members or partners.

| (Party/Intervenor) | (Citizenship) |
| --- | --- |
| Bank Midwest, a division of NBH Bank | Colorado |
| See Exhibit B | See Exhibit B |
| | |

8/4/2026
Date

/s/ James E. Van Horn
Signature of Attorney or Litigant
Counsel for Plaintiff

*Note: This form must be filed in CM/ECF using your pacer account. Please select the "Other Documents" category, then select the Disclosure of Citizenship event. Pro Se Litigants can file using the court's Electronic Document Submission (EDS) | Eastern District of Pennsylvania | United States District Court (uscourts.gov), by mail or in person.

**Exhibit A**

| Defendants |
|---|
| |
| QUESO TIME DE 1 LLC |
| QUESO TIME DE 2 LLC |
| QUESO TIME DE 3 LLC |
| QUESO TIME DE 4 LLC |
| QUESO TIME DE 5 LLC |
| QUESO TIME TPA1 LLC |
| QUESO TIME TPA2 LLC |
| QUESO TIME TPA3 LLC |
| QUESO TIME NJ 1 LLC |
| QUESO TIME NJ 10 LLC |
| QUESO TIME NJ 11 LLC |
| QUESO TIME NJ 12 LLC |
| QUESO TIME NJ 17 LLC |
| QUESO TIME NJ 2 LLC |
| QUESO TIME NJ 20 LLC |
| QUESO TIME NJ 3 LLC |
| QUESO TIME NJ 4 LLC |
| QUESO TIME NJ 5 LLC |
| QUESO TIME NJ 6 LLC |
| QUESO TIME NJ 9 LLC |
| QUESO TIME NJ 15 LLC |
| QUESO TIME NJ 18 LLC |
| QUESO TIME NJ 19 LLC |
| QUESO TIME NJ 21 LLC |
| QUESO TIME NJ 22 LLC |
| QUESO TIME NY 1 LLC |
| QUESO TIME NY 2 LLC |
| QUESO TIME NY 3 LLC |
| QUESO TIME NY 4 LLC |
| QUESO TIME PA 1 LLC |
| QUESO TIME PA 10 LLC |
| QUESO TIME PA 11 LLC |
| QUESO TIME PA 2 LLC |
| QUESO TIME PA 3 LLC |
| QUESO TIME PA 6 LLC |
| QUESO TIME PA 7 LLC |
| QUESO TIME PA 8 LLC |
| QUESO TIME PA 9 LLC |
| QUESO TIME PA 12 LLC |
| TIG QUESO NY LLC |
| TIG QUESO DE LLC |

Case 2:26-cv-05612 Document 1 Filed 03/04/26 Page 153 of 5

| |
|---|
| TIG QUESO NJ LLC |
| TIG QUESO PA LLC |
| TIG QUESO FL LLC |

**Exhibit B**

| Party | Citizenship |
|---|---|
| TIG QUESO LLC | Pennsylvania |
| QUESO TIME DE 1 LLC | Pennsylvania |
| QUESO TIME DE 2 LLC | Pennsylvania |
| QUESO TIME DE 3 LLC | Pennsylvania |
| QUESO TIME DE 4 LLC | Pennsylvania |
| QUESO TIME DE 5 LLC | Pennsylvania |
| QUESO TIME TPA1 LLC | Pennsylvania |
| QUESO TIME TPA2 LLC | Pennsylvania |
| QUESO TIME TPA3 LLC | Pennsylvania |
| QUESO TIME NJ 1 LLC | Pennsylvania |
| QUESO TIME NJ 10 LLC | Pennsylvania |
| QUESO TIME NJ 11 LLC | Pennsylvania |
| QUESO TIME NJ 12 LLC | Pennsylvania |
| QUESO TIME NJ 17 LLC | Pennsylvania |
| QUESO TIME NJ 2 LLC | Pennsylvania |
| QUESO TIME NJ 20 LLC | Pennsylvania |
| QUESO TIME NJ 3 LLC | Pennsylvania |
| QUESO TIME NJ 4 LLC | Pennsylvania |
| QUESO TIME NJ 5 LLC | Pennsylvania |
| QUESO TIME NJ 6 LLC | Pennsylvania |
| QUESO TIME NJ 9 LLC | Pennsylvania |
| QUESO TIME NJ 15 LLC | Pennsylvania |
| QUESO TIME NJ 18 LLC | Pennsylvania |
| QUESO TIME NJ 19 LLC | Pennsylvania |
| QUESO TIME NJ 21 LLC | Pennsylvania |
| QUESO TIME NJ 22 LLC | Pennsylvania |
| QUESO TIME NY 1 LLC | Pennsylvania |
| QUESO TIME NY 2 LLC | Pennsylvania |
| QUESO TIME NY 3 LLC | Pennsylvania |
| QUESO TIME NY 4 LLC | Pennsylvania |
| QUESO TIME PA 1 LLC | Pennsylvania |
| QUESO TIME PA 10 LLC | Pennsylvania |
| QUESO TIME PA 11 LLC | Pennsylvania |
| QUESO TIME PA 2 LLC | Pennsylvania |
| QUESO TIME PA 3 LLC | Pennsylvania |
| QUESO TIME PA 6 LLC | Pennsylvania |
| QUESO TIME PA 7 LLC | Pennsylvania |
| QUESO TIME PA 8 LLC | Pennsylvania |
| QUESO TIME PA 9 LLC | Pennsylvania |
| QUESO TIME PA 12 LLC | Pennsylvania |
| TIG QUESO NY LLC | Pennsylvania |
| TIG QUESO DE LLC | Pennsylvania |

| | |
|---|---|
| TIG QUESO NJ LLC | Pennsylvania |
| TIG QUESO PA LLC | Pennsylvania |
| TIG QUESO FL LLC | Pennsylvania |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Denver, Colorado

***RELATED CASE IF ANY:*** Case Number: 2:26-cv-05215 Judge: John R. Padova

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case [x] **is** / ☐ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

*A. Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief ***see certification below***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:________________

**B.** ***Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury (*Please specify*):________________
- ☐ 7. Products Liability
- [xx] 8. All Other Diversity Cases: *(Please specify)*________________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☐ **does not** have implications beyond the parties before the court and ☐ **does** / [xx] **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

[xx] Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

## Complaints and Other Initiating Documents

2:26-cv-05612 BANK MIDWEST, a division of NBH Bank v. TIG QUESO LLC et al

**United States District Court**

**Eastern District of Pennsylvania**

### Notice of Electronic Filing

The following transaction was entered by Van Horn, James on 8/6/2026 at 10:28 PM EDT and filed on 8/6/2026

**Case Name:** BANK MIDWEST, a division of NBH Bank v. TIG QUESO LLC et al
**Case Number:** 2:26-cv-05612
**Filer:** BANK MIDWEST, a division of NBH Bank
**Document Number:** 1

**Docket Text:**
**COMPLAINT *(VERIFIED)* against All Defendants ( Filing fee $ 405 receipt number APAEDC-19524568.), filed by BANK MIDWEST, a division of NBH Bank. (Attachments: # (1) Verification, # (2) Exhibit A - Term Loan Agreement, # (3) Exhibit B - DLOC A Note, # (4) Exhibit C - Loan Agreement, # (5) Exhibit D - Security Agreement, # (6) Exhibit E - Guaranty, # (7) Exhibit F - Loan Assumption and First Modification Agreement, # (8) Exhibit G - July 2, 2026 - Queso Cure Letter, # (9) Exhibit H - July 22, 2026 - Queso Default and Acceleration Letter, # (10) Exhibit I - July 10, 2026 - Queso Default Letter, # (11) Civil Cover Sheet, # (12) Summons, # (13) Disclosure of Citizenship in Diversity Jurisdiction Cases, # (14) Designation Form)(Van Horn, James)**

**2:26-cv-05612 Notice has been electronically mailed to:**

James Van Horn jvanhorn@btlaw.com

**2:26-cv-05612 Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-0
] [69926cf65302d281ef5af7347af477811a832b5999f1fe36ce8a2b5691e039bee29
367ff1e321f7ee89618e99df45c13f8ee4aa2ac2fc12e1ffc833af7cc73c8]]
**Document description:** Verification
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-1
] [b1a7cfe2df82cb6bf3b8565affb5d81a9fc29c84171fb3bbfc92d00da99c3705637
10a5d278e1b2859308768edce2f7d4ae36c2e5fd488e664060593350913bb]]
**Document description:**Exhibit A - Term Loan Agreement
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-2
] [78c41820bb1ded3f933bcae15cde5d0cbca6429d344c48043d162e5cdae44302ff4
d9786842d7346da3d4df2912bcd7413589b75d5c801a6db0b7a8dbabdb7b3]]
**Document description:**Exhibit B - DLOC A Note
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-3
] [b6a5d63c106d71c4df3e8ccdfc8d8c0341df39e135263992fcf121c2ac1e3531101
b2ebfac43725e23c57df3fb59b525ea948d0471df9e6db5dd1d06cbea65bc]]
**Document description:**Exhibit C - Loan Agreement
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-4
] [22498aa750d266ed85ff8aac7f01993a5e5ba158b98a108d2deee539a7a56566f2b
299e6b073e1e7953d104a6ca755e91591ae2b3c6ecca2e63e7ae972e4b35b]]
**Document description:**Exhibit D - Security Agreement
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-5
] [03a0edb88853b7691088602b15d84df37ae90ac38c0594c16b5fce603d7d0413023
4cbf507b797920704653798c3ffdb0ed463dc051af49067d67281076579e2]]
**Document description:**Exhibit E - Guaranty
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-6
] [693a75f30f18bb020bc144046be05f44b0971decf4790623a561b10f7187ecf985b
0efd25aa182bb2dd3dba4645cd43f413bfaca1fa803a9fc9d88c55732b9ba]]
**Document description:**Exhibit F - Loan Assumption and First Modification Agreement
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-7
] [af4ea7b1422404c9e6618e6b5c7b4362147af889890c717566ae4e9d7ec7ebcb385
23797f293de00f1cde526aff8e518011f3fdc17a51e56582ac73529ba0766]]
**Document description:**Exhibit G - July 2, 2026 - Queso Cure Letter
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-8
] [88848dd8986ff1ff21d8022edc73b06f941128052f0ec51ebb774b45543158bb234
096dbdc511930e0a4476b45e387afb124df04bebf91f375a72137f54aae66]]
**Document description:**Exhibit H - July 22, 2026 - Queso Default and Acceleration Letter
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-9
] [8320bb0e87d6bc10ef2f3569e725cc1ff226283ebcdff187a5a0aecd3fb954d8a79
9454bab304237ba5306a57a983adb78b211b8cd22b884f964f38c4c30e05e]]
**Document description:**Exhibit I - July 10, 2026 - Queso Default Letter
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-1
0] [b064cb37fc133983c8a3b530af05c2d2274fe29ab5c88ceabf52724bed285086aa
aba29a9c84747b816c394355cd6dab288efe10f2c25de24cc5a76f6308d98a]]
**Document description:**Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-1
1] [4eb07e5a2a27dc927618f3dc4d974a0fe0b97e724260247ef11c7974615f0774c5
e9b419a7f37751a813b8fccf68bc31329868270c0409f510c891f23bb540e6]]
**Document description:** Summons
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-12] [8c81f153bf4836b3bc8e5856e029b213c0cf3856396a97d41648f0272d69923af37ccc784e86fe922554768164bdc04324673d195a8f54364191df7fc2b4451a]]

**Document description:** Disclosure of Citizenship in Diversity Jurisdiction Cases

**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-13] [6d5ec485f8346e50e811262dc919c42535431acda7a4d6f6311e7d44808615750ac24484eeebc6eba7039612c6f823f28f82d773573c84801b800e81d5855e33]]

**Document description:**Designation Form

**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1001600548 [Date=8/6/2026] [FileNumber=21319732-14] [94ac0d75c068dc2acb96face534b2f202e74e5edc7550bd5189ba0189a25783f65597793db8208c5a73e8292f857be143d84bc1b60bcc154c95bfbafe2a8a328]]